# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

B. B. CRAIG,               )
  8956 Cross Chase Circle      )
  Lorton, VA 22079,         )
                       )
      **Plaintiff,**         )
                       )
      v.                 )     **Civ. Action No. 14-1340**
                       )
JACOB LEW,            )
  Secretary of the Treasury    )
  1500 Pennsylvania Avenue, NW  )
  Washington, D.C. 20220,    )
                       )
      **Defendant.**        )
                       )

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.)     B. B. Craig, an African American male and the plaintiff in this action, is an accomplished senior management official who, until his involuntary reassignment, was the SES Associate Director of Sales and Marketing ("SAM") of the U.S. Mint ("the Mint"). The organization Mr. Craig headed since November of 2008 is responsible for $500 million in sales of collector quality coins and investment grade gold bullion and had 80 subordinates including a deputy. Before joining the Mint, Mr. Craig was a member of senior management at Dell, where he headed organizations with up to 800 employees that produced $10 billion in revenue.

2.)     On October 26, 2012, Mr. Craig filed an informal EEO complaint. In short order, the management officials identified in Mr. Craig's complaint removed him as Associate Director of SAM, reassigned him to a non-existent position, and replaced Mr. Craig on an acting basis with a markedly less qualified Caucasian male who had not engaged in protected EEO activity.

3.)     Since being removed as Associate Director of SAM, Mr. Craig has not been given a position description; any supervisory responsibilities; any assignments commensurate with his background, experience, and membership in the SES; or any recurrent duties and responsibilities.

4.)     Mr. Craig originally applied to the Mint in March of 2008 for the SES position of Associate Director of Manufacturing, before becoming Associate Director of SAM that November.  Based on his application, Mr. Craig was rated among the best qualified candidates and referred for a panel interview on June 19, 2008.  That panel referred Mr. Craig for selection to Andrew Brunhart, who in turn interviewed Mr. Craig on July 19, 2008.

5.)     In late August or early September of 2008, Mr. Brunhart telephoned Mr. Craig unsolicited and informed Mr. Craig that he was not selected because the interview panel had recommended a different candidate.  At that time, Mr. Craig had no affiliation or professional experience with the Mint and therefore no reason to suspect that Mr. Brunhart deceived him about the selectee having been recommended instead of him or any reason to doubt the legitimacy of the selection process.

6.)     Mr. Brunhart, in this manner, fraudulently concealed his true reasons for not selecting Mr. Craig and that Mr. Craig had been the victim of discrimination.  It was not until July 12, 2013, while participating in the Mint's administrative EEO process over his removal as Director of SAM and his FY 2012 appraisal, that one of the members of the interview panel for the Associate Director of Manufacturing, Jerry Horton, advised Mr. Craig that he was the highest rated candidate for the position and the panel's recommendation to Mr. Brunhart.

7.)     Mr. Horton encouraged Mr. Craig to confirm his account of the selection process with Gloria Eskridge, who had been Mr. Craig's predecessor as Associate Director of SAM.  When Mr. Craig contacted Ms. Eskridge, she too stated that the panel recommended him to Mr.

Brunhart and not the selectee, Mr. Peterson, who is currently Deputy Director of the Mint.  Ms. Eskridge also informed Mr. Craig that she had been on the interview considering Mr. Peterson for two openings as two plant managers, a significantly lower position than Associate Director of Manufacturing of the Mint, and that Mr. Peterson was not selected because he interviewed poorly and his written application materials were not better.  During the EEO investigative process, Ms. Eskridge also came forward with the fact that she had not seen another instance where a selecting official did not follow the recommendation of an interview panel in making a selection.

8.)     This case seeks redress for defendant's discrimination and retaliation Mr. Craig in removing him as Associate Director of SAM, reassigning him to a make work non-supervisory position effective January of 2013 and failing to give Mr. Craig meaningful duties and responsibilities in a properly established supervisory position since that time; giving Mr. Craig an undeservedly low performance appraisal for FY 2012, and not selecting Mr. Craig when he first applied to the Mint to be Associate Director for Manufacturing.  It arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §§2000e-2, e-3), and by way of relief seeks:  a.) a declaration that defendant violated Mr. Craig's civil rights and an injunction to prevent further violations; b.) restoration of Mr. Craig to an established position as an Associate Director that is commensurate with his background, experience, and accomplishments; c.) record correction including, but not limited to, expungement of Mr. Craig's FY 2012 performance appraisal and his removal as Associate Director of SAM; d.) backpay in the amount of the difference of a performance based bonus at the Exceeds Expectations for FY 2012 and a Fully Successful bonus and the difference between the salary of the Associate Director for Manufacturing and Associate Director of Sales and Marketing; and e.) compensatory damages.

Mr. Craig also seeks an award of the attorneys' fees and costs incurred in the prosecution of this action and in the administrative EEO complaints processes that preceded it.

**Parties, Jurisdiction, And Venue**

9.)     Plaintiff B. B. Craig is an African American male who engaged in protected EEO activity beginning in October of 2012.  At all relevant times, Mr. Craig was employed by the U.S. Mint.  Mr. Craig resides at the address recited in the caption of this Complaint.

10.)     Defendant Jacob J. Lew is the Secretary of Treasury, the Cabinet official who heads the Department of Treasury and is sued in his official capacity only.  The Department of Treasury is in the Executive Branch of the federal government, the mission of which includes promoting economic growth through financial and fiscal policies to support job creation, investment, and economic stability.  The U.S. Mint is a component of the Department of Treasury.  Among other things, the U.S. Mint is the world's largest manufacturer of coins, medals and numismatic products, and has responsibility for the U.S. Bullion Depository at Fort Knox, Kentucky.

11.)     Jurisdiction of this Court is based upon 28 U.S.C. §1332; and 42 U.S.C. §2000e-16 (incorporating 42 U.S.C. §2000e2, 3, 5(c)).  The discriminatory and retaliatory actions that are at issue were all taken by or at the direction of the Treasurer of the United States, the Deputy Director of the Mint, and/or the Chief Administrator of the U.S. Mint from their duty stations in the Mint Headquarters in Washington, D.C.  Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because the discriminatory and retaliatory actions of defendant at issue occurred in this judicial district where plaintiff is and would have been employed but for defendant's unlawful actions.

**Statement Of The Case**

**Background And Service As Associate Director Sales and Marketing**

12.)     Mr. Craig began work in the U.S. Mint on November 12, 2008, after being competitively selected for the position of Associate Director of Sales and Marketing ("SAM"). The position is in the federal Senior Executive Service and Mr. Craig held it until December of 2012, when he was removed as SAM Associate Director, reassigned to a non-existent position, and replaced with a demonstrably less qualified Caucasian male who, unlike Mr. Craig, had not previously engaged in protected EEO activity.  In that position, Mr. Craig answered directly to the Deputy Director of the Mint and his second line supervisor was the Director of the Mint.

13.)     As Associate Director of SAM, Mr. Craig was responsible for heading the organization in the U.S. Mint responsible for the marketing and sale of collector quality U.S. coins and sale of gold bullion to investors.  The market for these sales is approximately $500 million annually.

14.)     Mr. Craig had, among his direct reports, a GS-15 Deputy Associate Director; a GS-15 Senior Adviser; and a GS-14 Program Manager .

15.)     Four separate program Divisions each headed by GS-15 Division Directors reported to Mr. Craig through his Deputy; the Business Management Division, the Brand Management Division; the Customer Operations Division; and the External Relations Division.  . In total, Mr. Craig had approximately 94 ("FTE's") allotted to SAM.  Approximately 100 additional contract employees were also assigned to the SAM call center, which was also under Mr. Craig's jurisdiction as Associate Director of SAM.

16.)     SAM itself was responsible for the development and design of a variety of marketing media, promotion, sales and services of a wide variety of numismatic collectibles,

among them American Eagle Silver Dollar, the American Buffalo Silver Dollar, and the Native American Silver Dollar.

17.)    As Associate Director of SAM, Mr. Craig was responsible for leading the development, administration, operations, and evaluations of United States Mint-wide marketing programs, plans, policies, strategies, research, processes, and procedures; implementing marketing plans; developing pricing; developing forecasts; evaluating the success of marketing programs and strategies; developing and conducting marketing research and surveys; evaluating outcomes related to United States Mint programs; exploring and developing new markets and products; directing the management of United States Mint exhibits, sales areas, public sales activities, and sales operations such as consignment, bulk, and potential international sales; and coordinating and providing customer services to purchasers of Mint products and services.

18.)    To be selected as Associate Director of SAM, Mr. Craig had to meet stringent Special Qualification Requirements because as the incumbent, Mr. Craig would have to have the stature to permit him to be a recognized leader in his field and to speak with and act with the full authority of the Mint in public meetings and private conferences with senior officials of the Department of Treasury and top level Mint management; technical, and administrative personnel of a large number of agencies of the federal government and international governments as well; and make public appearances as an ambassador at large for the Mint.

19.)    In this position, Mr. Craig was frequently called upon to travel around the country and represent the Mint at ceremonial numismatic launches.  In 2011 and 2012 alone, Mr. Craig traveled to Gettysburg National Military Part, Gettysburg, Pennsylvania; Native America Coin Ceremony at Plymouth, Massachusetts; Glacier National Park coin ceremony, Montana; Olympia National Park, Washington; Chickasaw National Recreation Center in Sulphur, Oklahoma;

Acadia National Park, Bar Harbor, Maine; and Ft. Benning, Georgia.  In each of these ceremonies and others, Mr. Craig had significant opportunity for public exposure with senior officials of the federal government and high level executives of the honoree organizations.

20.)    Mr. Craig qualified to be Associate Director of SAM because of his strong educational background and demonstrated track record of executive accomplishment and leadership.

21.)    Immediately before joining the Mint, Mr. Craig headed increasingly responsible senior management level positions at Dell Computers, a public traded corporation and recognized leader in the PC industry.  In eight years at Dell, Mr. Craig led organizations with as many as 800 employees focused on supporting Dell's complex service delivery programs and managing global deployment services.  Among other matters, Mr. Craig was responsible for setting up Dell's manufacturing plant in Malaysia and developed it into an entity responsible for $1.3 billion in a customer sales base.  Mr. Craig reported to one or more Dell Vice Presidents and was in the ranks of Dell senior management.

22.)    For ten years ending in May of 2000, Mr. Craig served as a Commissioned Officer in the U.S. Army where he attained the rank of Captain.  Among his other professional accomplishments while in the Army, Mr. Craig was responsible for managing and developing a 63 member tank company with assets over $600,000.00; managing 69 logistical personnel and a budget of $220 million; and training of 4500 National Guardsmen.

23.)    Mr. Craig became a Fellow at the Harvard Business School while at Dell, and earned an MPA and a BA while serving in the military.

**FY 2012 Performance**

24.)     Like all career federal employees, Mr. Craig was entitled at the outset of each Fiscal Year to receive an Executive Management Agreement, the equivalent of a performance plan for non-SES level employees, which would specify in advance his performance standards for the upcoming Fiscal Year.  In Mr. Craig's case, his Executive Management Agreement identified eight Mandated Elements that are the equivalent of Critical Elements that career federal employees up to GS-15 are rated on.

25.)     Defendant was required to provide Mr. Craig with his Executive Management Agreement at the outset of each Fiscal Year and a mid-term appraisal at the middle of each Fiscal Year.  Defendant did not do so until April 17, 2012, more than half way into that rating period; and did not provide Mr. Craig with his FY 2012 mid-term appraisal until June 29, 2012, almost nine months into the performance cycle.

26.)     On June 29, 2012, Mr. Craig met for his mid-year appraisal with his then first line supervisor, Mint Deputy Director Richard Peterson.  Mr. Peterson informed Mr. Craig that if it was time for his full FY 2012 rating, it would be at the Exceeded expectations level.  Mr. Peterson qualified his statement that Mr. Craig's performance would have to be rated at the end of the full cycle, but gave no indication at all that his performance to that point in time had been anything less than the Exceeded level.

27.)     On July 2, 2012, Mr. Peterson placed Mr. Craig's organization under the new Chief Administrative Officer of the Mint, Beverly Babers.  From that point until the end of FY 2012, Ms. Babers met with Mr. Craig infrequently about his performance and never indicated that it was below the Exceeded level in any respect.

28.)     Mr. Craig's Executive Management Agreement specified that he was entitled to a rating at the Exceeded level if he performed at the Exceeded level on three-quarters of his eight Mandated Elements and not below the Fully Successful level on any.

29.)     Mr. Craig's Performance Management Agreement for FY 2012 broke his Mandated Elements down into three "Responsibilities" and five "Commitments."

30.)     In other words, if Mr. Craig's performance for FY 2012 was at the Exceeded level for at least six of his Mandated Elements and no lower than Fully Successful on the remaining one or ones, he was entitled to a rating of Exceeded and a commensurate cash bonus no lower than approximately $9,000.00 and potentially as high as approximately $20,000.00.

31.)     On November 16, 2012, Ms. Babers gave Mr. Craig his FY 2012 rating.  In it, Mr. Craig received five ratings of Exceeded in his Mandated Elements and three ratings of Fully Successful from Ms. Babers.  In other words, if Mr. Craig had received one additional rating of Exceeded in the Mandatory Elements of his FY 2012 rating, he would have received an overall rating of Exceeded and received a cash bonus commensurate with that rating.  Instead, Mr. Craig was rated Fully Successful and received no cash bonus.

32.)     Ms. Babers articulated two supposed reasons for not rating Mr. Craig at the Exceeded level on at least one more of his Mandated Elements, both of which were false and discriminatory.  One was Ms. Craig's supposed failure to perform at the Exceeded level on an SAM project known as the Order Management System ("OMS") and for his alleged conflict with the Mint Information Technology Division ("ITD"), the organization with overall responsibility for production of OMS.  The other was supposedly Mr. Craig's performance in leading the production of a comprehensive marketing plan.  If either of these two Mandated Elements were

rated as Exceeded, Mr. Craig was entitled to receive an overall rating of Exceeded and commensurate cash bonus.

33.)    Both of Ms. Babers' alleged reasons for rating Mr. Craig below the Exceeded level were false and discriminatory.

34.)    The OMS project was undertaken jointly by SAM with hands on management by Mr. Craig and similar direct management of ITD by the Mint Chief Information Officer Goutham Kundu.  Senior Mint management, including but not limited to Ms. Babers, Mr. Peterson, and U.S Treasurer Rosie Rios, all knew before Mr. Craig was issued his FY 2012 appraisal that Mr. Kundu and his organization rather than Mr. Craig and SAM were responsible for the failure to complete the OMS project on time, successfully, and within budget.  Further, they were all aware that Mr. Kundu, whose national origin is East Indian, was abusive towards African Americans under his supervision and African Americans in SAM assigned to the OMS project; and that he subjected African Americans with whom he had professional dealings to disparate treatment.

35.)    Defendant commissioned a Culture Assessment into Mr. Kundu's management of ITD, reported that he engaged in abusive and disparate treatment of African Americans, and removed Mr. Kundu from his position.

36.)    Similarly, Ms. Babers, Mr. Peterson, and Ms. Rios, all knew before Mr. Craig was issued his FY 2012 appraisal that Mr. Craig's performance in the production of a comprehensive marketing plan was at the Exceeded level.

37.)    In fact, from the beginning of FY 2013 until his removal, under Mr. Craig's leadership in the first quarter of FY 2013, sales and product releases were one-third above the Mint's target level; the Mint's customer base exceeded its quarterly goal and was almost halfway toward its goal for all of FY 2012; the Mint's Customer Satisfaction Index was slightly above the

SAM target, and overall time for responding to incoming customer calls was reduced by 40%; the U.S. Department of the Interior had given SAM the highest award of all federal agencies for its web-based sales program; and numerous ceremonies were planned to roll out new numismatic issues over the remainder of the Fiscal Year.

### Removal As Associate Director of SAM, Materially Undesirable Reassignment, and Replacement With A Less Qualified Caucasian

38.)     Throughout his tenure as SAM Associate Director, Mr. Craig always carried out his assignments in exemplary fashion.  From the date of his hire in November of 2008 under U.S. Treasurer Rios; Mint Director Edwin Moy and then Ms. Rios; under two Deputy Directors Mint, first Mr. Brunhart and then Mr. Peterson; and finally as a subordinate Chief Administrative Officer Babers, Mr. Craig universally managed SAM with exceptional success, ensured that its mission was executed properly and on or before schedule, conducted himself professionally, and had an unblemished record of conduct.

39.)     In a weekly meeting that took place on or around September 25, 2012, Ms. Babers indicated to Mr. Craig that she wanted to find another position for Mr. Craig that she felt would better suit his professional background and experience.  Ms. Babers also intimated that Mr. Craig had somehow not performed up to Ms. Rios' expectations, which was untrue, but gave no further specific information about why Ms. Rios believed that.  At no time did Ms. Rios state or imply to Mr. Craig that he could or would be reassigned involuntarily, or to a position that was not the equivalent of SAM Associate Director in terms of responsibilities, reporting chain, subordinates, professional exposure, or any other material ways.  Similarly, at no time did Mr. Craig indicate in any way that he was receptive to being reassigned from his position as Associate Director of SAM, much less to one that was non-supervisory or in any other way less desirable.

40.)     For the reasons set forth in the foregoing Section of this Complaint, Mr. Craig believed that his performance for FY 2012 met the standard for an Exceeded rating and that had been discriminated against in being given a rating at the Fully Successful level.  Accordingly, on October 26, 2012, Mr. Craig initiated the informal EEO administrative complaints process to challenge his rating for FY 2012.

### Removal As Associate Director of SAM

41.)     On December 11, 2012, by email sent by Mr. Peterson to the Mint, defendant announced that it was removing Mr. Craig from the position of Associate Director of SAM and reassigning him to a position as executive lead for the Comprehensive Production Schedule and Plan Project, effective January 2, 2013.   Nothing in Mr. Craig's performance or conduct warranted removing him as Associate Director of SAM.

42.)     At the time of Mr. Craig's removal, the "executive lead" position to which he was being reassigned did not exist, and did not have specific position description associated with it. The position, such as it was, was not supervisory or designed to be supervisory; and did not have and was not designed to have meaningful recurrent duties for Mr. Craig to perform that were commensurate with his grade level, background, experience, and accomplishments.  The position did not offer and was not designed to offer Mr. Craig professional exposure and career opportunities equivalent to those of his former position as Associate Director of SAM and did not appear on a Mint organization chart.

43.)     Since the date of his removal as Director of SAM continuing through the present time, Mr. Craig has remained in the "executive lead" position and still has no position description. Mr. Craig has not been restored as a supervisor; given recurrent meaningful duties to perform that are commensurate with his grade level, background, experience, and accomplishments; and has

not had professional exposure and career opportunities equivalent to those of his former position as Associate Director of SAM.  The executive lead position still does not appear on a Mint organization chart.

44.)    Defendant assigned Mr. Landry, a Caucasian male who had not engaged in protected EEO activity, to replace Mr. Craig as Associate Director of SAM.  Mr. Landry is markedly less qualified for the position Mr. Craig and his permanent position of record at the Mint is as a local plant manager.

45.)    The position of Associate Director has remained encumbered on an acting basis since Mr. Craig was originally removed from it in January of 2013.

### Non-Selection as Associate Director of Manufacturing

46.)    Mr. Craig originally applied to the Mint in March of 2008, before becoming Associate Director of SAM, for the SES position of Associate Director of Manufacturing.  The Associate Director of Manufacturing was supervisory, answered to the Mint's Deputy Director had approximately 600 subordinates, and was responsible for executive level direction for all of the Mint's manufacturing and directing the operation of four Mint plants nationwide.  These duties included being responsible for all of the Mint's manufacturing operations, the procurement and operation of Mint manufacturing equipment, and the maintenance and delivery of Mint products to the Federal Reserve Bank and elsewhere.

47.)    Based on his written application, Mr. Craig was rated among the best qualified candidates and referred for a panel interview.  The interview took place on June 19, 2008.

48.)    The panel referred Mr. Craig for selection to Andrew Brunhart with the unanimous recommendation that he be selected for the position.  Mr. Brunhart interviewed Mr. Craig for the position on July 19, 2008.

49.)     In late August or early September of 2008, Mr. Brunhart telephoned Mr. Craig and informed him that he was not selected as Associate Director of SAM because the interview panel had recommended a different candidate.  Mr. Brunhart suggested that Mr. Craig apply for a different job with the Mint.

50.)     Mr. Craig did not solicit this information from Mr. Brunhart and had no reason to doubt that it was true.  Prior to joining the Mint later in 2008, Mr. Craig had no affiliation or professional experience with the Mint and therefore no reason to suspect that Mr. Brunhart deceived him about the selectee having been recommended instead of him or any reason to doubt the legitimacy of the selection process.  By telephoning Mr. Craig, Mr. Brunhart engaged in fraud and concealed the real course of events that led to Mr. Craig's nonselection.

51.)     On July 12, 2013, while engaged in the Mint's administrative EEO process over his removal from the position as Director of SAM and FY 2012 appraisal, one of the members of the interview panel for the Associate Director of Manufacturing, Jerry Horton, advised Mr. Craig that he was in fact the highest rated candidate for the position and also the panel's unanimous recommendation to Mr. Brunhart.

52.)     Mr. Horton encouraged Mr. Craig to confirm this account of the selection process with Gloria Eskridge, who had been Mr. Craig's predecessor as Associate Director of SAM.  She confirmed that the panel unanimously recommended Mr. Craig to Mr. Brunhart and not the selectee, Mr. Peterson, who is currently Deputy Director of the Mint.

53.)     Ms. Eskridge also informed Mr. Craig that she was on a panel that had interview Mr. Peterson recently for two plant manager positions, significantly lower position than Associate Director of Manufacturing, and that both Mr. Peterson's and his written application materials were poor.

54.)     Ms. Eskridge had served on other selection panels at the Mint and had not in her experience seen another instance where a selecting official did not follow the recommendation of an interview panel in making a selection.

55.)     Mr. Peterson, a Caucasian male, was demonstrably less qualified for the position of Associate Director of Manufacturing than Mr. Craig.

### Exhaustion of Administrative Remedies

56.)     Mr. Craig initiated the informal administrative EEO complaints process for the first time on October 26, 2012.  On March 18, 2013, Mr. Craig timely filed a formal EEO complaint over having been removed as Associate Director of SAM and reassigned to the non-existent position of executive lead for the Comprehensive Production Schedule and Plan Project. Defendant issued a letter of acceptance of Mr. Craig's formal complaint on May 20, 2013.  An investigation, which Mr. Craig participated in in all respects, was conducted between October 31, 2013, and March 31, 2014.

57.)     With the foregoing actions and all others required of him by law and regulation, Mr. Craig timely exhausted the administrative remedies available to him to utilize the administrative EEO complaints processes over his removal from the position of Associate Director of SAM and his FY 2012 performance appraisal.

58.)     For a second time, Mr. Craig commenced the informal discrimination complaints process on August 19, 2013, concerning his non-selection for the position of Associate Director of Manufacturing, and filed a formal EEO complaint on or before November 14, 2013. Defendant accepted Mr. Craig's complaint in a letter of acceptance issued on December 23, 2013, and consolidated his two complaints on February 20, 2014.  An investigation, which Mr. Craig

participated in in all respects, was conducted beginning on January 10, 2014, initially completed on March 31, 2014, and then supplemented on May 6, 2014.

59.)     As set forth in greater detail above in paragraphs 46 through 49, Mr. Craig applied for the position of Associate Director of Manufacturing of the Mint in March of 2008 and was interviewed for the position by a three person interview/selection panel on June 19, 2008.  Mr. Craig was the unanimous choice of the panel members and was referred for a final interview and selection by Mr. Brunhart on July 19, 2008.

60.)     Without any prompting on Mr. Craig's part, in August or September of 2008, Mr. Brunhart telephoned Mr. Craig and stated that another candidate, whom Mr. Brunhart did not identify, was the highest rated candidate of the interview/selection panel and for that reason was selected as Associate Director of Manufacturing.

61.)     These and other statements made by Mr. Brunhart in this unsolicited telephone call to Mr. Craig were false, designed by Mr. Brunhart to deceive Mr. Craig, and did in fact deceive Mr. Craig about the reasons for his nonselection as Associate Director of Manufacturing, about the role he played in the decision not to select Mr. Craig, and about the discrimination that Mr. Craig had been subjected to.

62.)     In 2010, after keeping the records and notes of the interview and selection process for the Associate Director of Manufacturing locked in his office for two years, Mr. Brunhart destroyed them.

63.)     Mr. Craig had no professional affiliation with or exposure to the Mint's personnel and, therefore, had no reason to suspect that he was better qualified than the selectee, Mr. Peterson, or that he had been discriminated against in the interview/selection process for Associate Director of Manufacturing.

64.)     Until July 12, 2013, when Mr. Horton informed Mr. Craig that he had been the unanimous recommendation of the interview/selection panel, Mr. Craig did not have a reasonable suspicion that he had been discriminated against in being passed over for the position of Associate Director of Manufacturing.  Mr. Brunhart not only actively engaged in fraud by concealing his role in the selection process and the outcome of the interview process, Mr. Brunhart actively concealed his discriminatory animus by suggesting that Mr. Craig apply for a different job with the Mint.

65.)     Immediately upon receiving information that he was the panel's top ranked candidate imparted by Mr. Horton on July 12, 2013, Mr. Craig acted with due diligence to investigate whether he had been discriminated against prior.

66.)     Beginning then, Mr. Craig diligently began investigating whether he had been discriminated against by locating Mr. Eskridge, who by that time had retired from the Mint and contacting her.  Doing so was the only reasonable available way for Mr. Craig to confirm that he had not been selected as Associate Director of Manufacturing despite receiving the unanimous recommendation of the interview/selection panel; that the selectee, Mr. Peterson, had been turned down for a lower level position as one of the Mint's plant managers; and that Mr. Peterson might not have been rated among the best qualified for the Associate Director position and, therefore, not eligible to be interviewed or referral for selection.

67.)     Prior to that point in time, a person in Mr. Craig's position acting with reasonable prudence and diligence would not have had reason to suspect that he was discriminated against in the selection process for Associate Director of Manufacturing or to conduct an inquiry or investigation into why he was not selected.

68.)     For the foregoing reasons, the 45 day filing deadline for Mr. Craig to commence the informal discrimination complaints process over his non-selection for the position of Associate Director of Manufacturing was tolled until July 12, 2013.  By initiating the informal complaints process on August 19, 2013, and filing a formal EEO complaint about his nonselection on or before November 14, 2013, Mr. Craig timely exhausted the administrative remedies available to him to utilize the administrative EEO complaints process over his nonselection as Associate Director of Manufacturing.

69.)     More than 180 days have elapsed since Mr. Craig filed the formal EEO complaints concerning his removal as Associate Director of SAM, his FY 2012 performance appraisal, and his nonselection as Associate Director of Manufacturing, without a final decision having been issued by the agency.

## COUNT I
### (Retaliation)

70.)     Plaintiff repeats the allegations set forth above in paragraphs 1 through 69, as though fully set forth here.

71.)     Plaintiff first engaged in protected EEO activity when he initiated the informal discrimination complaints process on October 26, 2012.

72.)     Within 30 days or less of learning that Mr. Craig had initiated the informal discrimination complaints process, defendant involuntarily reassigned plaintiff from his position as Associate Director of SAM to a position as "executive lead" for the Comprehensive Production Schedule and Plan Project.  The "executive lead" position to which plaintiff was being reassigned did not exist, and did not have a specific position description associated with it.  The position was not supervisory or designed to be supervisory; and did not have and was not designed to have recurrent meaningful duties for plaintiff to perform that were commensurate with his grade level,

background, experience, and accomplishments. The position did not offer and was not designed to offer plaintiff professional exposure and career opportunities equivalent to those of his former position as Associate Director of SAM and did not appear on a Mint organization chart.

73.)    In taking the foregoing actions, defendant took a materially adverse action against plaintiff that would dissuade a reasonable employee from participating in protected EEO activity and thereby retaliated against plaintiff in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

74.)    Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

### COUNT II
### (Retaliation)

75.)    Plaintiff repeats the allegations set forth above in paragraphs 1 through 74, as though fully set forth here.

76.)    Plaintiff first engaged in protected EEO activity when he initiated the informal discrimination complaints process on October 26, 2012, and has continued to engage in protected EEO activity through the filing of this Complaint.

77.)    Beginning with the time that defendant first announced plaintiff's reassignment continuing through the present, a period approaching two years, and despite plaintiff's repeated requests, defendant has failed to assign plaintiff to a position with a specific position description associated with it; given plaintiff a staff or supervisory duties to perform; assigned plaintiff recurrent meaningful duties to perform that were commensurate with plaintiff's grade level, background, experience, and accomplishments; offered plaintiff professional exposure and career

opportunities equivalent to those of his former position as Associate Director of SAM; or placed plaintiff in a position that appeared on a Mint organization chart.

78.)     In taking the foregoing actions, defendant took a materially adverse action against plaintiff that would dissuade a reasonable employee from participating in protected EEO activity and thereby retaliated against plaintiff in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

79.)     Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## COUNT III
## (Race Discrimination)

80.)     Plaintiff repeats the allegations set forth above in paragraphs 1 through 79, as though fully set forth here.

81.)     From November 12, 2008, until his involuntary reassignment on December 11, 2012, plaintiff served as Associate Director of SAM, the position heading the organization in the U.S. Mint responsible for the marketing and sale of collector quality U.S. coins and sale of gold bullion to investors.

82.)     In that position, plaintiff had, as his direct reports, a GS-15 Deputy Associate Director; a GS-14 Senior Adviser; and a GS-15 Marketing & Public Relations Adviser with a term appointment not to exceed one year.  Three separate program Divisions each headed by a GS-15 Division Director reported to plaintiff through his Deputy and approximately 80 white collar subordinates reported to plaintiff as Associate Director.

83.)     As Associate Director of SAM, Mr. Craig was responsible for leading the development, administration, operations, and evaluations of United States Mint-wide marketing

programs, plans, policies, strategies, research, processes, and procedures; implementing marketing plans; developing pricing; developing forecasts; evaluating the success of marketing programs and strategies; developing and conducting marketing research and surveys; evaluating outcomes related to United States Mint programs; exploring and developing new markets and products; directing the management of United States Mint exhibits, sales areas, public sales activities, and sales operations such as consignment, bulk, and potential international sales; and coordinating and providing customer services to purchasers of Mint products and services.

84.) From December 11, 2011, when defendant announced that it was involuntarily reassigning plaintiff from his position as Associate Director of SAM to a position as "executive lead" for the Comprehensive Production Schedule and Plan Project, through the present, defendant has never assigned plaintiff to an existing position with a specific position description; restored plaintiff to a supervisory position; never giving plaintiff recurrent meaningful duties to perform that were commensurate with plaintiff's grade level, background, experience, and accomplishments; has never offered plaintiff professional exposure and career opportunities equivalent to those of his former position as Associate Director of SAM; or place plaintiff in a position that appeared on a Mint organization chart.

85.) Since involuntarily reassigning plaintiff from his position as Associate Director of SAM, defendant has replaced him on an acting basis with a Caucasian male who is markedly less qualified than plaintiff for that position.

86.) In taking the foregoing actions, defendant took adverse employment action against plaintiff and discriminated against plaintiff on the basis of his race (African American) in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

87.)     Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## COUNT IV
### (Race And/Or Sex Discimination)

88.)     Plaintiff repeats the allegations set forth above in paragraphs 1 through 87, as though fully set forth here.

89.)     Plaintiff, as a member of the Mint's Senior Executive Service, was entitled at the outset of each Fiscal Year to receive an Executive Management Agreement that specified in advance his performance standards for the upcoming Fiscal Year.  Defendant did not provide plaintiff his Executive Management Agreement for FY 2012 until April 17, 2012; and did not provide the mid-year appraisal that plaintiff was entitled to receive halfway through every Fiscal Year, until June 29, 2012.

90.)     The Executive Management Agreement that defendant eventually provided to plaintiff identified eight "Mandated Elements" broken down into three "Responsibilities" and five "Commitments."

91.)     Plaintiff's Executive Management Agreement specified that he was entitled to a rating at the Exceeded level if he performed at the Exceeded level on three-quarters of his eight Mandated Elements and not below the Fully Successful level on any.  If plaintiff's performance for FY 2012 was at the Exceeded level for at least six of his Mandated Elements and no lower than Fully Successful on the remaining one or ones, he was entitled to a rating of Exceeded and a commensurate cash bonus between approximately $9,000.00 and $20,000.00.

92.)    On November 16, 2012, defendant gave plaintiff his FY 2012 rating.  In it, he received five ratings of Exceeded in his Mandated Elements and three ratings of Fully Successful. Plaintiff was entitled to a rating of Exceeded on one or more his Fully Successful ratings.

93.)    Had he received an overall rating at the Exceeded level instead of the Fully Successful level for FY 2012, plaintiff would have received a performance based bonus between approximately $9,000.00 and $20,000.00.  Because he received a Fully Successful rating, plaintiff did not receive a bonus.

94.)    In taking the foregoing actions, defendant took adverse employment action against plaintiff and discriminated against plaintiff on the basis of his race (African American), his sex (male), and/or his race and sex (African American male) in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

95.)    Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## COUNT V
### (Race Discrimination

96.)    Plaintiff repeats the allegations set forth above in paragraphs 1 through 95, as though fully set forth here.

97.)    Plaintiff applied to the Mint in March of 2008 for the SES position of Associate Director of Manufacturing.  The Associate Director of Manufacturing, as alleged in greater detail in paragraph, was responsible for all of the Mint's manufacturing operations, the procurement and operation of Mint manufacturing equipment, and the maintenance and delivery of Mint products to the Federal Reserve Bank and elsewhere.

98.) After he applied, plaintiff was rated among the best qualified candidates and referred for a panel interview. The interview took place on June 19, 2008.

99.) The interview/selection panel referred plaintiff for selection with the unanimous recommendation that he be selected.

100.) Defendant interviewed plaintiff for a second time on July 19, 2008.

101.) Although plaintiff was the best qualified candidate for the position of Associate Director of Manufacturing, defendant instead selected a markedly less qualified Caucasian candidate.

102.) In not selecting plaintiff for the position of Associate Director of Manufacturing, defendant took adverse employment action against plaintiff and discriminated against plaintiff on the basis of his race (African American) in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

103.) Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

Wherefore, plaintiff B. B. Craig respectfully requests that the Court enter judgment in his favor and award him the following relief.

A. An Order declaring that defendant violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and restraining and enjoining defendant from further violations.

B. Restoration of plaintiff to a position of Associate Director of the Mint that is commensurate with his background, experience, and accomplishments.

C.      Record correction including, but not limited to, expungement of Mr. Craig's FY 2012 performance appraisal and his removal as Associate Director of SAM.

D.      Backpay in the amount of the difference of a performance based bonus at the Exceeds Expectations for FY 2012 and a Fully Successful bonus and the difference between the salary of the Associate Director for Manufacturing and Associate Director of Sales and Marketing.

E.      Compensatory damages.

F.      An award of the attorneys' fees and costs incurred in the prosecution of this action and in the administrative EEO complaints processes that preceded it.

**JURY DEMAND**

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

Robert C. Seldon, Esq.
D.C. Bar No. 245100

Charlene Bofinger, Esq.
D.C. Bar No. 368879
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
(202) 393-8200
Counsel for Plaintiff