## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| B.B. CRAIG, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1340 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10 |
| | : | | |
| JACOB J. LEW, Secretary, | : | | |
| U.S. Department of the Treasury, | : | | |
| | : | | |
| Defendant. | : | | |

### MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL DISMISSAL, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff B.B. Craig, an African-American male, has been employed by the United States Mint (the "Mint") and a member of the Senior Executive Service (the "SES") since 2008. Mr. Craig has commenced this civil action against Defendant Jacob J. Lew in his official capacity as Secretary of the United States Department of the Treasury (the "Government") for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16, alleging race discrimination in connection with an unsuccessful application by Mr. Craig for employment with the Mint in 2008 (Count V), subsequent race and/or sex discrimination in connection with the Government's review of Mr. Craig's performance in 2012 (Count IV), and race discrimination and retaliation in connection with his reassignment within the Mint effective in 2013 (Counts I, II & III). *See* Compl., ECF No. 1.

Now before the Court is the Government's pre-discovery motion for partial dismissal, or, in the alternative, for partial summary judgment on Counts I and V of the Complaint.[1]  *See* Mot. Partial Dismissal or Summ. J., ECF No. 10 ("Def.'s Mot.").  The Government argues that Count I, Mr. Craig's retaliation claim concerning his reassignment in late 2012 and early 2013, should be dismissed because Mr. Craig cannot establish a causal link between his protected Equal Employment Opportunity ("EEO") activity and his reassignment.  *See id.* at 18–20.  The Government argues that Count V, Mr. Craig's discriminatory non-selection claim concerning his unsuccessful employment application in 2008, should be dismissed because Mr. Craig failed to timely exhaust his administrative remedies under Title VII and because the same Mint official who Mr. Craig alleges discriminated against him recommended him for another SES position in the Mint shortly thereafter.  *See id.* at 9–18.

For the reasons explained below, the Court will deny the Government's motion with respect to Count I without prejudice in order to permit Mr. Craig to take relevant discovery and will grant summary judgment in favor of the Government on Count V.

## II.  FACTUAL BACKGROUND

Upon consideration of the evidentiary record submitted by the parties, the Court finds that the following relevant facts are not in dispute, except where otherwise noted as an allegation by Mr. Craig or a disputed fact.

---

[1]     Throughout his opposition to the Government's motion, Mr. Craig erroneously refers to or treats the Government's motion as also seeking dismissal or summary judgment as to Count II.  *See, e.g.,* Pl.'s Opp. Def.'s Mot. Partial Dismissal or Partial Summ. J. at 19–20, ECF No. 12 (arguing that the Court should defer consideration of the Government's motion as to both Counts I and II); *id.* at 22–23 (arguing that Count II is actionable).  The Government's motion clearly concerned only Counts I and V, and, therefore, the Court does not consider here whether dismissal or summary judgment is appropriate with respect to Count II.

## A.  Mr. Craig's Background

Mr. Craig, an African-American male, is currently a member of the SES and employed by the Mint, which is a bureau of the U.S. Department of the Treasury.  *See* Pl.'s Stmt. of Genuine Issues ("Pl.'s SGI") ¶ I.1, ECF No. 12-1.  Mr. Craig alleges that prior to joining the Mint, he held senior management level positions at Dell Computers and served as a Commissioned Officer in the U.S. Army.  *See* Compl. ¶¶ 21–22.  Mr. Craig alleges that he became a Fellow at Harvard Business School while employed by Dell and earned an M.P.A. and B.A. while serving in the military.  *Id.* ¶ 23.

## B.  Mr. Craig's Applications for Employment in 2008

In or about March 2008, Mr. Craig applied for the position of Associate Director of Manufacturing, an SES position within the Mint.  *See* Pl.'s SGI ¶ I.2.  Mr. Craig's qualifications were reviewed by Mint Human Resources staff, and Mr. Craig was determined to be among the "best qualified" candidates for the Manufacturing position.  *See id.* ¶ I.3.  After the review by Human Resources, members of the U.S. Mint Executive Resources Board (the "ERB") conducted a telephone interview of Mr. Craig on or about June 19, 2008 and recommended him to then-Deputy Director of the Mint, Andrew D. Brunhart, for a further interview.  *See id.* ¶ I.4. Mr. Craig claims that he was only aware of the identities of two of his three interviewers, Jerry Horton and Daniel Shaver, and was mistaken about the identity of the third.  *See* Decl. B.B. Craig ("Craig Decl.") ¶¶ 26–27, ECF No. 12-2.

Mr. Brunhart, a Caucasian male, interviewed Mr. Craig for the Manufacturing position in or about July 2008.  *See* Pl.'s SGI ¶ I.5.  In late August 2008 or early September 2008, Mr. Brunhart informed Mr. Craig that the Mint had not selected him for the Manufacturing position. *See id.* ¶ I.6.  Mr. Craig alleges that, during that conversation, Mr. Brunhart falsely informed him

that he was not selected for the position because the ERB had recommended a different

candidate who was better qualified.  *See id.* ¶ II.26; Craig Decl. ¶ 34; Compl. ¶ 49.  Mr. Craig

characterizes Mr. Brunhart's statements to him as a "fraud that was worked on [him]."  Craig

Decl. ¶ 86.  *See also* Pl.'s SGI ¶ I.18 (characterizing the statements as "an elaborate fraud").  Mr.

Craig argues that "Mr. Brunhart's falsehoods thwarted any potential EEO complaint that Mr.

Craig might have filed in 2008."  Pl.'s SGI ¶ II.25.

        In addition to Mr. Craig, the ERB also interviewed Richard Peterson, a Caucasian male,

for the Manufacturing position in or about July 2008 and also referred Mr. Peterson to Mr.

Brunhart for a further interview.  Pl.'s SGI ¶ I.7.  Mr. Peterson was ultimately selected for the

Manufacturing position and began working in that position in October 2008.  *See id.* ¶¶ I.7–8.

The parties dispute whether Mr. Brunhart was responsible for the selection, as Mr. Craig alleges

Mr. Brunhart told him at the time, or whether Mr. Brunhart recommended Mr. Peterson to the

then-Director of the Mint, Daniel Moy.  *See id.* ¶ I.7.  Mr. Craig also alleges that the decision to

hire Mr. Peterson was not made until at least September 22, 2008, which was after Mr. Brunhart

informed Mr. Craig that he had not been selected.  *See id.* ¶ I.6 (citing Def.'s Mot. Ex. 3, ECF

No. 10-3 (September 22, 2008 memorandum authored by Mr. Moy requesting approval for Mr.

Peterson's salary)).

        Although Mr. Brunhart informed Mr. Craig that he was not selected for the

Manufacturing position, he also suggested that Mr. Craig apply for the position of Associate

Director of Sales and Marketing ("SAM"), which was another SES position.  *See* Pl.'s SGI ¶ I.9.

Mr. Craig alleges that, by making this suggestion, Mr. Brunhart was "steering [him] to the lesser

desirable Associate Director of SAM position."  Craig Decl. ¶ 36.  Mr. Craig alleges that the

Manufacturing position was "superior in every respect" to the SAM position, because, for

example, the Manufacturing position provided oversight over employees that were greater in number and senior to the employees overseen by the SAM position. *See id.* ¶ 36; *id.* ¶ 85. Mr. Craig applied for the SAM position and, in September or October 2008, was again interviewed by the ERB. *See* Pl.'s SGI ¶ I.9. The ERB again referred Mr. Craig to Mr. Brunhart for a further interview, and Mr. Brunhart interviewed Mr. Craig for the position in October 2008. *See id.* With Mr. Brunhart's support, Mr. Craig was offered the SAM position and began working as the Associate Director of SAM in November 2008. *See id.* ¶ I.10. The parties dispute whether Mr. Brunhart was the selecting official, as Mr. Craig alleges Mr. Brunhart held himself out to be, or whether he recommended Mr. Craig to the Director of the Mint. *See id.*

**C.  Discussion Regarding a Change in Position in 2012 and First Informal EEO Complaint**

Mr. Craig continued to hold his position as the Associate Director of SAM from November 2008 through December 2012. Mr. Peterson, meanwhile, was promoted to the position of Deputy Director of the Mint in January 2011. *See* Pl.'s SGI ¶ I.11.

In July 2012, Mr. Peterson modified the organizational structure within the Mint and placed SAM under the management of the Chief Administrative Officer of the Mint, Beverly Babers. [2]  *See id.* ¶ I.12; Craig Decl. ¶ 66. On September 25, 2012, Ms. Babers indicated to Mr. Craig during a meeting that she wanted to find a different position for Mr. Craig that would be a better fit. *See* Pl.'s SGI ¶ I.13; Craig Decl. ¶ 78; Compl. ¶ 39. Ms. Babers also discussed Mr.

---

[2]      In his Statement of Genuine Issues, Mr. Craig disputes the Government's characterization of this organizational change as a "realignment" and alleges that it was instead a "pretextual reorganization to discriminate against [Mr. Craig] on the ground of his race (African American) and prior protected EEO activity." Pl.'s SGI ¶ I.12 (citing Craig Decl. Att. D at 4; Craig Decl. Att. P at 6–10). Mr. Craig has not brought a claim in connection with the organizational change, and Mr. Craig did not make any similar allegation in his Complaint. *See* Compl. ¶ 27 (describing the change but making no allegations of discrimination or retaliation by Mr. Peterson).

Craig's performance during the meeting, but the parties dispute the nature of what was said.  *See*

Pl.'s SGI ¶ I.13; Craig Decl. ¶ 78; Compl. ¶ 39.  Mr. Craig also alleges that at no point during the

meeting did Ms. Babers state or otherwise imply that Mr. Craig would be "reassigned

involuntarily, or to a position that was not the equivalent of SAM Associate Director in terms of

responsibilities, reporting chain, subordinates, professional exposure, or any other materials

ways."  Pl.'s SGI ¶ I.13; Craig Decl. ¶ 78; Compl. ¶ 39.

As a result of the September 25, 2012 meeting with Ms. Babers, on October 26, 2012,

Mr. Craig commenced the federal administrative EEO process by contacting an EEO counselor

at the Mint and filing his first informal EEO complaint.[3]  *See* Pl.'s SGI ¶ I.14; Craig Informal

Compl. I, Def.'s Mot. Ex. 4, ECF No. 10-4.  In his informal complaint, Mr. Craig listed the date

---

[3]       At various points in the Complaint, Mr. Craig's brief in opposition to the Government's
motion, and Mr. Craig's declaration, Mr. Craig erroneously states or suggests that his first
informal EEO complaint in October 2012 concerned, at least in part, his FY2012 performance
appraisal and its consequences for Mr. Craig's performance-based bonus.  *See, e.g.,* Compl. ¶ 40
("Mr. Craig believed that his performance for FY 2012 met the standard for an Exceeded rating
and that had [sic] been discriminated against in being given a rating at the Fully Successful level.
Accordingly, on October 26, 2012, Mr. Craig initiated the informal EEO administrative
complaints process to challenge his rating for FY 2012."); Pl.'s Opp. at 11 ("Mr. Craig rightly
believed that his performance for FY 2012 met the standard for an Exceeded rating and that had
[sic] been discriminated against in being given a rating at the Fully Successful level.
Accordingly, on October 26, 2012, he initiated the informal EEO administrative complaints
process to challenge his rating for FY 2012 and potential reassignment."); Craig Decl. ¶ 79 ("I
initiated the informal EEO administrative complaints process to challenge my rating for FY 2012
and potential reassignment.").  According to the Complaint and Mr. Craig's declaration,
however, Mr. Craig did not receive his FY2012 appraisal until November 16, 2012, weeks *after*
he filed his informal complaint.  *See* Compl. ¶ 31; Craig Decl. ¶ 70.  The October 2012 informal
complaint, therefore, could not have concerned his FY2012 appraisal.  Indeed, the complaint
made no mention of Mr. Craig's FY2012 appraisal or his performance-based bonus for that year.
*See* Craig Informal Compl. I, Def.'s Mot. Ex. 4, ECF No. 10-4.  Mr. Craig did not raise issues
concerning his FY2012 appraisal and related performance-based bonus until his first formal EEO
complaint in March 2013.  *See* Craig Formal EEO Compl. I, Def.'s Mot. Ex. 8, at Bates No.
00024, ECF No. 10-8 (describing his FY2012 appraisal as a form of discrimination and reprisal
that Mr. Craig experienced "[s]ince filing the EEO intake form on October 26, 2012").

of his meeting with Ms. Babers as the date of the relevant discriminatory incident.  *See* Craig

Informal Compl. I, at Bates No. 00099.  He further wrote:

> The culmination of this discrimination—which Mr. Craig lists on
> this form as the "discriminatory act" at issue, but which is the latest
> in a continuing course of conduct—occurred on September 25,
> 2012, when Ms. Babers informed Mr. Craig that "they [superiors at
> the Mint] will need to find something [a new employment position]
> that is a better fit for you," despite his exemplary performance.

*Id.* at Bates No. 00101.  Mr. Craig states that he "began the administrative EEO process as a

precautionary measure, to ensure that the Mint would not come back later and claim that [he] had

missed a filing deadline."  Craig Decl. ¶ 13.

In this informal complaint, Mr. Craig did not raise a claim of discriminatory non-

selection in connection with his unsuccessful application for the Manufacturing position in 2008.

*See* Pl.'s SGI ¶ I.15.  Mr. Craig did, however, include the following alleged facts as background:

> In March 2008, Mr. Craig responded to a job posting for the position
> of Associate Director of Manufacturing at the Mint.  On or about
> June 2, 2008, Mr. Craig received a letter announcing that the review
> team had determined that he was 'among the Best Qualified
> applicants' and that he would be referred for further consideration.
> On or about July 21, 2008, Mr. Craig was interviewed for this
> position by several persons, including Jerry Horton, the Chief
> Information Officer of the Mint, and Dan Shaver, Chief Counsel –
> all white males.  Richard Peterson, a white male, was eventually
> chosen for the position by Andrew Brunhart, the official responsible
> for selecting the candidate to fill this position.  Mr. Peterson was
> chosen over Mr. Craig, despite Mr. Peterson having received a lower
> rating by the interview panel, being deemed "not competitive" for
> the position, and Mr. Craig's receiving a higher rating and being
> more qualified for the position.

Craig Informal Compl. I, at Bates No. 00101.  Mr. Craig maintains that, despite providing this

statement in October 2012, he did not have "sufficient reliable and verifiable information to have

proceeded with an EEO complaint over [his] non-selection as Associate Director of

Manufacturing" at the time.  Craig Decl. ¶ 31.  Mr. Craig states, however, that he first had an

"inkling that Mr. Brunhart had deceived [him]" regarding the panel's recommendation in 2008

and the true reason for his non-selection in the summer of 2012, when a union representative at

the Mint "suggested to [him]" that he had been the panel's recommendation for selection.  *Id.* ¶

41.  Mr. Craig states that, at the time, he "suspect[ed] something irregular may have led to [his]

non-selection" but that he lacked "any real way to begin penetrating Mr. Brunhart's deception"

until he obtained confirmation of the panel's recommendation and other information from

members of the panel and others in the summer of 2013.[4]  *Id.* ¶¶ 47–49.

### D.  Mr. Craig's Reassignment

Mr. Craig alleges that from his meeting with Ms. Babers on September 25, 2012 until

after he filed his informal EEO complaint on October 26, 2012, the Mint did not take any steps to

reassign him to a different position.  *See* Pl.'s SGI ¶ II.8; Craig Decl. ¶ 14.  He further alleges

that Ms. Babers did not learn that he had begun the EEO process until after he filed his informal

complaint on October 26, 2012.  *See* Craig Decl. ¶ 14; *see also* Craig Decl. Att. A ¶ 6, ECF No.

12-3, (Ms. Babers stating during the EEO investigation that she learned of Mr. Craig's informal

complaint on or around December 5, 2012).

On December 11, 2012, the Deputy Director of the Mint announced that Mr. Craig would

assume a new position as the "executive lead for the Comprehensive Production Schedule and

Plan Project" ("Executive Lead").  Pl.'s SGI ¶ I.16.  Mr. Craig alleges that the Executive Lead

---

[4]      Mr. Craig separately alleges in his Complaint that he "did not have a reasonable
suspicion that he had been discriminated against" until July 12, 2013.  Compl. ¶ 64.  *See also id.*
¶ 67 ("Prior to that point in time, a person in Mr. Craig's position acting with reasonable
prudence and diligence would not have had reason to suspect that he was being discriminated
against in the selection process for Associate Director of Manufacturing or to conduct an inquiry
or investigation into why he was not selected.").  Mr. Craig did not make any allegations or
otherwise mention the information he learned in 2012 concerning his non-selection in his
Complaint.

position was undefined and inferior to his prior SAM position.  *See* Craig Decl. ¶ 15.  Mr. Craig

states that the Executive Lead position was "a highly undesirable reassignment from every

perspective, ranging from duties, to professional exposure, to daily interaction."  *Id.*  He alleges,

for example, that the Executive Lead position did not exist prior to his reassignment, was non-

supervisory, and did not have any recurrent assignments commensurate with Mr. Craig's SES

grade level, experience, or qualifications.  *See id.* ¶ II.2; Craig Decl. ¶ 3.  He also alleges that, as

Executive Lead, he had no public functions to perform, did not attend SES-level meetings at the

Treasury Department, and no longer regularly interacted with other members of the SES.  *See*

Pl.'s SGI ¶ II.3; Craig Decl. ¶¶ 3, 15.

Mr. Craig notes that he formally assumed the Executive Lead position on January 2,

2013.  *See* Craig Decl. ¶ 80.

### E.  Formal EEO Complaints and the Present Action

On March 18, 2013, Mr. Craig filed his first formal EEO complaint, which was based on

his reassignment to the Executive Lead position and his performance rating for FY2012 and his

resulting failure to receive a performance-based bonus for that year.  *See* Pl.'s SGI ¶ I.18; Craig

Formal EEO Compl. I.  Mr. Craig alleged both discrimination and retaliation and, as the basis for

his retaliation allegation, listed the date of his informal EEO complaint in October 2012 as the

date of his prior EEO activity.  *See* Pl.'s SGI ¶ I.19; Craig Formal EEO Compl. I, at Bates No.

00022.  Mr. Craig did not assert a discriminatory non-selection claim in connection with his

application for the Manufacturing position in 2008.  *See* Pl.'s SGI ¶ I.18; Craig Formal EEO

Compl. I.

Mr. Craig claims that in July 2013, while engaged in the EEO process concerning his

formal complaint, he was "urged" to contact Jerry Horton, who served on the ERB panel of

interviewers during Mr. Craig's application for the Manufacturing position five years earlier and was no longer employed by the Mint.  Pl.'s SGI ¶ II.29; Craig Decl. ¶ 42.  Mr. Craig claims that Mr. Horton informed him at the time that "he had been the highest rated candidate for the position and also the panel's unanimous recommendation to Mr. Brunhart" and encouraged Mr. Craig to confirm this account with Gloria Eskridge, whom Mr. Craig believed also served on the ERB interview panel.  *See* Pl.'s SGI ¶¶ II.29–30; Craig Decl. ¶¶ 42–43; *see also* Horton EEO Aff., Craig Decl. Att. L, ECF No. 12-14 (stating his recollection that Mr. Craig "was forwarded as the top candidate" and that the selected candidate "had been eliminated in the first interview cut").  Mr. Craig claims that, in or around August 2013, he contacted Ms. Eskridge, who informed him that she served on a panel that interviewed Mr. Peterson for other positions prior to the Manufacturing position selection process and that Mr. Peterson's interview and written application materials for those positions were "poor."  Pl.'s SGI ¶ II.31; Craig Decl. ¶ 44.  *See also* Eskridge EEO Aff., Craig Decl. Att. I, ECF No. 12-11 (stating that the person later selected for the Manufacturing position was deemed "not qualified" for a different Plant Manager position).

On August 19, 2013, Mr. Craig filed a second informal EEO complaint, and on November 14, 2013, he filed a second formal EEO complaint.  Both of these complaints alleged discriminatory non-selection in connection with his application for the Manufacturing position in 2008.  *See* Pl.'s SGI ¶ I.20; Craig Formal EEO Compl. II, Def.'s Mot. Ex. 9, ECF No. 10-9.

Mr. Craig alleges that the investigation of his EEO complaints began on January 10, 2014, was initially completed on March 31, 2014, and was then supplemented on May 6, 2014.  *See* Compl. ¶ 58.  He alleges that the EEO has not issued a final decision on his claims.  *See id.* ¶ 69.

On August 6, 2014, Mr. Craig filed the present action, bringing five claims under Title VII of the Civil Rights Act of 1964.  Count I alleges that the Government reassigned him from his SAM position to the Executive Lead position in retaliation for his initiation of the informal discrimination complaints process in October 2012.  *See* Compl. ¶¶ 70–74.  Count II alleges that the Government subsequently failed to reassign him from the Executive Lead position to a position equivalent to his prior SAM position, despite his repeated requests, in retaliation for his protected activities of initiating the informal discrimination complaints process in October 2012, filing additional informal and formal complaints, and filing this action.[5]  *See id.* ¶¶ 75–79.  Count III alleges that the Government discriminated against him on the basis of his race by involuntarily reassigning him to the Executive Lead position.  *See id.* ¶¶ 80–87.  Count IV alleges that the Government discriminated against him on the basis of his race and/or sex by giving him a "Fully Successful" rating in his FY 2012 appraisal, which did not permit him to receive a performance based bonus for that year.  *See id.* ¶¶ 88–95.  Count V alleges that the Government discriminated against him on the basis of his race by not selecting him for the Manufacturing position in 2008.  *See id.* ¶¶ 96–103.

## III.  ANALYSIS

The Government's motion seeks dismissal of Counts I and V of the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In the alternative, the Government seeks summary judgment in its favor on

---

[5]      Mr. Craig states that he remained in the Executive Lead position for over year and a half and, effective September 7, 2014, was placed in a newly-created position of Associate Director of Environment, Safety and Health.  See Craig Decl. ¶ 15 n.1.

Counts I and V pursuant to Rule 56.  The Court discusses each of the Government's arguments below.

## A.  Legal Standard

When, on a motion under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and the parties "must be given reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Here, both parties have submitted evidence, in the form of documents and declarations, outside the pleadings in support of their positions and rely on them throughout their filings.  Therefore, the Court finds that conversion of the Government's motion to a motion for summary judgment is appropriate.  *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 195 (D.D.C. 2011).

Under Rule 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

As the movant, the Government "bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact."  *Allen*, 774 F. Supp. 2d at 194 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  In determining whether there exists a genuine dispute of material fact, the Court must regard Mr. Craig's factual claims as true and "accept all evidence and make all inferences in [his] favor."  *Id.* at 194–95 (citing *Anderson*, 477 U.S. at 255).  Mr. Craig may not, however, "rest upon the mere allegations or denials of his pleading,

but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

U.S. at 248 (internal quotation omitted).  He must establish more than "the mere existence of a

scintilla of evidence." *Id.* at 252.  If the evidence favoring the non–moving party is "merely

colorable" or "not significantly probative," then the Court may grant summary judgment. *Id.* at

249–50.

### B.  Count I

The Government argues that summary judgment in its favor is appropriate on Count I of

the Complaint, Mr. Craig's retaliation claim in connection with his reassignment to the

Executive Lead position, because Mr. Craig cannot establish that his protected EEO activity, his

first informal complaint filed on October 26, 2012, was the causative factor in his reassignment.

*See* Def.'s Mot. at 18–20.

A plaintiff bringing a retaliation claim under Title VII based on circumstantial evidence

must first establish a prima facie case by showing:  "(1) that he engaged in statutorily protected

activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal

link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing *Wiley v.

Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007)).  The Supreme Court has ruled that Title VII

retaliation claims, unlike status-based discrimination claims, "require proof that the desire to

retaliate was the but-for cause of the challenged employment action," rather than merely a

"motivating factor." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

"Under this standard, it is not sufficient for plaintiff to demonstrate that a reasonable jury could

find that retaliatory animus by plaintiff's supervisor was *a* cause for the [allegedly adverse

action]. Rather, plaintiff must demonstrate that there is a genuine issue of material fact as to

whether retaliatory animus was *the* cause for the [allegedly adverse action]." *Rattigan v. Holder*,

982 F. Supp. 2d 69, 81 (D.D.C. 2013) *aff'd*, 780 F.3d 413 (D.C. Cir. 2015).

      The crux of the Government's causation argument concerns the nature and timing of the

alleged materially adverse action, a required element of Mr. Craig's retaliation claim.  The

Government argues that, as a matter of law, Mr. Craig cannot establish but-for causation,

because, by Mr. Craig's own timeline of events, the alleged materially adverse action occurred

*before* he engaged in statutorily protected activity by filing his informal EEO complaint on

October 26, 2012.  *See* Def.'s Mot. at 19–20.  But Ms. Babers's conversation with Mr. Craig on

September 25, 2012 was not a materially adverse action for purposes of a Title VII retaliation

claim.

      Under the antiretaliation provision of Title VII, a materially adverse action is one that a

reasonable employee would find to be materially adverse, meaning that it "might have dissuaded

a reasonable worker from making or supporting a charge of discrimination." *Burlington

Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The September 25, 2012

conversation, in which Ms. Babers merely expressed her desire to locate a position for Mr. Craig

that would be a "better fit" without providing any more specifics, does not meet this standard,

because such a conversation, on the facts presented to the Court, would not dissuade a reasonable

employee from making or supporting a discrimination charge.  For example, in *Baloch v.

Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008), an employee argued that his employer's

unmaterialized proposals to suspend him first for two days and then later for thirty days, drafting

a written proposal for the thirty-day suspension, were retaliatory under Title VII.  *See Baloch*,

550 F.3d at 1199.  The D.C. Circuit disagreed, holding that the actions were not materially

adverse, because the suspension was not actually served and the written proposal had no actual

effect.  *See id.*  The same analysis would have applied if Mr. Craig brought a retaliation claim in connection with the September 25, 2012 meeting.  Had Ms. Babers never followed through on locating a different position for him, then Mr. Craig never would have had an actionable claim for retaliation under Title VII.  There was no materially adverse action at least until the Government informed Mr. Craig that he would actually be reassigned to the allegedly inferior Executive Lead position.  Thus, the Government's argument that the alleged materially adverse action occurred before the statutorily protected activity is incorrect.  The actionable retaliatory materially adverse action indisputably came *after* the statutorily protected activity.

The Government's argument is more properly construed as taking the position that, consistent with the Supreme Court's holding that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality," *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 272 (2001), Mr. Craig cannot establish causation, because, by reassigning him, the Government was simply following the line it contemplated before he filed his informal EEO complaint.  Mr. Craig's claim, however, is more nuanced than that.  He argues that the specific nature of his reassignment—the Executive Lead position that he alleges was substantially inferior to his prior SAM position—was retaliatory.  *See, e.g.,* Compl. ¶ 72.  He alleges that Ms. Babers did not state or otherwise imply during their September 25, 2012 conversation that he would be reassigned involuntarily or reassigned to a position that was not the equivalent of his SAM position.  *See* Pl.'s SGI ¶ I.13; Craig Decl. ¶ 78.  He further alleges that the Government took no steps to actually reassign him or to reassign him to the Executive Lead position until *after* he filed his informal complaint.  *See* Pl.'s SGI ¶ II.8; Craig Decl. ¶ 14.

On the current record, the Court is unable to compare what Ms. Babers envisioned for Mr. Craig at the time of their September 25, 2012 meeting with what she ultimately did by reassigning him to the purportedly vastly inferior Executive Lead position after he filed his informal EEO complaint.  Mr. Craig requests, therefore, that the Court defer consideration of the Government's motion until after he has had an opportunity to take discovery concerning Count I. *See* Pl.'s Opp. Def.'s Mot. Partial Dismissal or Partial Summ. J. ("Pl.'s Opp."), at 19–20, ECF No. 12.  Rule 56(d) of the Federal Rules of Civil Procedure provides that, upon a showing by a party that, for specified reasons, he cannot "present facts essential to justify" his opposition to a motion for summary judgment, the Court may defer consideration of or deny the motion, allow time for the party to take discovery, or issue any other appropriate order.  Fed. R. Civ. P. 56(d).

In order to meet the Rule's requirements, the party must meet three criteria:  (1) he must "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation"; (2) he "must explain why he could not produce the facts in opposition to the motion for summary judgment"; and (3) he "must show the information is in fact discoverable." *Convertino v. U.S. Dep't. of Justice*, 684 F.3d 93, 99–100 (D.C. Cir. 2012) (internal quotations omitted).  "A [Rule 56(d)] motion requesting time for additional discovery should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Id.* at 99 (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996)).  This is particularly true with respect to pre-discovery motions for summary judgment on retaliation claims brought under Title VII.  *See Blue v. Jackson*, 860 F. Supp. 2d 67, 78 (D.D.C. 2012) (holding that "it would be premature to grant summary judgment [on a retaliation claim] before [the plaintiff] has been afforded any opportunity to develop facts to support his argument"); *McWay v. LaHood*, 269 F.R.D. 35, 37–38

(D.D.C. 2010) ("[T]he D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view [pre-discovery] summary judgment motions . . . with special caution.") (*citing Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).

Although Mr. Craig has neither submitted a separate motion under Rule 56(d) nor provided a separate affidavit in support of his request, the Court finds that he has satisfactorily provided information to warrant the Court to defer consideration of the Government's motion in order to permit Mr. Craig to take discovery concerning his claim.[6]  He satisfies the first criterion by explaining that he seeks discovery to confirm his account of the sequence of events leading to his reassignment.  *See* Pl.'s Opp. at 19.  Discovery concerning the Government's decision-making process between September 2012, when Ms. Babers first raised the possibility of finding a different position, and early December 2012, when Mr. Craig's reassignment was formally announced, is essential to proving or disproving Mr. Craig's claim.  The second criterion is easily satisfied here, because Mr. Craig has not had any opportunity to take discovery in this action.  Retaliation cases turn on the motivations of the plaintiff's employer, and discovery is typically the only means by which a plaintiff can prove his claim.  *See Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012) (stating that whether an employer had a legitimate, non-discriminatory reason for an alleged retaliatory action "is a fact-sensitive inquiry that can only be undertaken after discovery has run its course").  It is, therefore, understandable that Mr. Craig is unable to provide evidence to oppose the Government's motion at this juncture.  The

---

[6]     The Government does not challenge the procedure in which Mr. Craig has made his Rule 56(d) request.

third criterion is also satisfied, as documents within the Government's control and witnesses can provide relevant evidence during discovery.

Moreover, permitting Mr. Craig to obtain discovery concerning Count I of his complaint raises little, if any, concerns of judicial economy or wasting the parties' resources. The Government's argument to the contrary, based on the differences between the factual allegations underlying Counts I and II and the agency officials involved in those factual allegations, is misplaced. *See* Def.'s Reply at 18, ECF No. 14. The Government ignores the overlap in the discovery relevant to Counts I and III. In Count III of the Complaint, on which the Government does not seek dismissal or summary judgment, Mr. Craig alleges that the Government discriminated against him on the basis of his race by involuntarily reassigning him to the Executive Lead position. *See* Compl. ¶¶ 80–87. Discovery concerning Mr. Craig's allegations underlying Count III will focus on the Government's process for deciding how, when, and why to reassign him. Discovery concerning Count I will focus on the same factual issues and will primarily concern the short time frame between Mr. Craig's informal complaint on October 26, 2012 and the formal announcement of his reassignment on December 2, 2012. Little, if any, additional resources should be required to conduct this discovery.

Therefore, the Court will grant Mr. Craig's request by denying the Government's motion for summary judgment with respect to Count I without prejudice to the Government's ability to seek summary judgment again after Mr. Craig has had an opportunity to conduct discovery. *See, e.g., Dinkel v. Medstar Health, Inc.*, 286 F.R.D. 28 (D.D.C. 2012).

## C.  Count V

The Government argues that summary judgment on Count V of the Complaint, Mr. Craig's discrimination non-selection claim in connection with his unsuccessful application for

the Manufacturing position in 2008, is appropriate, because Mr. Craig failed to timely exhaust his administrative remedies.[7]  *See* Def.'s Mot. at 9–15.

A federal employee seeking to bring a claim under Title VII must first exhaust his administrative remedies.  *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 197 (D.D.C. 2011) (citing *Harris v. Gonzalez*, 488 F.3d 442, 443 (D.C. Cir. 2007); *Winston v. Clough*, 712 F. Supp. 2d 1, 7 (D.D.C. 2010)).  To meet the requirement, the employee must contact an EEO counselor within 45 days of the alleged discriminatory action in accordance with Equal Employment Opportunity Commission ("EEOC") regulations.  *See id.* (citing 29 C.F.R. § 1614.105(a)(1); *Greer v. Paulson*, 505 F.3d 1306, 1316–17 (D.C. Cir. 2007)).  The agency must extend the 45-day time limit if an employee shows that he did not know and reasonably should not have known that the alleged discriminatory action had occurred.  *See* 29 C.F.R. § 1614.105(a)(2).  The time limit is also separately subject to the equitable doctrine of tolling.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Generally, tolling "will be exercised only in extraordinary and carefully circumscribed instances."  *Bass v. Bair*, 514 F. Supp. 2d 96, 99 (D.D.C. 2007) (citing *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).  If an employee fails to properly exhaust his administrative remedies and does not provide an adequate basis for equitable tolling, then he cannot pursue a Title VII claim against the federal government.  *See Allen*, 774 F. Supp. 2d at 197 (citing *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008)).

---

[7]    The Government separately argues that summary judgment should also be granted in its favor because the same official that allegedly discriminated against Mr. Craig recommended him for selection for the SAM position.  *See* Def.'s Mot. at 17–20.  Because the Court grants summary judgment in the Government's favor due to Mr. Craig's failure to exhaust his administrative remedies, the Court does not reach this issue.  But the Court notes that it would not have seemed advisable to resolve this issue at this stage of the litigation.

Mr. Craig argues that the 45-day time limit should be tolled under the fraudulent concealment doctrine, as he alleges that Mr. Brunhart fraudulently concealed his role in rejecting Mr. Craig's application for the position by, among other things, telling Mr. Craig that he was not the ERB panel's recommendation for the position. *See* Pl.'s Opp. at 25.

Under the fraudulent concealment doctrine, a time bar is tolled when "a party injured by another's fraudulent conduct 'remains in ignorance . . . without any fault or want of diligence or care on his part'" until the fraud is discovered. *Hobson v. Wilson*, 737 F.2d 1, 33 (D.C. Cir. 1984) (quoting *Bailey v. Glober*, 88 U.S. (21 Wall.) 342 (1874)), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). The D.C. Circuit has held that the doctrine applies only when the defendant has "engage[d] in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action." *Hobson*, 737 F.2d at 34–35. "The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Id.* at 35.

Notice in this context is different from typical inquiry notice and is instead "something closer to actual notice." *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C. Cir. 1989). It means "an awareness of sufficient facts to identify a particular cause of action" or a "showing that the plaintiff could have discovered . . . the cause of action if he had exercised due diligence." *Hobson*, 77 F.2d at 35. In *Hobson*, the D.C. Circuit described two factors to consider: first, "the plaintiff must know facts giving notice of the particular cause of action at issue, not just any cause of action"; and second, the "plaintiff's knowledge of the grounds for a

suit must generally extend to an awareness of the persons responsible for plaintiff's injury." *Id.* at 35–36.

Mr. Craig alleges that Mr. Brunhart falsely told him in late August or early September 2008 that he was not selected for the Manufacturing position because the ERB had recommended a different candidate who was better qualified. *See* Pl.'s SGI ¶ II.26; Craig Decl. ¶ 34; Compl. ¶ 49. Mr. Craig provides, among other things, a sworn affidavit by Mr. Horton, a member of the ERB interview panel, submitted as part of the EEO investigation in which Mr. Horton states his recollection that Mr. Craig "was forwarded as the top candidate" and that the selected candidate "had been eliminated in the first interview cut." Horton EEO Aff at 3–4. Accepting Mr. Craig's evidence as true for purposes of summary judgment, the Court finds that there is a genuine issue of fact as to whether Mr. Brunhart provided him with a false justification for his non-selection. The question for purposes of summary judgment is whether that issue of fact is material. The inquiry therefore turns on whether and when, regardless of whether Mr. Brunhart provided a false justification, Mr. Craig had notice of the alleged discriminatory action sufficient to start running the 45-day time limit.

The Government argues that Mr. Craig had sufficient notice of his non-selection claim at the time it occurred in 2008, because, according to Mr. Craig's allegations, he knew at that time that: he had applied and was not selected for the Manufacturing position; Mr. Peterson, a Caucasian, had been selected; and Mr. Brunhart had a role in Mr. Peterson's selection. *See* Def.'s Mot. at 11. The argument is not persuasive. An employee's mere knowledge that a person of a different race was selected instead of him for a position is insufficient to meet the heightened notice standard in the context of fraudulent concealment. Taking Mr. Craig's allegations as true for purposes of summary judgment, Mr. Craig had no reason at the time to

suspect that the selection was made on the basis of race, that he had been recommended by the ERB, or that Mr. Peterson was unqualified for the position.

The Court agrees, however, with the Government's argument that, even if Mr. Craig did not have sufficient notice in 2008, he had sufficient notice at least by the time he filed his first informal EEO complaint in October 2012. *See* Def.'s Mot. at 9–14.  Mr. Craig claims that in the summer of 2012, a union representative at the Mint "suggested to [him]" that, contrary to what Mr. Brunhart told him, he had been the ERB's recommendation for the Manufacturing position. Craig Decl. ¶ 41.  Even more importantly, it is an undisputed fact that on October 26, 2012, he represented, through counsel, to the EEO the following facts as background to his informal complaint:  Mr. Peterson, a white male, was selected by Mr. Brunhart, a white male, for the Manufacturing position; Mr. Peterson "received a lower rating by the interview panel" than Mr. Craig; the ERB deemed Mr. Peterson "not competitive" for the position; and Mr. Craig was more qualified than Mr. Peterson for the position.  Pl.'s SGI ¶ I.15.

Mr. Craig's claim that, despite making these statements, he lacked "any real way to begin penetrating Mr. Brunhart's deception," Craig Decl. ¶ 48, is implausible, and he fails to provide any sufficient explanation.  He claims that he only gained the ability to "penetrate Mr. Brunhart's deception" when Mr. Horton and Ms. Eskridge responded to his contacts in the summer of 2013, but he does not explain why he was unable to contact them and obtain the same information from them any earlier, despite knowing who they were and believing since 2008 that they both served on the ERB panel that interviewed him for the Manufacturing position.  Not only did Mr. Craig have the ability to uncover additional information concerning his non-selection and confirm his suspicions as early as the summer of 2012, but his statements to the EEO demonstrate that he

already knew by October 2012 that Mr. Brunhart had not been truthful and that the ERB did, in fact, recommend him and find him to be more qualified than Mr. Peterson.

The D.C. Circuit's decision in *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977), is instructive. In that case, the plaintiff alleged that Air Force and executive branch officials conspired to discharge him from his employment by the Air Force in retaliation for testimony he gave before a congressional committee. *See Fitzgerald*, 553 F.2d at 222–23. The plaintiff initially appealed his termination to the Civil Service Commission in a letter in which he "complained that he had been the victim of a discharge improperly motivated by his congressional testimony." *Id.* at 222. The D.C. Circuit upheld the district court's decision that, although the fraudulent concealment doctrine applied because the plaintiff had alleged that the defendants concealed their conspiracy, the plaintiff's appeal letter demonstrated that, by at least the time of the letter, "he had facts in hand sufficient to put him on notice of the conspiracy by the [defendants] to retaliate against him for his congressional testimony." *Id.* at 228. The present case is substantially similar: Mr. Craig's informal EEO complaint demonstrates that he had knowledge of specific facts sufficient to put him on notice of his non-selection claim, despite Mr. Brunhart's alleged fraud.

No reasonable juror could find that, by October 26, 2012, Mr. Craig did not have sufficient notice of his non-selection claim. Accordingly, any equitable tolling of the EEOC's 45-day time limit ceased by at least that date, and Mr. Craig failed to timely exhaust his administrative remedies by not filing a complaint for discriminatory non-selection until August 2013. The Court will therefore grant summary judgment in favor of the Government on Count V of the Complaint.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny without prejudice Defendant's Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment (ECF No. 10) with respect to Count I and grant summary judgment in favor of the Government with respect to Count V.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 19, 2015                                              RUDOLPH CONTRERAS
                                                                          United States District Judge