# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| B.B. CRAIG, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1340 (RC) |
| | : | | |
| v. | : | Re Document No.: | 33 |
| | : | | |
| STEVEN MNUCHIN, Secretary, | : | | |
| United States Department of the Treasury,[1] | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff B.B. Craig, an official at the United States Mint (the "Mint"), brings this suit against Steven Mnuchin, in his official capacity as Secretary of the United States Department of Treasury, alleging violations of Title VII of the Civil Rights act of 1964 ("Title VII"). Now before the Court is the Secretary's Motion for Summary Judgment. *See generally* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 33. For the reasons stated below, the Court will grant in part and deny in Defendant's motion.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Steven Mnuchin, the current Secretary of the United States Department of the Treasury, is automatically substituted as the defendant in this matter.

## II. BACKGROUND[2]

The Mint, which is a bureau of the United States Department of Treasury ("Treasury"), is responsible for not only manufacturing and distributing coins used by the public in commerce, but also for manufacturing, marketing and selling collectible ("numismatic") coins and investment grade bullion. *See* Pl.'s Resp. SMF ¶ 1. Within the Mint, marketing and selling of such products is the responsibility of the Sales and Marketing Division ("SAM Division"), which is overseen by the Mint's Associate Director for Sales and Marketing ("A/D SAM"). *See* Pl.'s Resp. SMF ¶¶ 7, 13–14.

On November 17, 2008, the Mint hired B.B. Craig, an African-American man, to be its A/D SAM. *See* Pl.'s Resp. SMF ¶ 13. In that role, Mr. Craig reported directly to the Deputy Director of the Mint and was charged with leading an organization responsible for generating sales of approximately $500 million annually. *See* Dep. B.B. Craig ("Craig Dep.") at 25:12–26:5, 32:24–33:9, ECF No. 51-3. Mr. Craig had "authority to speak and act on behalf of the Mint in public meetings and private conferences with senior officials of the [] Treasury, top-level Mint management, and representatives of other agencies of the federal government and international governments." Decl. B.B. Craig ("Craig Decl.") ¶ 3, ECF No. 40-2. Mr. Craig also had significant supervisory authority, with approximately ninety-four full-time equivalent employees allotted to the SAM Division. *See* Craig Decl. ¶ 4.

Upon assuming the A/D SAM position, Mr. Craig also became a member of the Senior Executive Service ("SES"), the Federal government's executive management core. Pl.'s Resp. SMF ¶¶ 6–7, 13. Members of the SES are "charged with executive management of key

---

[2] Unless otherwise noted, this section recounts only facts that the parties do not dispute or facts substantiated by the record. *See generally* Pl.'s Resp. Def.'s Statement Material Facts ("Pl.'s Resp. SMF") at 1–44, ECF No. 40-1 (admitting that certain facts are undisputed).

governmental programs, divisions, offices, and functions within Federal executive branch agencies, such as the Mint." Pl.'s Resp. SMF ¶ 8. However, they are governed differently than other federal employees and can, at the discretion of the agency, be reassigned to any SES position within an agency for which they are qualified or be "detailed" to a position with unclassified duties within the agency or to another agency for up to 240 days. *See* Pl.'s Resp. SMF ¶¶ 10–12; Pl.'s Opp'n, Ex. 16 at 9, 11–12, ECF No 41-14.

This case primarily concerns Mr. Craig's removal from his position as A/D SAM, his placement into other inferior roles at the Mint, and Defendant's refusal to reassign him to a position that was commensurate with the A/D SAM position. Of central importance to all of these claims is Mr. Craig's performance on two critical projects during the 2012 fiscal year rating period ("FY 2012")—the Order Management System Project and the Comprehensive Numismatic Marketing Plan and Advertising Spend Request. The Secretary claims that Mr. Craig's inadequate performance on these two projects set into motion a series of employment actions that Mr. Craig is now alleging were discriminatory and retaliatory. Indeed, Defendant argues that Mr. Craig's performance justified Mr. Craig's FY 2012 performance evaluation, his removal from the A/D SAM position, and prompted Defendant to find another position at the Mint that was a "better fit" for Mr. Craig. Ultimately, the "better fit" that Defendant identified was a detail to a position called "Executive Lead," which, unlike Mr. Craig's previous position, had unclassified duties and no supervisory authority. Although Mr. Craig remained in the Executive Lead position beyond the 240-day limit, he was eventually reassigned to a permanent SES position as Associate Director of Environment, Safety, and Health ("A/D ES&H"), which Mr. Craig argues is only marginally better than the "Executive Lead" position and was far from commensurate with his former A/D SAM position.

## A. The OMS Project

One of the projects that Mr. Craig worked on during the FY 2012 rating period was the Order Management System Project ("OMS Project" or "the Project"). *See* Pl.'s Resp. SMF ¶ 22–23. This Project was undertaken by the SAM Division and the Mint's Information Technology Division ("IT"). *See* Pl.'s Resp. SMF ¶ 22; Pl.'s Statement Genuine Issues ¶ 16, ECF No. 40-1. The Mint's goal was to overhaul, upgrade, and revise the Mint's existing online ordering system that the public used to purchase Mint products. *See* Pl.'s Resp. SMF ¶ 22. Between SAM and IT, SAM was responsible for specifying its needs and how the system should function, while IT was responsible for delivering the system. *See* Dep. Beverly Babers ("Babers Dep.") at 120:5–121:13, ECF No. 51-1 (SAM is responsible for identifying "what we need and this is how we need it to work and this is why it important to our customers," while IT is responsible for presenting "here is how you do it and here are your options for doing it."); Craig Dep. at 84:1–5 ("So the way it was designed, IT was the lead of the [P]roject. I was the customer, but I had say-so and I was supposed to give up resources to make the [P]roject an accomplishment."). However, this was to be a highly collaborative process between the two departments. *See* Babers Dep. at 121:13–15 ("So it's got to be really, really collaborative. And they are both [SAM and IT] both very critical to the situation."). Overseeing the Project was an Executive Steering Committee ("ESC"), which was to provide support, guidance, and resources to ensure that the OMS Project was a success. *See* Dep. Richard Peterson ("Peterson Dep.") at 76:10–20, ECF No. 50-2. Both Mr. Craig and the Mint's Chief Information Officer ("CIO") served on this committee. *See* Peterson Dep. at 75:14–17; *accord* Pl.'s Resp. SMF ¶ 51.

The Project was initiated at the beginning of FY 2012, but by Spring of 2012, problems had emerged. Richard Peterson, the Deputy Director of the Mint, recalled that by early April, he felt that the "[P]roject was not on track" and knew "the [P]roject was late and behind budget."

Peterson Dep. at 79:17–20.  Thus, in May 2012, Mr. Peterson made the decision to temporarily

halt the OMS Project and retain the Mitre Corporation ("Mitre") to conduct an analysis of the

OMS Project's continued viability.  *See* Pl.'s Resp. SMF ¶ 31.

Around this same time, Mr. Peterson hired Beverly Babers.  Earlier that year Mr.

Peterson had decided to seek additional executive management resources for the Mint.  *See* Pl.'s

Resp. SMF ¶ 32.  Thus, in April and May of 2012, Mr. Peterson interviewed and ultimately hired

Ms. Babers to be the Mint's Chief Administrative Officer.  *See* Pl.'s Resp. SMF ¶ 33.  Before she

began working at the Mint, however, Mr. Peterson asked Ms. Babers to attend a meeting with

Mitre and other Mint executives to discuss the OMS Project.  *See* Pl.'s Resp. SMF ¶ 34.  At that

meeting, Mitre described its findings and recommended that the OMS Project be temporarily

suspended.  *See* Pl.'s Resp. SMF ¶ 35; Babers Dep. at 106:1–11.  Ms. Babers testified that her

understanding of Mitre's findings from that meeting was that "there was lack of . . . governance

and oversight that contributed to the failure of the [P]roject and, specifically, [that] the IT and

Sales and Marketing Departments had failed to effectively collaborate."  Babers Dep. at 107:14–

19.

Indeed, Mitre found systemic and programmatic deficiencies in the OMS Project, one of

which was "governance."  *See* Pl.'s Resp. SMF ¶ 36.  One problem that Mitre identified was the

Project's "shifting program accountability and decision making."  Def.'s Mot., Ex. 15 at Bates

No. 002548, ECF No. 35-3.  According to Mitre, while the documented governance processes

indicated that the CIO was "responsible and accountable for program delivery," it observed that

the ESC "[did] not operate in accordance with its documented roles and responsibilities and

[was] acting in a de facto decision-making capacity."  Def.'s Mot., Ex. 16 at 7, ECF No. 35-4.

So while, "program accountability [resided] with the [CIO], [] decision-making [was] diffused

via the ESC." Def.'s Mot., Ex. 16 at 7. In addition, Mitre identified "weak communications," "conflicting assumptions about program scope and intent," and "internal discord." Pl.'s Resp. SMF ¶¶ 36, 38; *see also* Def.'s Mot., Ex. 15 at Bates No. 002548. It concluded that this "infighting [was] endangering pursuit of [the Mint's] goal." Pl.'s Resp. SMF ¶¶ 36, 38; *see also* Def.'s Mot, Ex. 15 at Bates No. 002548. Thus, Mitre recommended that the Mint make improvements to its "program governance and management structures, methods, and disciplines," Pl.'s Resp. SMF ¶ 37, but also that it "slow down" the Project until "certain systemic improvements in governance and management of the [P]roject were incorporated." Pl.'s Resp. SMF ¶ 39.

Mr. Craig does not dispute that Mitre made such findings or that they were discussed during the meeting with Ms. Babers. However, according to Mr. Craig, the failure of the Project had nothing to do with him or the SAM Division, but was, instead, attributable to the CIO who was responsible for both the budget and the timeline for the OMS Project. *See* Craig Dep. at 84:13–15. He also claims that it was the CIO that was hostile towards other members of the OMS Project team and who refused to share information about the budget, status, or progress of the Project with Mr. Craig. *See* Craig Dep. at 50:2–52:7. And even though Mr. Craig brought these issues to Mr. Peterson's attention, he claims that Mr. Peterson did nothing to address them. *See* Craig Dep. at 153:14–154:18.

Ms. Babers officially reported for duty at the Mint in July 2012. *See* Pl.'s Resp. SMF ¶ 44. Once she arrived, Mr. Peterson shifted the reporting lines of Mr. Craig and other executives as part of an organizational realignment. *See* Pl.'s Resp. SMF ¶ 45. From that point forward, Mr. Craig and others, including the CIO, were to report directly to Ms. Babers who, in turn, reported to Mr. Peterson. *See* Pl.'s Resp. SMF ¶ 45; Def.'s Mot., Ex. 2, ECF No. 34-2.

After joining, Ms. Babers took several steps to improve the project governance of the OMS Project.  *See* Pl.'s Resp. SMF ¶¶ 48–51.  For example, an Executive Lead was assigned to the Project and an official from the Treasury's Office of the Chief Information Officer was added to assist on technical aspects of the Project.  *See* Pl.'s Resp. SMF ¶¶ 48–49.  The Project was ultimately reconstituted as "OMS II" and, later, both Mr. Craig and the CIO were removed from the ESC.  *See* Pl.'s Resp. SMF ¶¶ 50–51.

### B.  The Marketing Plan

In addition to the OMS Project, Mr. Craig was responsible for developing the "mission-critical" Comprehensive Numismatic Marketing Plan and Advertising Spend Request ("Marketing Plan" or "the Plan").  Pl.'s Resp. SMF ¶ 52.  At that time, the Mint was looking for ways to halt or reverse the years-long decline in the numismatic customer base and revenue for numismatic product sales.  *See* Pl.'s Resp. SMF ¶ 53.  To do this, it wanted to engage in advertising, but it first needed approval from Treasury to obtain the funds.  *See* Dep. Sherry Suggs ("Suggs Dep.") at 54:7–55:5, ECF No. 51-8.  Thus, Mr. Craig and his team were responsible for developing a marketing plan to support their request for funds.  *See* Suggs Dep. at 54:7–55:5.  This Marketing Plan would explain how the funds were to be spent, the kinds of marketing and advertising the Mint wanted to pursue, what those efforts were expected to produce in terms of revenue and customers, and would include supporting evidence for the various recommendations.  *See id.*  Although Mr. Craig was responsible for the Plan, Ms. Babers felt that he left much of the oversight for the Plan to his Deputy.  *See* Def.'s Mot., Ex. 14 at Bates No. 00178 (Mr. Craig "left primary oversight of the plan to his deputy"), ECF No. 34-12; *see also* Babers Dep. at 174:16–21 ("it was my understanding from [Mr. Craig] that [his deputy] had the more technical [marketing] experience and in fact that she was the one who was within Sales and Marketing leading this . . . marketing plan effort.").

Work on the Marketing Plan first began in FY 2011 and continued through FY 2012. During that time, the Plan received both praise and criticism. For example, in June 2012, the Mint's Chief Counsel reviewed a draft of the Marketing Plan and said it was "the best piece of work in terms of a marketing plan that [he] [had] seen in some time" and told Mr. Craig "Nice Job!" Pl.'s Opp'n, Ex. 19, ECF No. 41-16. Others, however, noted issues. For example, the Mint's Director of Public Affairs wrote Mr. Peterson and Ms. Babers a lengthy email in July 2012 in which he raised several substantive questions concerning the Plan and stated his belief that the Plan outlined or identified many problems, but failed to provide many good solutions or recommendations. Pl.'s Resp. SMF ¶ 58; Def.'s Mot., Ex. 22, ECF No. 34-17.

On August 23, 2012, there was a meeting among various Treasury and Mint officials to discuss the Marketing Plan. *See* Def.'s Mot., Ex. 23, ECF No. 34-18. Following that meeting, Treasury's Assistant Secretary for Management sent an email to Mr. Craig and others, including the Treasurer of the United States, Mr. Peterson, and Ms. Babers, in which she raised questions about the Plan's recommended new customer base, the Plan's ability to capture new customers, the requested spend amount, and the Plan's return on investment calculation. *See* Pl.'s Resp. SMF ¶ 58; Def.'s Mot., Ex. 23 Indeed, she noted that some of the Plan's arguments were not sufficiently "convincing" or "compelling" Def.'s Mot., Ex. 23.

At this same time, however, there was a draft action memorandum that was going through the Mint clearance review process. *See* Def.'s Mot., Ex. 24, ECF No. 34-19; Pl.'s Resp. SMF ¶ 59. The memorandum was a draft of the formal funding request from the Mint to the Treasury and summarized the Marketing Plan. *See* Def.'s Mot., Ex. 24. According to Mr. Craig, Ms. Babers put this memorandum together using excerpts of the SAM Division's Marketing Plan. *See* Craig Decl. ¶ 24. Although the Mint's Executive Secretary and its Chief Counsel each

approved the memorandum on August 22 and 23 respectively, Ms. Babers and Mr. Peterson did not sign off on it. *See* Def.'s Mot., Ex. 24. Thus, the memorandum was never presented to Treasury. *See* Pl.'s Resp. SMF ¶ 59.

At her deposition, Ms. Babers recalled that, at some point in August or September, Mr. Craig, Ms. Babers, and Mr. Peterson had a meeting with the Treasurer where they attempted to "instill confidence" that they "had a plan of action that was credible and baked for moving forward with marketing and advertising" in the event Treasury approved their spend request. Babers Dep. at 164:2–165:1. According to Ms. Babers, that meeting "went poorly" and it became clear from the Treasurer that the Marketing Plan was not "going well." Babers Dep. at 164:18, 165:12–15.

Ultimately, neither the Treasurer nor the Treasury Deputy Secretary ever approved a Marketing Plan in FY 2012, *see* Pl.'s Resp. SMF ¶ 60, and Ms. Babers came to believe that Mr. Craig had been unsuccessful in his efforts to deliver an acceptable Marketing Plan, *see* Def.'s Mot., Ex. 10 at Bates No. 00204, ECF No. 34-10; Def.'s Mot., Ex 14 at Bates No. 00178.

### C. FY 2012 Performance Appraisal

The performance objectives, deliverables, and standards that SES members are expected to meet over the course of a particular rating year are memorialized in a document called an Executive Performance Agreement ("EPA"), which is issued to each SES member annually. *See* Pl.'s Resp. SMF ¶ 23. Mr. Craig's FY 2012 EPA listed the OMS Project as a critical performance deliverable and therefore it became "Commitment Element 4" of Mr. Craig's evaluations. *See* Pl.'s Resp. SMF ¶ 23.

Over the course of the 2012 fiscal year, Mr. Craig received both a mid-year review from Mr. Peterson and an end-of-year review from Ms. Babers. The available rating options for a Treasury SES member, such as Mr. Craig, in ascending order, are: Unsatisfactory, Minimally

Successful, Fully Successful, Exceeded, and Outstanding. *See* Pl.'s Resp. SMF ¶ 72; Pl.'s

Opp'n, Ex. 11, ECF No. 41-11. Mr. Peterson conducted a mid-year review of Mr. Craig in June

2012. Pl.'s Resp. SMF ¶ 43; Pl.'s Opp'n, Ex. 10, ECF No. 41-10. He rated Mr. Craig as "Fully

Successful" on "Commitment Element 4," which related to Mr. Craig's work on the OMS

Project, and "Exceeded" in all other categories. *See* Pl.'s Resp. SMF ¶ 43; Pl.'s Opp'n, Ex. 10.

This resulted in an overall rating for Mr. Craig of "Exceeded." *See* Pl.'s Opp'n, Ex. 10.

On November 8, 2012, Ms. Babers met with Mr. Craig to issue his FY2012 performance

rating. Pl.'s Resp. *See* SMF ¶ 71. Like Mr. Peterson, Ms. Babers gave Mr. Craig a "fully

successful" rating on the OMS Project, but unlike Mr. Peterson, she also evaluated Mr. Craig as

"fully successful" in the areas of "Program Management" and "Customer Service &

Collaboration." *See* Pl.'s Resp. SMF ¶ 73; Pl.'s Opp'n, Ex. 11. In all other areas Ms. Babers

rated Mr. Craig as "Exceeded." *See* Pl.'s Opp'n, Ex. 11. Once combined, these grades resulted

in Mr. Craig's overall rating of "Fully Successful." *See* Pl.'s Opp'n, Ex. 11. In the narrative

assessment of Mr. Craig's performance, Ms. Babers specifically cited the unsuccessful OMS

Project and Marketing Plan as bases for the rating. *See* Pl.'s Resp. SMF ¶ 74 When Plaintiff

sought a higher-level review of his rating from an official outside of Ms. Babers's chain of

command, that official sustained Ms. Babers's rating, noting that she "did not find any

documentation to change the ratings for Program Management, Customer Service and

Collaboration, or Commitment Element 4." Def.'s Mot., Ex. 27, ECF No. 34-22; *see also* Pl.'s

Resp. SMF ¶ 75.

Mr. Craig argues that Ms. Babers's failure to rate him at the "Exceeded" level resulted in

him not receiving an SES performance bonus for FY 2012. *See* Pl.'s Opp'n at 15–16. Although

Mr. Craig had previously received SES performance bonuses every other year for which he had

been at the Mint,[3] *see* Pl.'s Opp'n, Exs. 2–3, ECF Nos. 41-4 & 41-5, Ms. Babers did not

recommend, and Mr. Craig did not receive, an SES performance bonus for the FY2012 rating

period.  *See* Pl.'s Resp. SMF ¶ 80.  According to Office of Personnel Management and Treasury-

wide guidance, SES members are not guaranteed a bonus regardless of their performance level.

*See* Pl.'s Resp. SMF ¶ 81.  Furthermore, Treasury-wide guidance advises agencies to make

"meaningful distinctions" among SES members' performance and notes that "[a]ll bonuses are

discretionary, they are not required or guaranteed, regardless of rating level."  Pl.'s Resp. SMF ¶

83.

### D.  Removal from A/D SAM, Detail to Executive Lead, and Reassignment to A/D ES&H

On September 25, 2012, a few days before the end of the FY 2012 rating year and shortly

after the last Marketing Plan briefing with the Treasurer, Ms. Babers and Mr. Craig had a

meeting.  *See* Pl.'s Resp. SMF ¶¶ 62–63; Babers Dep. at 164:2–165:1.  At that meeting, Ms.

Babers addressed concerns relating to the Marketing Plan and raised criticism of Mr. Craig's

performance as A/D SAM.  *See* Babers Dep. at 164:2–165:1; Craig Decl. ¶ 9.  Ms. Babers

observed that the Marketing Plan was not "going well" and told Mr. Craig she believed

marketing did not appear to be his strong suit.  *See* Babers Dep. at 165:7–18.  Mr. Craig

explained that, in fact, he was "a manufacturing guy" and the two had a discussion regarding his

experience in that area.  *See* Babers Dep. at 166:18–19; 169:4–11; 173:13.  Thus, the two began

discussing the possibility of finding another position at the Mint that would be a "better fit" for

---

[3] Mr. Craig's previous performance bonuses ranged from approximately $8,500 to
$12,800.  *See* Pl.'s Resp. SMF ¶ 84.

Mr. Craig.[4]  *See* Pl.'s Resp. SMF ¶ 66; Babers Dep. at 166:22–67:2, 172:10–73:1; Craig Decl. ¶ 9.

Ms. Babers and Mr. Craig had further discussions between September and December 2012.  *See* Def.'s Mot., Ex. 14 at Bates No. 00181; Babers Dep. at 198:2–202:1.  According to Ms. Babers, she and Mr. Craig worked together, seeking to identify an alternative role based on Mr. Craig's stated interests and strengths.  *See* Def.'s Mot., Ex. 14 at Bates No. 00181.  Those discussions eventually came to center on the concept that would later be described as the "Executive Lead" role.  *See* Def.'s Mot., Ex. 14 at Bates No. 00187; Babers Dep. at 198:2–202:1. That position would entail "long-range process planning," the goal of which was to identify ways of the Mint could be more efficient in manufacturing and bringing its numismatic products to market.  *See* Pl.'s Resp. SMF ¶¶ 100–01; Def.'s Mot., Ex. 14 at Bates No. 00181 Babers Dep. at 198:2–202:1.  But, according to Mr. Craig, during the few conversations between the two, they did not discuss "specifics about what [he] would be doing in the Executive Lead position" nor did Ms. Babers ever tell him how much staff he would have, where his position would fall within the organization, or what budget he would be working with.  Craig Decl. ¶ 15.

On October 26, 2012, before being detailed to the Executive Lead position, Mr. Craig filed an informal EEO complaint.  *See* EEO Counseling – Intake Information ("EEO Compl.") at Bates No. 00098, ECF No. 12-18; Pl.'s Resp. SMF ¶ 86.  In it, he made various allegations of reprisal and discrimination based on his race and sex.  *See generally* EEO Compl.  He also

---

[4] Ms. Babers did not explicitly state that she intended to reassign Mr. Craig from his position at this meeting, though she did believe that her intention was clear from the conversation.  *See* Babers Dep. at 172:7–173:1.  Mr. Craig apparently understood this because, in his October 26, 2012 EEO complaint, he wrote that, at the September meeting, Ms. Babers wanted "to discuss what [Mr. Craig] wanted to do in the future, as it was 'time for them to find a better fit for him' than his current position" and that she wanted to "transition [him] out of SAM."  EEO Counseling – Intake Information at Bates No. 00109, ECF No. 12-18.

described the September 25 meeting with Ms. Babers and stated that Ms. Babers had informed him that they "needed to discuss what he wanted to do in the future, as it was 'time for them to find a better fit for him' than his current position." EEO Compl. at Bates No. 00109. It also states that she "suggested that she would find a position within the Mint that would last about one year, and which would allow him to transition out of SAM and work on 'operational issues.'" EEO Compl. at Bates No. 00109. Mr. Craig claims that he "did not know what would come of the September 25, 2012 meeting," but that he initiated the EEO process "as a precautionary measure to ensure that the Mint could not come back later and claim that [he] had missed a filing deadline." Craig Decl. ¶ 10. Ms. Babers learned of Mr. Craig's EEO activity on December 5, 2012 and expressed to Mr. Craig that she understood Mr. Craig had filed an EEO complaint and indicated that she was amenable to mediation. *See* Pl.'s Resp. SMF ¶¶ 87–88.

Six days later, on December 11, 2012, Mr. Peterson issued a Mint-wide email announcing several leadership changes at the Mint. Pl.'s Resp. SMF ¶¶ 90–91. First, it announced that Mr. Craig would leave his role as A/D SAM and would become the "Executive Lead" for the Comprehensive Production Schedule and Plan Project. *See* Pl.'s Resp. SMF ¶ 90; Def.'s Mot., Ex 31, ECF No. 34-25. The email also announced that Jon Marc Landry, a white SES member with no prior EEO activity, would discontinue his role as Acting Associate Director of Manufacturing ("Acting A/D Manufacturing") and would take over, on an acting basis, the A/D SAM position that Mr. Craig was vacating. *See* Pl.'s Resp. SMF ¶¶ 20, 92, 94; Def.'s Mot., Ex. 31. Dave Croft, another white SES member with no prior EEO activity who had been overseeing the Denver manufacturing facility, would assume Mr. Landry's former position as Acting A/D of Manufacturing. Pl.'s Resp. SMF ¶¶ 21, 94. Although the Mint's Human Resources ("HR") department would ordinarily have been consulted about an SES member's

detail, neither the head of HR nor the HR representative responsible for SES executives at the Mint learned about Mr. Craig's detail until the December 11, 2012 announcement was made. *See* Dep. Lisa Nicholson ("Nicholson Dep.") at 63:12–70:4, ECF No. 51-6; Dep. Anita Fogan ("Fogan Dep.") at 30:22–32:6, ECF No. 51-5.

Mr. Craig's detail to the Executive Lead position began effective January 3, 2013. Pl.'s Resp. SMF ¶ 91. This position had no occupational code, classified grade level, or position description and was therefore subject to the 240-day detail restriction for SES executives. *See* Nicholson Dep. at 60:1–62:9, 68:13–70:4, 80:4–83:21, 94:18–95:4. In that role, unlike his former A/D SAM position, Mr. Craig had no staff or administrative support and he spent a significant amount of time entering data and performing tasks that would typically be performed by a GS-5 or GS-7 employee. Craig Decl. ¶ 14. This position did not exist either before or after Mr. Craig occupied the role and the projects that he worked on were not transferred to anyone or any department after he left. Craig Decl. ¶ 14. However, Mr. Craig's detail in the role was extended several times through the 2013 fiscal year and into the beginning of the 2014 fiscal year, which caused Mr. Craig's detail to extend beyond the 240-day limit. *See* Pl.'s Resp. SMF ¶ 103; Nicholson Dep. at 95:5–7.

In February 2014, a serious, near-fatal accident occurred at the Mint's Denver manufacturing plant, where one employee was injured while operating a fork-lift. Pl.'s Resp. SMF ¶ 111. Thereafter, Mr. Peterson and Ms. Babers decided to appoint Mr. Craig to oversee the administrative investigation of the accident, conduct an analysis and review of the circumstances and cause, and generate a final report with recommendations for Mint-wide safety improvements. Pl.'s Resp. SMF ¶ 112. Mr. Craig performed this work for several months and ultimately generated a report recommending changes in safety protocols, which was well-

received by Mint leadership. Pl.'s Resp. SMF ¶¶ 113–14. As a result of the incident and Mr. Craig's work, Mr. Peterson and Ms. Babers decided to create an SES-level position to oversee safety throughout the Mint. Pl.'s Resp. SMF ¶ 114.

On July 31, 2014, it was announced that Mr. Craig would assume a position entitled Associate Director of Environment, Safety, and Health ("A/D ES&H"). *See* Def.'s Ex. 41, ECF No. 34-35. Before Mr. Craig took on this role, that same work was being performed by a GS-14 employee who had the same resources and reporting structure that Mr. Craig now has. Craig Dep. at 183:1–24. Indeed, Mr. Craig himself reports to another Associate Director at the Mint and is the only Associate Director to do so. Craig Dep. at 227:6–8. He is also not invited to any of the high-level meetings that he used to attend when he was A/D SAM. Craig Dep. at 229:1– 21. Furthermore, he is the only Associate Director who does not have a GS-15 in his organization. Craig Dep. at 227:4–228:23.

Through the EEO process, Mr. Craig requested that he be returned to the A/D SAM position or to be placed in a comparable position, which included the Associate Director of Manufacturing ("A/D Manufacturing"). *See* Pl.'s Opp'n, Ex. 14, ECF No. 41-13. Craig was never returned to his former position nor was he ever selected for the A/D Manufacturing position.

### E. A/D Manufacturing and Acting A/D SAM Positions

As explained above, on December 11, 2012, the same day that it was announced that Mr. Craig would become the "Executive Lead," it was also announced that Mr. Landry, who was serving as Acting A/D Manufacturing at the time, would leave that position and become the Acting A/D SAM. Pl.'s Resp. SMF ¶¶ 20, 92, 94. Ms. Babers purportedly selected Mr. Landry due to his effectiveness running the manufacturing-side of the Mint and his understanding of the SAM Division and the numismatic business. *See* Babers Dep. at 217:1–10; Peterson Dep. at

170:9–17.  This meant, however, that someone else would need to fill Mr. Landry's former position as Acting A/D Manufacturing.

The A/D Manufacturing position was responsible for overseeing all four of the Mint's manufacturing facilities in the United States.  Def.'s Mot. at 3–4; *see also* Def. Ex. 2.  Mr. Peterson announced that Mr. Croft, who was in charge of the Denver plant, would take over as Acting A/D Manufacturing.  Pl.'s Resp. SMF ¶¶ 21, 92, 94.  The record is unclear, however, as to how or why Mr. Peterson selected Mr. Croft for that position.  Mr. Croft testified that he had never expressed any interest in the position, but Mr. Peterson had recruited him for it nonetheless.  Dep. David Croft ("Croft Dep.") at 34:2–9, ECF No. 51-4.  And even though it was inconsistent with agency policy and practice, Mr. Peterson allowed Mr. Croft to remain at his duty station in Denver throughout the course of his 18-month acting assignment while performing two-week rotations to the headquarters office in Washington, D.C.  Croft Dep. at 34:11–35:18; Nicholson Dep. at 152:21–153:9.

By August 2014, Mr. Peterson began considering assigning someone to the A/D Manufacturing role on a permanent basis.  Pl.'s Resp. SMF ¶ 119.  To fill the position, Mr. Peterson did not undertake any competitive hiring process, but instead considered only two possible candidates—Mr. Landry and Mr. Croft.  *See* Pl.'s Resp. SMF ¶ 119.  Mr. Landry and Mr. Croft both had extensive experience in manufacturing, both at the Mint and elsewhere.  Pl.'s Resp. SMF ¶ 120.  Indeed, Mr. Landry and Mr. Croft had, for several years, managed the Mint's Philadelphia and Denver manufacturing facilities, respectively, and each had previously served as Acting A/D Manufacturing for a period of approximately eighteen months.  Pl.'s Resp. SMF ¶ 120.  Furthermore, they both had significant manufacturing experience in the automotive industry prior to joining the Mint.  *See* Peterson Dep. at 189:13–15; Def.'s Mot., Ex. 44, ECF

No. 35-7.  Mr. Croft at that time was still serving as the Acting A/D Manufacturing and Mr. Peterson considered him to be doing an "outstanding job" in that role.  Peterson Dep. at 189:19.  Thus, based on his qualifications and performance in the position, Mr. Peterson selected Mr. Croft for the permanent A/D Manufacturing role.  Pl.'s Resp. SMF ¶ 121.  Mr. Peterson announced Mr. Croft's permanent appointment on August 19, 2014.  Pl.'s Resp. SMF ¶ 122.

In making his selection, however, Mr. Peterson admittedly did not consider Mr. Craig.  Pl.'s Resp. SMF ¶ 124.  Although Mr. Craig had never occupied a manufacturing position at the Mint, he did have prior manufacturing experience.  *See* Pl.'s Resp. SMF ¶¶ 125–26.  Indeed, in 2008, Mr. Craig applied for the A/D Manufacturing position and was considered to be among the "best qualified" candidates for the position at that time.  Def.'s Mem. P & A. in Supp. Mot. Partial Dismissal or Partial Summ. J. at 2–3, ECF 10.  The resume that Mr. Craig submitted to the Mint at that time indicated that Mr. Craig had spent more than three years in manufacturing positions with Dell Computers, including standing up a manufacturing facility in Malaysia and managing manufacturing operations at a large facility in Tennessee.  *See* Pl.'s Resp. SMF ¶ 126; Pl.'s Opp'n, Ex. 4, ECF No. 41-6.

In December 2014, a few months after selecting Mr. Croft to be the permanent A/D Manufacturing, the Mint learned that the Deputy Director of the Philadelphia plant was to retire.  Pl.'s Resp. SMF ¶ 127.  Thus, Mr. Peterson determined that Mr. Landry would need to return full-time to his position as plant manager in Philadelphia and would terminate his role as Acting A/D SAM.  Peterson Dep. at 188:1–4, 199:16–200:5.  Mary Lhotsky, who had been serving as Mr. Landry's Deputy in the SAM Division and was considered to be a "very solid performer" was temporarily slotted into the Acting A/D SAM position.  Peterson Dep. at 200:10–17.

Meanwhile, in the Spring of 2015, the Mint sought to competitively fill the permanent A/D SAM position. *See* Dep. Jon Cameron ("Cameron Dep.") at 44:5–6, 46:16–19, ECF No. 51-2. The Mint received somewhere between thirty and forty-five applications and ultimately interviewed five candidates. Cameron Dep. at 46:13–16. These interviews were carried out by a panel that included Ms. Babers and Jon Cameron, who was the Director for the Office of Coin Studies at the Mint. Cameron Dep. at 44:7–8, 46:13–14. However, after the interview process, the panel felt that there were no viable candidates for the position. Cameron Dep. at 45:14–15.

According to Mr. Peterson, Ms. Lhotsky felt she had been "overtaxed" in the Acting A/D SAM position and approached Ms. Babers to ask for help. Peterson Dep at 200:18–21. Ms. Babers suggested that Mr. Cameron be selected for the position. Peterson Dep. at 200:21–201:8. Mr. Peterson approached Mr. Cameron and asked if he would consider temporarily stepping in as Acting A/D SAM, which Mr. Cameron agreed to do. Cameron Dep. at 43:14–22. In May 2015, the newly appointed Principal Deputy Director of the Mint announced in an email several personnel moves, including Mr. Cameron's selection to serve as Acting A/D SAM. *See* Def.'s Mot., Ex. 48, ECF No. 34-41; Pl.'s Resp. SMF ¶ 130. It also noted, however, that the Mint would continue its search for a new A/D SAM. *See* Def.'s Mot., Ex. 48.

### F.  Procedural Background

On August 6, 2014, Mr. Craig initiated the present action, asserting five claims under Title VII of the Civil Rights Act of 1964. *See generally* Compl., ECF No. 1. Thereafter, the Defendant filed a pre-discovery motion for partial dismissal, or in the alternative, for partial summary judgment on two Counts. *See* Mot. Partial Dismissal or Summ. J., ECF No. 10. In an Order dated June 19, 2015, the Court granted in part and denied in part Defendant's motion, granting summary judgment on one of Mr. Craig's claims for failure to exhaust his administrative remedies. *See* Mem. Op., ECF No. 16.

On September 30, 2015, Mr. Craig filed an amended complaint. *See* Am. Compl., ECF No. 22. In his Amended Complaint, Mr. Craig alleges that the Mint discriminated against him on the basis of his race by giving him a "Fully Successful" rating in his FY 2012 appraisal, which he claims resulted in him not receiving a performance-based bonus for that year.[5] *See* Am. Compl. ¶¶ 107–13. He also alleges that Defendant removed him from the A/D SAM position and detailed him to the Executive Lead position and later reassigned him to the A/D ES&H position based on racially discriminatory and retaliatory reasons. *See* Am. Compl. ¶¶ 61–71, 87–93. In addition, Mr. Craig claims that the Mint retaliated and racially discriminated against him by refusing to restore him to his former A/D SAM position or to an equivalent position, such as A/D Manufacturing, despite his requests. Am. Compl. ¶¶ 72–86, 94–106. Finally, Mr. Craig alleges that the Mint retaliated and racially discriminated against him when it failed to select him for the A/D Manufacturing position in 2014. *See* Am. Compl. ¶¶ 114–26. On September 21, 2016, the Secretary moved for summary judgment on all of Mr. Craig's claims. *See generally* Def.'s Mot.

### III. LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is

---

[5] Although Mr. Craig also initially claimed that the Mint discriminated against him based on his sex, *see* Am. Compl. ¶¶ 107–13, Mr. Craig declared in his opposition to Defendant's motion that he was "no longer pursuing sex (male) as a basis for his discrimination claim over his FY 2012 performance appraisal," Pl.'s Opp'n at 28 n.10.

"genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Title VII of the Civil Rights Act prohibits an employer from discriminating against their employees on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e–2(a), and forbids retaliation against an employee because he "opposed any practice made an unlawful employment practice by" Title VIII, or because he "made a charge" under Title VII, *id.* § 2000e–3(a). To establish employment discrimination, a plaintiff must demonstrate that the plaintiff suffered an adverse employment action because of the employee's race, color, religion, sex, or national origin. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). On the other hand, to prove unlawful retaliation, a plaintiff must establish that he made a charge or opposed a practice made unlawful by Title VII, that the employer took a materially adverse action against

him, and that the employer took the action because of his protected conduct.  *See Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006) (Title VII).  The D.C. Circuit, however, has explained that, at the motion the summary judgment stage, "the question of whether plaintiff made out a prima facie case is almost always irrelevant."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Indeed, once an employer asserts a legitimate, nondiscriminatory, non-retaliatory reason for its actions, inquiry into a plaintiff's prima facie case typically becomes "an unnecessary and improper 'sideshow.'"  *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady*, 520 F.3d at 494).

Instead, district courts should consider only whether "'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee."  *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 493) (brackets omitted).  To answer this question, the Court considers whether a reasonable jury could infer discrimination or retaliation "from 'all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its actions and [any] other evidence.'" *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (alteration in *Morris*)).  "Whether the available evidence suffices to support a jury finding of [discrimination or] retaliation will, necessarily, be a contextual judgment." *Allen*, 795 F.3d at 40.  "Typically, successful rebuttal of an employer's stated reason counts as evidence of the invidious motive that is a required element of a disparate treatment or retaliation claim."  *Id.* (citing *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005).  Furthermore, "though evidence of pretext is not *per se* sufficient to permit an inference of discrimination [or retaliation], it usually

will be enough to get a plaintiff's claim to a jury." *Jones*, 557 F.3d at 679 (internal quotations, citations, ellipses, and brackets omitted); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (courts "do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.") (internal quotations omitted).

There are multiple ways in which a plaintiff may support an inference that an employer's stated reason for a challenged employment action was not the actual reason, and that the real reason was prohibited discrimination or retaliation. For example, the D.C. Circuit has held that "temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation." *Allen*, 795 F.3d at 40 (citing *Hamilton,* 666 F.3d at 1357–59). "Other common ways of proving invidious motive—whether retaliation or discrimination—include pointing to evidence that the employer treated other, similarly situated employees better; that the employer is 'lying about the underlying facts' of its decision; that there were 'changes and inconsistencies' in the employer's given reasons for the decision; that the employer failed to 'follow established procedures or criteria'; or that the employer's 'general treatment of minority employees' (or, in the retaliation context, employees who asserted their Title VII rights) was worse than its treatment of non-minorities (or employees who did not assert their Title VII rights).'" *Id.* (quoting *Brady,* 520 F.3d at 495 & n.3) (parentheses in original).

## IV. ANALYSIS

The thrust of Mr. Craig's claims is that the Mint discriminated and retaliated against him by giving him a sub-par performance review for FY 2012, removing him from the A/D SAM position, placing him in other inferior roles at the Mint, and refusing to reassign him to a position

that was commensurate with his former A/D SAM position. Defendant argues that Mr. Craig's inadequate performance on the OMS Project and the Marketing Plan formed the basis of Mr. Craig's downgraded performance review and precipitated his removal from A/D SAM. The Court finds that Mr. Craig has not presented evidence sufficient to rebut that legitimate, non-discriminatory, non-retaliatory reason. Thus, Defendant is entitled to summary judgment on those issues. Likewise, Defendant asserts that it refused to reinstate Mr. Craig to the A/D SAM position for the same reason that it removed him, which Mr. Craig also fails to rebut. Consequently, Defendant is entitled to summary judgment on this issue as well.

However, there remain genuine disputes as to whether the Mint retaliated against Mr. Craig when it detailed him to the Executive Lead position and failed to select him for the A/D Manufacturing position in 2014. With respect to the Executive Lead detail, there is a genuine dispute about whether the Mint retaliated against him for his EEO activity based on the fact that it placed him in an indisputably inferior role only six days after it learned that he had initiated the EEO counseling process. Moreover, there were procedural irregularities attendant with his detail, including failures to consult with HR and the detail extending well beyond the 240-day limit for an SES executive. When viewed together, a reasonable jury could conclude that his detail to that position was retaliatory and, thus, summary judgment is not warranted on this issue.[6] On the issue of non-selection for the A/D Manufacturing position, Mr. Craig has raised genuine issues as to whether the Mint "preselected" Mr. Croft for the acting position in 2012, which ultimately led to Mr. Croft obtaining the permanent position in 2014, and whether there was retaliatory intent associated with those selections. He has not, however, demonstrated that

---

[6] Although Mr. Craig also claims that his detail was the result of racial discrimination, he has not supported this claim with sufficient evidence to rebut Defendant's claim that he was detailed to the position because it represented a "better fit."

racial animus played any part of any supposed selection decisions in 2012 or 2014. Accordingly, summary judgment on the issue of his non-selection for the A/D Manufacturing position is appropriate with respect to the discrimination claim, but not on the retaliation claim.

## A. FY 2012 Performance Appraisal

Mr. Craig alleges that the Mint engaged in racial discrimination when it failed to give him an overall performance rating at the "Exceeded" level for fiscal year 2012,[7] which he claims would have entitled him to a bonus of at least $8,497. Pl.'s Opp'n at 9–10. Mr. Craig's performance review period began in October 2011 and concluded September 30, 2012. *See* Pl.'s Opp'n, Ex. 11. In her review of Mr. Craig, Ms. Babers rated Mr. Craig as "Fully Successful," in the areas of "Program Management," "Customer Service & Collaboration," and "Commitment Element 4" (relating to the OMS Project) and "Exceeded" in all other areas. *See* Pl.'s Opp'n, Ex. 11. Once combined, these grades resulted in Mr. Craig's overall rating of "Fully Successful." *See* Pl.'s Opp'n, Ex. 11. In the narrative assessment of Mr. Craig's performance, Ms. Babers specifically cited the unsuccessful OMS Project and Marketing Plan as bases for the rating. *See* Pl.'s Resp. SMF ¶ 74. Def.'s Mot. at 35. When Plaintiff sought a higher-level review of his annual performance rating from an official outside of Ms. Babers's chain of command, that official sustained Ms. Babers's rating, noting that she "did not find any documentation to change the ratings for Program Management, Customer Service and Collaboration, or Commitment Element 4." Def.'s Mot., Ex. 27; *see also* Pl.'s Resp. SMF ¶ 75.

Defendant's dissatisfaction with Mr. Craig's performance establishes a legitimate, non-discriminatory reason for Mr. Craig's performance ratings. *See Paquin v. Fed. Nat'l. Mortg.*

---

[7] Although Mr. Craig also alleged discrimination on the basis of sex in his Amended Complaint, he is no longer pursuing that as a basis for his claim. Pl.'s Opp'n at 28 n.10.

*Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997) (holding that an employer proffered a legitimate non-discriminatory reason for negative performance evaluation by offering an evaluation that criticized the employee's work performance and identifying specific examples of the employee's inadequate performance); *see also Dews–Miller v. Clinton*, 707 F. Supp. 2d 28, 52 (D.D.C. 2010) (noting that the supervisors' dissatisfaction with employee's work was a legitimate, nondiscriminatory reason for employee's two "minimally successful" performance evaluations). Accordingly, the Court considers whether, in light of the total circumstances of the case, Mr. Craig has "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated" against him on the basis of his race. *See Brady*, 520 F.3d at 495.

The D.C. Circuit has explained that, in cases such as this, involving "[d]isagreement[s] between a middle manager and [his] immediate supervisor over the validity of discretionary judgments," courts must be "vigilant in smoking out unlawful motives while remaining 'reluctan[t] to become involved in the micromanagement of everyday employment decisions.'" *Allen v. Johnson*, 795 F.3d 34 40–41 (D.C. Cir. 2015) (quoting *Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001)) (fourth alteration in original); *see also Manuel v. Potter*, 685 F. Supp. 2d 46, 63 (D.D.C. 2010) (noting that the court does not sit as a "super-personnel department" that "independently evaluate[s] the quality of the plaintiff's work product" (internal quotation marks and citation omitted)).  Accordingly, courts do not concern themselves with whether an employer's action was "wise, fair, or correct." *Kelly v. Mills*, 677 F. Supp. 2d 206, 228–29 (D.D.C. 2010) (internal quotation marks and citations omitted, alteration in original); *see Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or

sensible," for "the issue is not the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.") (internal quotation marks and citations omitted). Instead, courts assessing whether an employer's purported reasons for its actions were pretext for discrimination consider only whether a plaintiff has provided any evidence from which to infer that the employer's explanation was a lie. *See Desmond v. Mukasey*, 530 F.3d 944, 963–64 (D.C. Cir. 2008) ("[I]t will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory" (citing *Brady*, 520 F.3d at 495)). Thus, "'[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence,' and is honestly held, there ordinarily is no basis to put the case to a jury, even if the employee disagrees with the discretionary decision the employer made." *Allen*, 795 F.3d at 40–41 (quoting *Brady*, 520 F.3d at 495); *see also George*, 407 F.3d at 415. With those principles in mind, the Court turns to the Plaintiff's various arguments concerning his FY 2012 performance evaluation and his performance on the OMS Project and Marketing Plan.[8]

Much of Mr. Craig's argument appears to rest on the fact that Mr. Peterson, Mr. Craig's former supervisor, gave Mr. Craig a higher performance rating in his mid-year review than Ms.

---

[8] Although Defendant argues that Plaintiff's performance appraisal did not constitute a materially adverse action because he was not entitled to an "automatic monetary benefit," Def.'s Mot. at 31, the Court does not find that argument persuasive. Indeed, it rests on the incorrect premise that a plaintiff cannot make out a prima facie case of discrimination based on denial of a bonus if that bonus is discretionary. The D.C. Circuit, however, has stressed that "[t]he denial of even a purely discretionary bonus can be actionable." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citing *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001)). Moreover, the evidence set forth by Defendant makes it abundantly clear that if Mr. Craig had received an overall Exceeded rating, he would be much more likely to have received a monetary bonus even if there are a few isolated incidences to the contrary. *See* Def.'s Mot., Ex. 29, ECF No. 35-6.

Babers ultimately gave him at his end-of-year review. According to Mr. Craig, although Ms. Babers claimed that her downgraded performance rating of Mr. Craig was based on the unsuccessful OMS Project and Marketing Plan, she "had not been at the Mint long enough to make that assessment, and certainly not long enough to reach a different conclusion from Mr. Peterson." Pl.'s Opp'n at 32. But this argument appeals only to whether Ms. Babers's decision was "wise, fair, or correct," for which the Court is not concerned, and it does not speak to the pertinent question of whether Ms. Babers honestly and reasonably believed her criticisms. *Kelly*, 677 F. Supp. 2d at 229. Indeed, Mr. Craig does not point to any evidence that Ms. Babers was *required* to adhere to Mr. Peterson's mid-year ratings and courts in this Circuit have routinely refused to infer discriminatory pretext merely because a subsequent supervisor departs from a prior supervisor's appraisal. *See, e.g., Robertson v. Dodaro*, 767 F. Supp. 2d 185, 193 (D.D.C. 2011) ("[E]vidence of the plaintiff's higher performance ratings by evaluators other than [plaintiff's current supervisors] is insufficient to give rise to an inference of race or gender discrimination"); *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 101 (D.D.C. 2005) (concluding that evidence of previous positive performance reviews and numerous letters of commendation did not give rise to an inference of discriminatory intent because that "evidence has nothing to do with any possible discrimination by defendant"); *Hussain v. Principi*, 344 F. Supp. 2d 86, 102 n.19 (D.D.C. 2004) (stating that "the fact that a previous manager found that plaintiff had met or exceeded expectations does not, by itself, establish that a subsequent manager's evaluation of employee's performance was discriminatory" (internal citation omitted)). As explained in greater detail below, even though Ms. Babers had been at the Mint for only three months at the time she gave her assessment, she had a factual basis for her beliefs, which Mr. Craig does not dispute, and Mr. Craig does not present any evidence demonstrating that Ms. Babers's beliefs

were not honestly or reasonably held. Because Mr. Craig gives no reason why the Court should question Ms. Babers's stated criticisms of his performance on the OMS Project or the Marketing Plan, the Court will grant Defendant's motion for summary judgment as to Count V.

### 1. The OMS Project

Ms. Babers faulted Mr. Craig's performance on the OMS Project because he demonstrated a lack of leadership and failed to achieve a "constructive resolution" of the Project. Pl.'s Opp'n, Ex 24. According to Ms. Babers, Mr. Craig, along "with the [CIO], was responsible for ensuring the successful implementation of a new order management system (OMS). This [P]roject was established to replace the aging legacy system [through] which customers place [online] orders for Mint products. It suffered from significant interpersonal conflict between Sales and Marketing and Information Technology team members, including the respective leadership. Unfortunately, the [P]roject was ultimately halted at a cost of several million dollars to the United States Mint." Def.'s Mot., Ex. 24.

Plaintiff does not dispute that the OMS Project failed, instead, he essentially argues that Ms. Babers's assessment of his performance was flawed because the Project's failures should have been attributed to the Mint's CIO—not Mr. Craig. First, Plaintiff argues that Ms. Babers misconstrued the scope of Mr. Craig's authority on the OMS Project. *See.* Pl.'s Opp'n at 32. Specifically, he challenges Ms. Babers's claims that SAM was the "owner" of the OMS Project when, in reality, the CIO had been in control of the budget and the schedule. *See* Pl.'s Opp'n at 32. Plaintiff also argues that Ms. Babers unfairly attributes some of the "interpersonal conflicts" between SAM and the IT Department to him or his leadership. *See* Pl.'s Opp'n at 32. According to Mr. Craig, he and SAM were the *recipients* of hostility from the CIO, who was supposedly known to have a volatile personality and to discriminate against people who were different from him. Pl.'s Opp'n at 32. Thus, according to Mr. Craig, Ms. Babers was wrong to credit the

failure of the Project to him and the CIO equally, when the failures should have been more properly attributed to the CIO alone.[9]

But even if Ms. Babers was factually wrong in her appraisal of Mr. Craig, those flaws do not create a genuine issue of material fact unless Mr. Craig can demonstrate that Ms. Babers's "putative error on [his assessment] was either dishonest or unreasonable." *Allen*, 795 F.3d at 42; *see also George*, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach*, 86 F.3d at 1183 ("Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" (second, third, and fourth alterations in original) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  In this case, the arguments that Mr. Craig advances and the evidence that he has proffered do not suggest either that Ms. Babers did not honestly believe her criticisms or that her beliefs were unreasonable.

With respect to Ms. Babers's purported misunderstanding of Mr. Craig's authority, Mr. Craig seizes upon Ms. Babers's description of the SAM Division as an "owner" of the OMS Project without putting it into the context in which Ms. Babers used the term.  According to Ms. Babers, she understood that SAM was responsible for identifying "what we need and . . . how we need it to work and . . . why it's important to our customers," while IT was responsible for

---

[9] Mr. Craig also notes that, in their mid-year evaluations, Mr. Peterson rated the CIO slightly worse on the OMS Project than he did Mr. Craig, which, according to Mr. Craig, demonstrates that he understood the CIO "bore the majority of the blame for the OMS failings." Pl.'s Opp'n at 32.  As noted above, there is no evidence that Ms. Babers was required to adhere to the performance appraisals issued by Mr. Peterson, and the mere fact that she departed from those appraisals will not give rise to an inference of discriminatory pretext when there is no evidence that her beliefs were either dishonest or unreasonable.

presenting "how you do it and . . . your options for doing it." Babers Dep. at 120:5, 121:13. Thus, according to Ms. Babers, to the extent that the SAM Division has the "knowledge and vision, [] they own the [P]roject in that respect[,] [b]ut they are supported by IT." Babers Dep. at 121:1–4. As a result, Ms. Babers understood that the Project had to be "really, really collaborative" because SAM and IT "are both very critical to the situation." Babers Dep. at 121:13–15. This description is not terribly different from Mr. Craig's own description in which he describes IT as "the lead" and SAM as the "customer" when he also admits that he "had say-so and [] was supposed to give up resources to make the [P]roject an accomplishment." Craig Dep. at 84:1–4. He further agrees that it "was [his] job" to get the "OMS [P]roject up and running." Craig Dep. at 84:6–9. Indeed, Mr. Craig does not deny that he served on the OMS Project's ESC, *see* Peterson Dep. at 75:14–17; *accord* Pl.'s Resp. SMF ¶ 51, or that his evaluation expressly called for an assessment of his performance in "[i]mplement[ing] [a] Customer Order Management System in collaboration with IT and Procurement" and his "Serv[ice] on the Executive Steering Committee providing support guidance and resources to support the overall success of the Order Management System." Pl.'s Opp'n, Ex. 11. Thus, it is undisputed that he had an active role in the Project, that it was a collaborative effort between the SAM Division and IT, and that Mr. Craig actually had leadership authority on the Project by virtue of his position on the ESC. Thus, Mr. Craig has not shown that Ms. Babers was either dishonest or unreasonable in her assessment of Mr. Craig based on any error concerning his authority over the OMS Project.

Mr. Craig points out, however, that the CIO was in control of the "budget and schedule" for the Project. Pl.'s Opp'n at 32. But Ms. Babers has never intimated that Mr. Craig was responsible for those matters nor did she fault him for problems stemming from either the budget

or schedule. Rather, she faulted him for his part in the "significant interpersonal conflict" between the SAM Division and IT and his failure to provide "more effective leadership" that "could have made a difference to the outcome" of the Project. Def.'s Mot., Ex. 14 at Bates No. 00179; *see also* Pl.'s Opp'n, Ex. 11 at Bates No. 00204.

Critically, the record demonstrates that Ms. Babers had a reasonable basis for those criticisms. Specifically, Ms. Babers's critique was supported by the reports from Mitre, the third-party consultant that was hired to assess the continued viability of the Project.[10] Indeed, Ms. Babers testified that she knew, based on Mitre's briefing, "that there was some failure of leadership when it came to those two areas [IT and SAM] in leading their teams in a way that could have led to a more successful outcome." Babers Dep. at 124:2–6. She also understood from that briefing that "leadership or governance of the OMS [P]roject was ineffective, and that . . . ineffectiveness was in the way that Sales and Marketing and IT collaborated or failed to collaborate, and that was in part due to the leadership of those organizations." Babers Dep. at 124:16–125:3. This account is also supported by Mitre's written reports, which observed that there were governance issues, including "weak communications," "conflicting assumptions about program scope and intent," and "internal discord," concluding that this "infighting [was] endangering [the] pursuit of [the Mint's] goal." Pl.'s Resp. SMF ¶¶ 36, 38; Def.'s Mot, Ex. 15 at Bates 002548; *see also* Def.'s Mot., Ex. 16. Mr. Craig does not dispute that Mitre made these findings or that they were presented to Ms. Babers. Nor does Mr. Craig offer any evidence that Ms. Babers did not honestly believe in Mitre's findings or that she had any reason to disregard

---

[10] Ms. Babers also testified that she observed "firsthand" Mr. Craig's "lack of leadership in terms of [] collaboration." Babers Dep. at 119:11–15.

them.  Thus, even though Mr. Craig disagrees with Ms. Babers's assessment, he does not identify

any reason to question the genuineness of her stated criticisms with respect to the OMS Project.

### 2.  Marketing Plan

Ms. Babers also faulted Plaintiff's performance on the Mint's Marketing Plan.

According to her, Mr. Craig had been directed "to deliver a high quality Comprehensive

Marketing Plan and Advertising Spend Request" which was "critical to reverse the steady

decline of the Mint's numismatic customer base," but he "left primary oversight of the plan to

his deputy and, ultimately, the plan was not acceptable."  Pl.'s Opp'n, Ex. 24 at Bates No. 00178,

ECF No. 41-19; *see also* Babers Dep. at 174:16–17 ("it was my understanding from [Mr. Craig]

that [his deputy] had the more technical [marketing] experience and in fact that she was the one

who was within Sales and Marketing leading this . . . marketing plan effort."); Pl.'s Opp'n, Ex.

11 ("the Comprehensive Numismatic Marketing Plan and the advertising spend request[s] . . .

were critical to reverse the steady decline of the Mint's numismatic customer base," which

"required significant guidance and direction and . . . were not ultimately successful in FY12.").

Mr. Craig does not present any evidence that disputes Ms. Babers's justification.  Indeed, he

does not present any evidence that the Marketing Plan was not his responsibility, that the Plan

was not critical to the Mint, that he did not delegate it to his deputy,[11] that the Plan was, in fact,

acceptable, or that it was ever approved by the Treasury in FY 2012.

---

[11] Although Mr. Craig denies that he delegated "much of the responsibility for the plan to
his Deputy," he does not point to any evidence supporting his position.  Instead, he points to an
email from Mr. Peterson that praised Mr. Craig for his performance on the FY 2011 marketing
and advertising campaign.  Because that evidence does show Mr. Craig did not delegate the
Marketing Plan to his deputy, the Court cannot find that Mr. Craig has created a genuine issue of
material fact on that point.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an
assertion of fact or fails to properly address another party's assertion of fact as required by Rule
56(c), the court may . . . consider the fact undisputed for purposes of the motion.".)

Instead, Mr. Craig again argues that Ms. Babers's assessment was flawed. First, Mr. Craig argues that he previously received praise by Mint employees other than Ms. Babers, which he claims undermines Ms. Babers's evaluation. For example, he points out that, in June 2012, the Mint's Chief Counsel reviewed a draft of the Marketing Plan and stated that it was "the best piece of work in terms of a marketing plan that [he] ha[d] seen in some time. Nice Job!" Pl.'s Opp'n Ex. 19. But an unqualified assessment of the Marketing Plan carries very little weight when the record does not suggest that the Chief Counsel had any specific knowledge or expertise in the field of marketing. However, Mr. Craig also points to the praise he received from his former supervisor, Mr. Peterson. Specifically, in the justification for Mr. Craig's 2011 bonus, Mr. Peterson stated that Mr. Craig "excelled in creating a comprehensive Mint Marketing and Advertising Campaign" for FY 2011, Pl.'s Opp'n, Ex. 2, ECF No. 41-4, and prior to Ms. Babers's arrival, he had rated Mr. Craig's performance on the Marketing Plan as "Exceeded," Pl.'s Opp'n, Ex 18. But between the time that Mr. Peterson gave his mid-year review and the time Ms. Babers gave her final evaluation, the Marketing Plan failed with Treasury. Thus, it should be no surprise that the year-end evaluation would be worse than the mid-year evaluation. In any event, as explained above, even if others at the Mint might have considered earlier drafts of the Marketing Plan to be praiseworthy or viewed Mr. Craig's prior work on the project to be laudable, it does not demonstrate that *Ms. Babers's* stated reasons were pretextual, particularly when he does not dispute the facts underpinning her stated reasons. *See, e.g.*, *Robertson*, 767 F. Supp. 2d at 193. Indeed, the Court cannot find that Ms. Babers was unreasonable in finding the Marketing Plan to be unacceptable when it is undisputed that Treasury officials, who were the target audience for the Plan, observed that aspects of it were not sufficiently "convincing" or

"compelling," Def.'s Mot., Ex. 23, and the United States Treasurer expressed concern that the Marketing Plan was not "going well." Babers Dep. at 164:18, 165:12–15.

Mr. Craig also argues that the Marketing Plan document that was submitted for the Mint's signoff—which was ultimately never approved—was actually a summary of the Marketing Plan that was put together by Ms. Babers without the knowledge or assistance of Mr. Craig or SAM. Craig Decl. ¶¶ 24–25. But Mr. Craig points to no evidence suggesting that the summary misrepresented SAM's Marketing Plan or that the ultimate rejection of the plan was somehow attributable to Ms. Babers's work, rather than the Marketing Plan upon which it was based.[12] Indeed, the evidence suggests that the Marketing Plan upon which the memo was based received criticisms from Treasury at approximately the same time that the memorandum was circulating for approval. *See* Def.'s Mot., Ex. 24 (first signoff of memorandum dated August 22, 2012); Def.'s Mot., Ex. 23 (email detailing Treasury's questions, comments, and criticisms of Marketing Plan from meeting held on August 23, 2012). It is therefore unsurprising in light of Treasury's critique that the memorandum would not be approved. Thus, Mr. Craig has not presented any evidence demonstrating that Ms. Babers's assessment of his performance on the Marketing Plan was either dishonest or unreasonable.

\*      \*      \*

There is no dispute that Mr. Craig had substantial or total responsibility over two projects that failed. Although one could disagree over how much responsibility Mr. Craig had for each failure, it was certainly not unreasonable to conclude that this performance did not merit either

---

[12] Likewise, Mr. Craig's contention that Ms. Babers surreptitiously removed a section about a mobile device application from the Plan, which had been requested by Treasury, does not create a genuine issue of fact when there is no evidence that anyone, including Treasury, found the Plan to be inadequate because it did not have such a section in it. *See* Craig Decl. ¶ 8.

an "Exceeded" rating or a bonus. Accordingly, the Court finds that Plaintiff has failed to rebut Defendant's stated explanation of his performance rating or set forth any other evidence from which to infer that it was the result of racial discrimination. Thus, the Court must grant summary judgment to Defendant with respect to Count V of Plaintiff's Amended Complaint. *See Allen*, 795 F.3d at 44 (summary judgment was warranted when "[n]othing in the record suggest[ed] that [supervisor] did not genuinely and reasonably believe she made the right decision in the performance ratings she assigned to [plaintiff]").

## B. Removal from A/D SAM, Detail to Executive Lead, and Reassignment to A/D ES&H

Mr. Craig also alleges that Defendant engaged in retaliation and racial discrimination by removing him from the A/D SAM position, detailing him to the "Executive Lead" position, and then later reassigning him to the role of A/D ES&H. Am. Compl. ¶¶ 61–71, 87–93. Defendant argues that Mr. Craig was removed from the A/D SAM position because of his sub-par performance on the OMS Project and the Marketing Plan and that he was detailed to the Executive Lead position because it represented a "better fit" for him.[13] As discussed above, Mr. Craig has not put forth any evidence demonstrating that Ms. Babers's criticisms of his performance on the OMS Project and the Marketing Plan were either dishonest or unreasonable. Therefore, the question is whether Plaintiff has produced any other evidence that would allow a reasonable jury to find that the Defendant's stated reasons were pretext for Defendant's actions and that the real reasons were to discriminate or retaliate against him. In reviewing this claim,

---

[13] Although Mr. Craig does not claim that the transfer resulted in a loss of salary, grade level, or benefit, the D.C. Circuit has held that transfers, even if described as "lateral transfers," may constitute adverse employment actions. *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). Where, as in this case, an employer "withdraw[s] an employee's supervisory duties," that "constitutes an adverse employment action." *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003).

the Court distinguishes between the Defendant's decisions (1) to remove Mr. Craig from the A/D SAM position, (2) to detail Mr. Craig to the Executive Lead position, and (3) to reassign Mr. Craig to the A/D ES&H position.

## 1. Retaliation

The Court first considers whether Mr. Craig has presented any evidence that the real reason that the Mint removed him from the A/D SAM position, detailed him to the Executive Lead position, and ultimately reassigned him to A/D ES&H was to retaliate against him.

To start, Mr. Craig does not present any evidence that his removal from A/D SAM was the result of retaliation. In fact, the record suggests that Ms. Babers was contemplating removing Mr. Craig from the A/D SAM position *before* he engaged in any protected activity at all. There is no dispute that, as early as September 25, 2012, Ms. Babers and Mr. Craig had been discussing the idea of finding another position at the Mint that would be a "better fit" for Mr. Craig and that Mr. Craig did not initiate any protected activity until one month later. *See* Babers Dep. at 166:22–67:2 ("I said, perhaps it would be better for us to see if there is a better fit for you at the Mint than the marketing job."); *id.* at 172:10–73:1 ("it was clear that when I said this is not a good fit for you" and "I said, let's talk about what position within the Mint might be a better fit for you that . . . we weren't talking about what within Sales and Marketing could you do more of, it was what instead of Sales and Marketing might be a better fit."); Craig Decl. ¶ 9 ("I was completely surprised when Ms. Babers raised performance criticisms with me in the September 25 meeting" and "[h]er suggestion that there might be a 'better fit' for me elsewhere in the organization took me aback."). Indeed, in Mr. Craig's October 26, 2012 EEO complaint, he wrote that, at the September meeting, Ms. Babers wanted "to discuss what [Mr. Craig] wanted to do in the future, as it was 'time for them to find a better fit for him' than his current position" and that she wanted to "transition [him] out of SAM." EEO Compl. at Bates No. 00109. Mr. Craig

points out, however, that the formal announcement that Mr. Craig would be vacating the A/D SAM position was issued only six days after Ms. Babers learned of Mr. Craig's EEO activity. *See* Pl.'s Opp'n at 28.  Although "temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation," *Allen*, 795 F.3d at 40 (citing *Hamilton*, 666 F.3d at 1357–59), the Supreme Court has made clear that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  Because the undisputed evidence demonstrates that Ms. Babers contemplated removing Mr. Craig from his position before she learned of his protected activity, the fact that the Mint later "proceed[ed] along [those] lines" does not demonstrate that his removal was retaliatory.  Accordingly, Mr. Craig has failed to demonstrate a genuine issue of material fact with respect to his removal from A/D SAM.

However, there remains a genuine dispute as to whether Ms. Babers contemplated detailing Mr. Craig to a role as inferior as the Executive Lead position prior to Mr. Craig's EEO complaint.  Mr. Craig argues that his detail to "the previously non-existent Executive Lead Position," was a materially adverse employment action because it left him "without staff and with greatly diminished duties for over a year and a half."  Pl.'s Opp'n at 25; *see also* Craig Decl. ¶ 14 ("In the Executive Lead position, I had no staff or administrative support.  I spent a significant amount of time entering data or sorting through information—tasks that would typically be performed by a grade GS-5 or a GS-7 employee.  I was extremely isolated and marginalized in the position, which did not draw upon my accomplishments, experience, or skill as an SES executive.").  Defendant does not dispute this.  Instead, Defendant argues that Ms.

Babers and Mr. Craig jointly discussed the "parameters" of the Executive Lead role between September 2012 and December 2012 and that these discussions ultimately culminated in the Executive Lead role that Mr. Craig assumed. *See* Def.'s Mot. at 22–23; Def.'s Reply at 10. Thus, Defendant attempts to argue again that it was "proceeding along lines previously contemplated" when it detailed him to the position. Def.'s Mot. at 21 (citing *Breeden*, 532 U.S. at 272).

Mr. Craig, however, presents competent evidence that casts doubt on how well formed the position was when Ms. Babers learned of his EEO activity. To start, it is clear that the Executive Lead role was not defined when Ms. Babers and Mr. Craig had the "better fit" meeting in September 2012. *See* Babers Dep. at 174:2–10 (at the September 2012 meeting, "[i]n my head was, wow, this is a mismatch in terms of skill sets and what we need. . . . I hadn't thought about . . . the specific next steps for getting the match . . . but I wanted to have a conversation with [Mr. Craig] about it to see where he was coming from."). But more importantly, it appears that Ms. Babers had not yet decided at least some fundamental details concerning the position by the time she learned of Mr. Craig's EEO complaint. For example, Ms. Babers admitted in her deposition that she had not yet "made a decision that [Mr. Craig] wouldn't have any staff as of December 11, 2012"—six days after she learned of his complaint. Babers Dep. at 203:10–13. Furthermore, even if Ms. Babers and Mr. Craig previously discussed the general parameters of the Executive Lead position, Mr. Craig attested that he and Ms. Babers "did not discuss specifics about what [he] would be doing in the Executive Lead position." Craig Decl. ¶ 15. And it is undisputed that Ms. Babers did not inform Mr. Craig of "whether or how much staff [he] would have, where [his] position would be located within the organization, or what budget [he] would be working with." Craig Decl. ¶ 15; *see* Babers Dep. at 203:10–204:4. Critically, Defendant has proffered

no evidence demonstrating that any of those areas had been previously contemplated or defined. Because Mr. Craig claims that each of those aspects contributed to the detrimental nature of his position and there is no evidence that Ms. Babers or anyone else at the Mint had decided those issues prior to Mr. Craig's EEO activity, Defendant has not shown that it was proceeding along lines previously contemplated.

Defendant argues, however, that the notion of "creating out of whole cloth an entire division with budget, staff, and resources commensurate with other A/D positions . . . flies in the face of any basic understanding of the Mint's organizational structure." Def.'s Reply at 10–11. Specifically, Defendant explains that there were only a "handful" of SES positions in the Mint and that, at the time Mr. Craig and Ms. Babers discussed the role, they "were all filled." Babers Dep. at 191:6–11. Thus, according to Defendant, "[a] reasonable person could only have understood the discussions of the alternative role in the September 2012 through November 2012 timeframe as . . . exactly as culminated in the announcement of the Executive Lead role—a detail to unclassified duties with the responsibility to establish a long range, comprehensive planning mechanism that focused on cross-organizational, Mint-wide processes." Def.'s Reply at 10. But the issue is not what a reasonable person would have understood the discussions between Ms. Babers and Mr. Craig to mean. Rather the issue is what Defendant intended Mr. Craig's detail to be prior to learning of his EEO activity. While evidence that the Mint's other SES positions were occupied might help explain why Ms. Babers *ultimately* detailed Mr. Craig to the Executive Lead position and why it *ultimately* took the form that it did, it does not necessarily demonstrate that Ms. Babers made those decisions *prior* to learning about Mr. Craig's EEO activity.[14]

---

[14] Defendant's argument also seems to be undercut by the undisputed fact that there *was* an SES position available on the day that Mr. Craig was detailed to the Executive Lead position. Indeed, the Acting A/D Manufacturing position, which Mr. Craig previously expressed interest

Indeed, as noted above, there are at least some key aspects of the position that Ms. Babers had *not* decided, such as Mr. Craig's supervisory authority. *See* Babers Dep. at 203:10–13. Thus, the Court finds that a reasonable jury could conclude that detrimental aspects of the Executive Lead position were not decided until after Ms. Babers learned of Mr. Craig's EEO activity. If a jury were to reach that conclusion, then it may also consider the temporal proximity between Ms. Babers coming to learn of Mr. Craig's EEO activity on December 5 and Mr. Craig's detail to the Executive Lead role on December 11 as "highly probative . . . evidence of retaliation." *Allen*, 795 F.3d at 40 (citing *Hamilton*, 666 F.3d at 1357–59). The Court is mindful, however, that "[o]nce an employer proffers a legitimate reason for an allegedly retaliatory action, 'positive evidence beyond mere [temporal] proximity is required to defeat the presumption that the proffered explanations are genuine.'" *Kline v. Berry*, 404 F. App'x 505, 507 (D.C. Cir. 2010) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Woodruff*, 482 F.3d at 530 ("If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.").

Here, the Court is convinced that Mr. Craig has carried that burden through his identification of procedural irregularities associated with the detail to the Executive Lead role.[15]

---

in, was vacated on the same day because Ms. Babers decided to select Mr. Landry, who was serving in that role, to act as Mr. Craig's temporary replacement as Acting A/D SAM. So, the Mint could have simply switched Mr. Craig's and Mr. Landry's positions. Furthermore, Defendant concedes that it *did* eventually create an entirely new permanent SES position for Mr. Craig, the A/D ES&H position, which it claims gave him "several direct reports" and responsibility "oversee[ing] a programmatic function that is critical to the Mint." Pl.'s Resp. SMF ¶ 117.

[15] Although Mr. Craig also argues that his retaliation claim is supported by Ms. Babers's alleged retaliatory treatment of two other employees, the Court need not resolve this issue at this time. The Supreme Court has instructed that "me too" evidence such as this is neither *per se*

To start, the HR representative primarily responsible for SES executives at the Mint testified that a detail to a role like Executive Lead would ordinarily have been coordinated with her. *See* Fogan Dep. at 30:22–31:8. In this instance, however, she was not consulted and did not even learn about Mr. Craig's detail until Mr. Peterson issued the Mint-wide announcement on December 11, 2012.[16] *See* Fogan Dep. at 30:22–31:22. Moreover, under the Office of Personnel Management procedures governing the SES, the Mint was prohibited from detailing Mr. Craig to a position that was not formally classified at the SES level for more than 240 days. Pl.'s Resp. SMF ¶¶ 10–12; Pl.'s Opp'n, Ex. 16 at 9, 11–12. Despite this clear prohibition, Mr. Craig encumbered the Executive Lead position, well beyond this 240-day limit. *See* Pl.'s Resp. SMF ¶ 103; Nicholson Dep. at 95:5–7. Thus, the picture painted by the evidence is this: there was little or no advanced planning done to place Mr. Craig in the Executive Lead position and then, literally days after becoming aware of the EEO claim, Mr. Craig's transfer was effected

---

admissible nor *per se* inadmissible. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Rather, the question is "fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* "Among the factors to consider are whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." *Elion v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008). Defendant presents several arguments for why those employees were not similarly situated, *see* Def.'s Reply at 19–21, which ordinarily presents a question of fact for the jury, *see Wheeler*, 812 F.3d at 1115. But because the Court finds other evidence is sufficient to give rise to a genuine dispute as to the issue of retaliation *vel non* such that summary judgment is not warranted, the Court will reserve ruling on the relevance and admissibility of Mr. Craig's "me too" evidence.

[16] Mr. Craig also points out that the paperwork that memorialized Mr. Craig's detail was not prepared until March 2013—more than three months after the detail was first announced. *See* Def.'s Mot., Ex. 4 at 11, ECF No. 34-4. However, Mr. Craig does not present evidence of how long it normally takes to have such paperwork submitted. Even so, this fact would seem to strengthen Plaintiff's claim of a lack of advanced planning for the transfer.

following no established procedures.  Under those circumstances, a reasonable juror could certainly conclude that this was a knee-jerk reaction done in retaliation for his EEO claims. Summary judgment is therefore not appropriate on this issue.

Summary judgment is likewise not appropriate with respect to Mr. Craig's reassignment to the A/D ES&H position.  Defendant argues that this reassignment, which occurred in July 2014, was "almost 18 months after [Ms.] Babers first learned of the Plaintiff's EEO activity" and that, given this lack of temporal proximity, there can be no inference of retaliatory intent.  *See* Def.'s Mot. at 21–22.  While it is true that the Mint did not reassign Mr. Craig to the A/D ES&H position until over a year after his first EEO complaint, the D.C. Circuit has cautioned that subsequent protected activity should also be considered when assessing temporal proximity. *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) ("we have held that courts should consider later protected activity in determining whether evidence of temporal proximity satisfies the causation element.") (citing *Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009) and *Singletary v. Dist. of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003)).  Doing so, it becomes clear that Mr. Craig continued to engage in protected activity well after his initial complaint.  Indeed, Mr. Craig continued to participate in the EEOC investigation until at least February 2014, *see* Def.'s Mot. Partial Dismissal or Partial Summ. J., Ex. 2, ECF No. 10-2, and the investigation itself lasted until March 2014.  *See* Pl.'s Opp'n Def.'s Mot. Partial Dismissal or Partial Summ. J., Ex. J, ECF No. 12-12.  Thus, Mr. Craig's reassignment occurred within three or four months of Mr. Craig's last protected act.  Admittedly, this degree of temporal proximity is generally considered to be at the tail-end of what courts typically find sufficient to give rise to an inference of causation.  *See Booth v. Dist. of Columbia*, 701 F. Supp. 2d 73 (D.D.C. 2010) ("action which occurs more than three or four months after protected activity is not likely to qualify for such a

causal inference.") (citing *Clark Cty Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001)); *Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit.") (citing *Hamilton v. Geithner,* 666 F.3d 1344, 1357–58 (D.C. Cir. 2012))  Nevertheless, the Court finds that this temporal proximity, when combined with the evidence of potential retaliation associated with Mr. Craig's detail to the Executive Lead position, would allow a reasonable juror to conclude that the Mint's motives were pretextual.[17]

---

[17] The Court notes that it is questionable whether Mr. Craig's reassignment to the A/D ES&H position was a materially adverse employment action.  As a discrete decision, it would seem the actionability of that reassignment should be evaluated on its own merits, rather than simply as a continuation of prior retaliatory acts.  *C.f. Nat'l R.R. Passenger Corp. v Morgan*, 536 U.S. 101, 114 (2002) (continuing violation doctrine does not apply to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "'unlawful employment practice.'").  Of course, actionability requires that the reassignment be a materially adverse employment action.  To assess whether an employment decision is materially adverse in a case where "plaintiff alleges retaliation based on a reassignment, the fact-finder must compare the position the plaintiff held before the transfer to the one he holds afterwards."  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010).  In this case, even though the A/D ES&H position is arguably not of the same stature as his prior A/D SAM position, it would seem to be better than the Executive Lead role that he held immediately before the reassignment because he now has some supervisory authority, it protects his SES salary, and he could not have continued in his non-SES duties.  As a result, there remains a question of whether the reassignment actually constituted a materially adverse employment action and, consequently, whether it is independently actionable.

Nevertheless, the Court need not decide this issue because the Defendant has not raised it as a basis for summary judgment and, in any event, whether Mr. Craig's reassignment is a separate claim would seem to have little practical consequence for the trial of this case.  First, given that there is no evidence that Mr. Craig's salary ever changed as a result of his detail or reassignment, any claim based on Mr. Craig's A/D ES&H reassignment would not seem to entitle Plaintiff to any further relief in the form of back pay.  Second, given that Mr. Craig's overarching claim is that he was removed from his position and never restored to his prior level of responsibility, even if the reassignment were not a separate claim, evidence of the reassignment would still be admissible to prove the continued emotional harm Plaintiff suffered from the Mint's earlier actions and its continued refusal to restore him to his prior level of responsibility.  Lastly, whether or not the reassignment is treated as a separate claim would seem

## 2. Racial Discrimination

The Court next turns to Mr. Craig's racial discrimination claim.  Review of the record demonstrates that Mr. Craig has not offered any evidence from which a reasonable jury could conclude that Ms. Babers's actual reason for removing him from the A/D SAM position, detailing him to the Executive Lead position, or later assigning him to the A/D ES&H position was to discriminate against Mr. Craig on the basis of his race.  Mr. Craig argues that "[m]uch of the same evidence that proves Mr. Craig's reprisal claims . . . also supports his claims of discrimination" and that it is also supported by the fact that similarly-situated Caucasian men received more favorable treatment.  Pl.'s Opp'n at 28.  The Court finds these arguments unpersuasive.

First, Mr. Craig offers no evidence supporting his claim that he was removed from the A/D SAM position as a result of racial discrimination.  For example, Mr. Craig has not shown that there have been any changes or inconsistencies in the stated reasons for removing him from the position, that Ms. Babers or Mr. Peterson made any racially insensitive or discriminatory remarks, or that Defendant's general treatment of African-American employees was any worse than their treatment of other employees.[18]  Instead, Mr. Craig again relies primarily on his

---

to have little, if any, impact on the Court's remedial options if Plaintiff prevails on his earlier claims because the Court would still need to consider whether Plaintiff was entitled to be placed in a position with greater responsibilities than the A/D ES&H position.

[18] Although Mr. Craig presents testimony from a co-worker who believes Ms. Babers "directly discriminates against individuals," Nicholson Dep. 38:14–15, such conclusory, unsubstantiated testimony is not sufficient to raise a genuine issue of material fact as to pretext, *see, e.g., Ransom v. Ctr. For Nonprofit Advancement,* 514 F. Supp. 2d 18, 27 (D.D.C. 2007) (conclusory testimony of co-worker regarding discrimination against plaintiff was not "actual evidence" of pretext); *Chung v. Washington Metro. Area Transit Auth.,* No. 04–0366, 2007 WL 1154084, at *3 (D.D.C. Apr. 18, 2007) (co-worker testimony that plaintiff failed to receive promotion based on race and gender was not probative of pretext); *Carter v. Rubin,* 14 F. Supp.

arguments that Ms. Babers's assessment of his performance was flawed. But, as discussed above, Mr. Craig has not demonstrated that Ms. Babers's beliefs were either dishonest or unreasonable. Thus, these arguments fail once again. Mr. Craig also points out, however, that Defendant later filled the Acting-A/D SAM position with two white employees—Mr. Croft and Mr. Landry. However, this alone does not demonstrate pretext for racial discrimination.

While it is certainly true that "[o]ne way to discredit an employer's justification is to show that similarly situated employees of a different race received more favorable treatment," Mr. Craig has not done that here. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008) (citing *Brady*, 520 F.3d at 495). Mr. Craig argues simply that Mr. Landry and Mr. Cameron, two white SES employees, each held the Acting A/D SAM position after it was vacated by Mr. Craig. But, as the D.C. Circuit has previously held, the mere fact that a defendant hired white employees to fill a position that was formerly occupied by an African-American employee is not enough on its own to rebut a defendant's performance-based, non-discriminatory reasons for an adverse action. *See id.* at 146 (affirming summary judgment where plaintiff "provid[ed] no evidence of unlawful discrimination that the court might properly consider" other than "evidence that he and his African American supervisor were replaced by white employees"); *Harris v. Grp. Health Ass'n, Inc.*, 662 F.2d 869, 872 (D.C. Cir. 1981) (holding that there is no inference of discrimination based purely on fact that plaintiff "was black and that the person [that defendant] first considered to replace her was a white male,"

---

2d 22, 42 (D.D.C. 1998) (finding that "broad allegations" of discrimination within a government agency "have no bearing" on the question of pretext).

particularly where there was "evidence that the reason for [plaintiff's] discharge was her inadequate performance at her position.").

Moreover, Mr. Craig has failed to show that he was similarly situated to either Mr. Cameron or Mr. Landry, yet they received more favorable treatment. Specifically, he has not shown that "all of the relevant aspects of [his] employment situation were 'nearly identical'" such that they could be considered "similarly situated." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Importantly, the dynamic was this: Ms. Babers believed that Mr. Craig had failed as A/D SAM (which he has not shown to be either dishonest or unreasonable) and then the Mint needed to consider how to fill *that position*. Mr. Cameron and Mr. Landry, on the other hand, had never served in that position before and had certainly never failed in that particular position.[19] In addition, unlike Mr. Craig, Mr. Landry and Mr. Cameron were selected to fill the A/D SAM position in an *acting capacity* rather than on a permanent basis. *See Kline v. Springer*, 602 F. Supp. 2d 234, 240 (D.D.C. 2009) (temporary detailee was not similarly situated to permanent employee); *see also McMillan v. Bair*, 304 F. App'x 876, 877 (D.C. Cir. 2008) ("probationary trainees are not similarly situated to permanent employees for purposes of Title VII"). Finally, Mr. Craig fails to argue or identify any evidence demonstrating that either Mr. Cameron's or Mr. Landry's performance as Acting A/D SAM was commensurate with his performance or that Defendant treated their failures any differently than they treated his. *See e.g., Neuren*, 43 F.3d at 1514 (plaintiff was not similarly situated to colleague where employer viewed the "unrelated criticisms" of colleague as "less serious" than the criticisms of plaintiff);

---

[19] Although Plaintiff argues that Mr. Cameron had previously performed poorly in *another* position outside of the Mint, *see* Pl.'s Opp'n at 21, he was not placed back in *that* position.

*Kline*, 602 F. Supp. 2d at 240 (holding that plaintiff's colleagues were not similarly situated, in part, because "plaintiff failed to show that her performance was similar to theirs"). For all of these reasons, Mr. Cameron and Mr. Landry were not similarly situated to Mr. Craig.

Nevertheless, Mr. Craig argues that a discriminatory inference should be drawn based on Mr. Landry's and Mr. Cameron's lack of marketing experience. Mr. Craig points out that, part of the purported reason for removing Mr. Craig from the A/D SAM position was because Ms. Babers believed that he did not have the marketing expertise necessary to successfully complete the Marketing Plan. According to Ms. Babers, the Mint had been "trying to develop a marketing plan[,] which[,] in order to be done well[,] needed marketing expertise." Babers Dep. at 170:9–11; *see also id.* at 174:2–5 ("In my head was, wow, this is a mismatch in terms of skill sets and what we need, because we needed the technical marketing."). Mr. Craig argues, that, in fact, neither of the men that came after him had the marketing expertise that Mr. Craig supposedly lacked, yet they were still selected for the position.

Fundamentally, this argument is flawed because it assumes that the desirable qualifications and credentials of someone assuming a permanent A/D SAM position are the same as the qualifications and credentials of someone assuming the position in a temporary or acting capacity. While Ms. Babers's comments might suggest a desire to ultimately hire a permanent A/D SAM with marketing expertise, they do not go so far as to demonstrate that it is the most important qualification or even a necessary credential for purposes of selecting someone to immediately fill that role on a temporary, acting basis. Indeed, when employers are faced with the need to fill high-level positions temporarily, they may very well be unable to identify, within a reasonable time, any person with the qualifications or credentials that they would ordinarily require of someone filling the position on a permanent basis. Thus, expediency may require

employers to prioritize the qualifications that they deem most important in order to fill the position in a timely fashion. In this case, when Mr. Craig was removed, Ms. Babers detailed Mr. Landry to the Acting-A/D SAM position because she sought "to have an experienced SES member who was knowledgeable of the Mint's mission and operations to act in the role until such time as a permanent SES assignment could be made." Def.'s Reply at 15; *see also* Babers Dep. at 217:1–10 (Mr. Landry had been "Acting Associate Director for Manufacturing for about 18 months at that time" and "[i]n that role he seemed very effective in terms of managing the organization[,]" so "I thought that that would be a good fit for him . . . to act for the Sales and Marketing" Division); Peterson Dep. at 170:9–17 ("Ms. Babers recommended that Mr. Landry move into the AD of Sales and Marketing because . . . he's been in D.C. for a year-and-a-half, had established contacts in [] Sales And Marketing, understood . . . the ebbs and flows of the numismatic business, and [] he would be more seamless than anybody else at the Mint."). Then, in 2014, when the Mint needed Mr. Landry to return to full-time management at the Philadelphia manufacturing facility, Mr. Cameron was detailed to Acting A/D SAM position only after no viable candidate could be found to fill the position permanently. *See* Cameron Dep. 43:11–22. Mr. Craig gives the Court no reason to doubt these explanations for selecting either Mr. Landry or Mr. Cameron to temporarily serve as Acting A/D SAM. The mere fact that they did not have the marketing expertise that Ms. Babers might require of a candidate for the permanent position does not advance Mr. Craig's argument, particularly when he has not shown that there was *anyone* that the Mint could have selected to temporarily fill the position who had such expertise. Thus, Mr. Craig has not presented any evidence from which a reasonable trier-of-fact might conclude that the Defendant's stated reasons for removing Mr. Craig from the A/D SAM position was pretext for racial discrimination.

Mr. Craig's discrimination claims relating to his detail to the Executive Lead position and assignment to the A/D ES&H position do not fare any better. First, Mr. Craig does not offer any other evidence to support his claim of racial discrimination. As discussed above, however, Mr. Craig's detail to the Executive Lead role was attendant with certain procedural irregularities. Specifically, the failure to consult with the HR Department prior to announcing the detail and the length of the detail, which violated the policies applicable to detailing SES executives. But Courts in this circuit have concluded that "'procedural irregularities'" do not establish pretext "absent some actual evidence that defendant acted on a motivation to discriminate." *Kelly v. LaHood*, 840 F. Supp. 2d 293, 302 (D.D.C. 2012) (quoting *Oliver–Simon v. Nicholson*, 384 F.Supp.2d 298, 312 (D.D.C. 2005); *see also Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) ("a failure on the part of the prospective employer to follow its own regulations and procedures, alone, may not be sufficient to support a finding of age discrimination."); *Johnson v. Dist. of Columbia*, 99 F. Supp. 3d 100, 106 (D.D.C. 2015) ("the procedural defect must evidence the employer's discriminatory bias"); *Washington v. Chao*, 577 F. Supp. 2d 27, 46 (D.D.C. 2008) ("procedural irregularities do not raise an inference of racial discrimination unless there is a connection to the discrimination that the plaintiff is claiming") (citing *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1228 (D.C. Cir. 2008)). Mr. Craig has produced no evidence that racial discrimination played any role in Defendant's failure to consult with the HR Department or that its violation of the SES protocols was motivated by racial animus. Accordingly, the procedural irregularities on their own would not permit a reasonable jury to find that Defendant's stated reasons for the detail were pretext for discrimination. Likewise, without any evidence of racial discrimination there can be no genuine issue as to Mr. Craig's later reassignment to the

A/D ES&H position.  Thus, the Court finds that Defendant is entitled to summary judgment on Count III of Mr. Craig's Amended Complaint.

### C.  Failure to Restore to A/D SAM or to Select as A/D Manufacturing

In addition to his complaints about Defendant removing him from his former position and placing him in inferior ones, Mr. Craig complains that Defendant discriminated and retaliated against him by failing to either restore him to his former position or place him in a position commensurate with his former position, such as A/D Manufacturing.  The Court finds that, while Mr. Craig is not entitled to relief from Defendant's failure to reinstate him to his former position, he has demonstrated a genuine issue as to Defendant's failure to select him to serve as A/D Manufacturing, at least with respect to his retaliation claim.

### 1.  Failure to Restore to A/D SAM

First, the Court can easily dispose of Mr. Craig's claim that the Mint discriminated or retaliated against him by failing to restore him to his former position.  Defendant asserts that it did not restore him to his former position for the same reason that it removed him from the position—his inadequate performance of the job.  *See* Def.'s Mot. at 29.  As discussed in greater detail above, Mr. Craig has failed to demonstrate that this reason was pretext for discrimination or retaliation.  And Mr. Craig does not present any evidence specific to this claim that tends to rebut the Mint's legitimate, non-discriminatory, non-retaliatory reason for not reinstating him to a job from which he was removed due to inadequate performance.  Accordingly, Mr. Craig has failed to satisfy his burden on summary judgment.[20]

---

[20] The Court further notes that these claims appear to be foreclosed by circuit precedent. In *Kaufman v. Perez*, 745 F.3d 521 (D.C. Cir. 2014), the D.C. Circuit considered a similar claim brought by a federal government employee.  In that case, the employer revoked the plaintiff's duties assisting an Ombudsman after the plaintiff engaged in a pattern of unprofessional and inappropriate behavior.  *See id.* at 523.  Following one particularly egregious incident, plaintiff's second-level supervisor met with plaintiff and issued a memorandum informing him "that he

## 2.  Failure to Select as Permanent A/D Manufacturing in 2014

Finally the Court considers Mr. Craig's argument that he was discriminated and retaliated against when he was not selected to serve in the permanent A/D Manufacturing position in 2014. *See* Pl.'s Opp'n at 39–41; Am. Compl. ¶¶ 72–86, 94–106.  According to Defendant, Mr. Peterson did not consider selecting Mr. Craig for the position because he "already had two outstanding

---

would no longer be performing Ombudsman's duties." *Id.*  Thereafter, the plaintiff made several requests that he be allowed to resume working for the Ombudsman, all of which were denied. *See id.* at 524–25.  Plaintiff brought suit against his employer challenging both the revocation of his Ombudsman duties as well as his employer's repeated refusals to reinstate those duties.  *See id.* at 526.  An Administrative Law Judge dismissed the case, finding that the initial removal of the plaintiff's Ombudsman duties was time-bared and that the subsequent refusals to restore his responsibilities were not actionable as they did not constitute adverse employment actions.  *See id.* at 526.

The D.C. Circuit affirmed.  Id. at 528–30.  The Court explained that "[b]ecause [the plaintiff] was barred from performing Ombudsman duties [at the time he met with his supervisor], he could not have suffered adverse action through the [employer]'s direct and indirect failure to subsequently assign him such work."  *Id.* at 529.  The Court did, however, leave open the possibility that "a failure to reinstate might in some circumstances constitute an independent discriminatory act."  *Id.* at 529.  Specifically, it suggested that such a claim may lie whenever there is "initial or subsequent uncertainty" as to definiteness of the employment action or where a "defect in the reinstatement process" rendered "the failure to reinstate independently *adverse* to the claimant."  *Id.* at 530 (emphasis in original).  These circumstances, however, did not apply to the plaintiff in *Kaufman* because the plaintiff had "failed to demonstrate any uncertainty about his prohibition."  *See id.*  It also observed that, because "there was never . . . a termination, there was no reinstatement process, nor indeed any other process, let alone a defective process."  *Id.*  Accordingly, the Court held that the plaintiff "failed to demonstrate that any [of the employer's] later actions were adverse" because the plaintiff's "prohibition was clear from the beginning, and that clarity never abated."  *Id.*

Here, the Defendant's failure to restore Mr. Craig to his former A/D SAM position was not "independently adverse" to him.  Mr. Craig was definitively removed from his position as A/D SAM for performance reasons by January 2013.  Mr. Craig has not shown that this decision was provisional, that it was subject to any further review, or that he had any reasonable expectation that he would resume those duties in the future.  And, like *Kaufman*, that "clarity never abated" even despite Mr. Craig's requests to be returned to the position.  *See id.*  Mr. Craig has also not shown that he participated in any sort of reinstatement process or that any such process suffered from a defect.  Thus, as in *Kaufman*, Mr. Craig has failed to demonstrate that Defendant's refusal to restore him to the A/D SAM position was an independent adverse employment action.

SES members within the Mint," Mr. Croft and Mr. Landry, both of whom had extensive prior

manufacturing experience and both of whom had "previously served for approximately 18

months as the Acting A/D Manufacturing." Def.'s Mot. at 36. Defendant contends that Mr.

Peterson ultimately selected Mr. Croft for the Acting A/D Manufacturing position "based upon

[his] extensive background, experience, training, and education in manufacturing." Def.'s Mot.

at 36.

When an employer argues that its hiring decision was based on the candidates' relative

qualifications, "a plaintiff can directly challenge that qualifications-based explanation only if the

plaintiff was '*significantly* better qualified for the job' than those ultimately chosen." *Adeyemi v.*

*District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433

F.3d 889, 897 (D.C. Cir. 2006)). But "[i]n cases where the comparative qualifications are close,

a reasonable jury would not usually find discrimination . . . ." *Adeyemi*, 525 F.3d at 1227.

Instead, "the jury would 'assume that the employer is more capable of assessing the significance

of small differences in the qualifications of the candidates, or that the employer simply made a

judgment call.'" *Id.* (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998);

*accord Gilbert v. Napolitano*, 670 F.3d 258, 262 (D.C. Cir. 2012). In these cases, courts "'defer

to the employer's decision of what nondiscriminatory qualities it will seek' in filling a position,"

*Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007) (brackets omitted) (quoting *Stewart v.*

*Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)), and "must respect the employer's unfettered

discretion to choose among qualified applicants." *Grosdidier v. Broad. Bd. of Governors*, 709

F.3d 19, 26 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Fischbach v. D.C.*

*Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

To be sure, the evidence demonstrates that both Mr. Croft and Mr. Landry have extensive experience in manufacturing, both at the Mint and elsewhere. *See* Pl.'s Resp. SMF ¶ 120; Peterson Dep. at 189:13–15; Def.'s Mot., Ex. 44. In fact, both of them have considerably more manufacturing experience than Mr. Craig, who himself has less than four years of experience. *See* Pl.'s Resp. SMF ¶¶ 125–26. Viewing those credentials in isolation, a reasonable jury could not conclude that Mr. Craig is "significantly better qualified for the job" and Mr. Craig makes no serious attempt to argue that point. But "an employment discrimination plaintiff is not limited to arguing that the employer's explanation is wrong on the merit[s];" he can "show by other means that the explanation was made up to disguise illegitimate bias." *Aka*, 156 F.3d at 1299. For instance, the plaintiff can attempt to show "that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision" or "that the employer's explanation misstates the candidates' qualifications." *Id.* at 1295. A factfinder might also infer discrimination from evidence showing "procedural irregularities in a highly subjective selection process, " "attitudes suggesting the decision maker harbors discriminatory animus," or "data showing that the defendant employs members of the plaintiff's protected class at rates far below their numbers in the applicant pool and the general population." *See Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012); *Holcomb*, 433 F.3d at 899.

Here, Mr. Craig essentially argues that a jury could infer discrimination and retaliation based on the "preselection" of Mr. Croft in 2012. "'Preselection' refers to the practice of soliciting a particular candidate to apply for a job vacancy." *Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164, 169 (D.D.C. 2015). Plaintiff points out that in December 2012, at the same time the Mint announced Mr. Craig would be leaving the A/D SAM position, the Mint also decided to

select a new person to serve in the Acting A/D Manufacturing position. *See* Pl.'s Opp'n at 41–42. Rather than approach Mr. Craig for the position, however, Mr. Peterson selected Mr. Croft, a white employee with no prior EEO activity who had never expressed any interest in the position. *See* Pl.'s Opp'n at 41–42; Croft Dep. at 34:2–10. Later, in 2014, Mr. Peterson decided that Mr. Croft should fill the A/D Manufacturing position permanently. *See* Pl.'s Resp. SMF ¶¶ 121–22. Plaintiff argues that "[h]ad [he] been given the opportunity to serve [in the Acting A/D Manufacturing position], as Mr. Croft was, he would have been well positioned for the permanent position" in 2014 because Mr. Peterson's decision was supposedly influenced by Mr. Croft's "success while in the acting role." Pl.'s Opp'n at 42.

Preselection is considered to be "relevant evidence of the employer's motivation." *Shelborne v. Runyon*, No. 95-0641, 1997 WL 527352, at *10 (D.D.C. Aug. 21, 1997) (citing *Goosetree v. Tennessee*, 796 F.2d 854, 861 (6th Cir.1986)). However, "[p]reselecting a candidate for a position based upon his or her qualifications is not *per se* improper." *Kilby-Robb*, 77 F. Supp. 3d at 169–70 (citing *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008)). In fact, "where the selection is to be made from among a narrow band of current employees well known to the selectors, it is hard to see how there could not be a substantial degree of pre-selection . . . ." *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969 (D.C. Cir. 1998). However, preselection may raise an inference of discrimination, if an "employer preselected a candidate out of a discriminatory motive." *Kilby-Robb*, 77 F. Supp. 3d at 169; *Tolson v. James*, 315 F.Supp.2d 110, 118 (D.D.C. 2004) ("Pre-selection does not violate Title VII unless it is based on discriminatory motives."). Thus, on summary judgment, a plaintiff may demonstrate that his non-selection was discriminatorily motivated if he "produces some evidence that discrimination

played a role in [the selectee]'s pre-selection and thus plaintiff's non-selection." *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005).

Here, the Court is persuaded that Mr. Craig has met this burden with respect to his retaliation claim. As previously discussed, it is undisputed that Mr. Craig filed an informal EEO complaint alleging race and sex discrimination on October 26, 2012, *see* Pl.'s Resp. SMF ¶ 86; EEO Compl. ECF No. 12-18, and that the Mint learned of this claim on December 5, 2012.[21] Six days later, it was announced the Mr. Craig would assume the Executive Lead position while Mr. Croft, a white man with no prior EEO activity, would serve in the Acting A/D Manufacturing role. Yet, to date, Defendant has offered no explanation for why it initially chose Mr. Croft for the acting role in 2012 or, conversely, why it did not choose Mr. Craig even though Mr. Craig was arguably qualified. *See* Def.'s Mot. at 29–30. While Mr. Craig's manufacturing experience was not as extensive as that of Mr. Croft, the experience he did have was not insubstantial.

---

[21] Although Defendant argues that there is no evidence that Mr. Peterson, who was responsible for selecting Mr. Croft for the Acting A/D Manufacturing position in 2012, actually had any knowledge of the EEO complaint or that Ms. Babers relayed any information to Mr. Peterson, *see* Def.'s Reply at 24, such a showing is not required. "To survive summary judgment . . . [the plaintiff] needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). The D.C. Circuit has held time and again that evidence "that the *employer* had knowledge of the employees protected activity and the adverse personnel action took place shortly after that activity [] is adequate to permit an inference of retaliatory motive, at least at the prima facie stage." *Id.* (internal quotations and citations omitted) (emphasis in original). Moreover, "if such evidence can support an inference of actual retaliatory motive, it necessarily can support an inference of mere knowledge." *Id.* In this case, Mr. Craig has shown that the Mint, through Ms. Babers, had knowledge of his EEO complaint before Mr. Peterson announced that Mr. Croft would serve as Acting A/D Manufacturing. Thus, there is at least a genuine issue as to whether Mr. Peterson actually knew of Mr. Craig's EEO activity and whether that knowledge resulted in the preselection of Mr. Croft, and not Mr. Craig, for the Acting A/D Manufacturing position. *Cf. Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) ("[T]he close temporal proximity of [plaintiff's] discrimination complaints to the refusal to consider him for the ASC Director position is sufficient to establish a causal connection.").

Indeed, he had experience establishing a manufacturing facility abroad for a large multinational corporation and managing large manufacturing operations at a facility in Tennessee. *See* Pl.'s Resp. SMF 126; Pl.'s Opp'n, Ex. 4. In fact, it was presumably because of these experiences that the Mint had previously considered Mr. Craig to be among the "best qualified" applicants for the A/D Manufacturing position when he applied for it in 2008. *See* Def.'s Mem. P & A. in Supp. Mot. Partial Dismissal or Partial Summ. J. at 2–3, ECF 10. Furthermore, during the "better fit" discussion between Ms. Babers and Mr. Craig in September 2012, the two even discussed Mr. Craig's aptitude for manufacturing. *See* Babers Dep. at 166:18–19; 169:4–11; 173:13.

Mr. Craig's protected activity continued through 2014. Indeed, not only did Mr. Craig file EEO complaints and participate in the EEOC's investigation, *see* Def.'s Mot. Partial Dismissal or Partial Summ. J., Ex. 2, ECF No. 10-2, but he also filed the instant lawsuit on August 6, 2014, *see* Compl., ECF No. 1. Less than two weeks later, on August 19, 2014, Mr. Peterson announced that Mr. Croft would assume the permanent A/D Manufacturing position. *See* Pl.'s Resp. SMF ¶ 122. In making this selection, he did not give any thought to placing Mr. Craig in the position, *see* Pl.'s Resp. SMF ¶ 124, and it appears that Mr. Croft's experience in the Acting A/D Manufacturing position was a crucial consideration. *See* Peterson Dep. at 189:9–15 ("I had two great candidates to select from," because Mr. Landry and Mr. Croft had been "plant managers for the two largest Mints in the World," had "served as Acting A/D of Manufacturing for over a year," and had "significant private sector experience in the automotive industry."). Based upon these circumstances, including the temporal proximity between Mr. Craig's various protected activities and Mr. Croft's selection for the temporary and permanent positions, a reasonable jury could conclude that the Mint preselected Mr. Croft in 2012, which ultimately allowed him to be placed in the permanent position in 2014, and that this preselection was

accompanied by retaliatory animus for those that engaged in protected activity. Thus, Mr. Craig's retaliation claim stemming from the Mint's failure to select him for the permanent A/D Manufacturing role in 2014 survives summary judgment.

By contrast, however, the record does not support the notion that racial discrimination played any role in either Mr. Croft's preselection in 2012 or Mr. Craig's non-selection in 2014. Mr. Craig points to no additional evidence of racial discrimination in 2014, but instead relies entirely on his preselection argument. As explained elsewhere in this opinion, the record simply contains no evidence that any of the Mint's decisions, either in 2012 or at any other time, were motivated in any way by racial animosity. Because Mr. Craig has produced no "evidence that [racial] discrimination played a role in [Mr. Croft]'s pre-selection and thus plaintiff's non-selection," *Oliver-Simon*, 384 F. Supp. 2d at 310, this claim necessarily fails. Accordingly, Defendant is entitled to summary judgment on Counts IV and VII of Mr. Craig's Amended Complaint.

## V.  CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (ECF No. 33) is **GRANTED IN PART AND DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 29, 2017                                    RUDOLPH CONTRERAS
                                                              United States District Judge