# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| B.B. CRAIG, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1340 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 110, 120, 121, 129 |
| | : | | |
| STEVEN MNUCHIN, | : | | |
| Secretary of the Treasury | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART PLAINTIFF'S MOTIONS FOR COMPLETE EQUITABLE RELIEF AND COMPLETE ATTORNEYS' FEES; DENYING PLAINTIFF'S MOTIONS FOR PARTIAL EQUITABLE RELIEF AND INTERIM ATTORNEYS' FEES

## I. INTRODUCTION

Plaintiff B.B. Craig, an official at the United States Mint, sued United States Secretary of the Treasury Steven Mnuchin, in his official capacity, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e-17 ("Title VII").[1] Following a trial, the jury returned a verdict in favor of Mr. Craig, awarding him $5,485 in compensatory damages. With the verdict now in, Mr. Craig seeks injunctive relief and attorneys' fees. As explained below, the Court concludes that Mr. Craig is entitled to both forms of relief, though not to the extent he requests. Accordingly, the Court grants in part and denies in part Mr. Craig's motions.

---

[1] While Secretary Mnuchin is technically the Defendant, this Court will hereafter refer to "the government" or "the Mint" when discussing the Defendant's arguments.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

Mr. Craig has worked for the United States Mint, as a member of the United States Treasury's Senior Executive Service ("SES"), since 2008.[3]  *See* Am. Compl. ¶ 12, ECF No. 22. From 2008 to early 2013, he was the Associate Director of the Mint's Sales and Marketing Division ("A/D SAM"), having failed to receive his preferred position of Associate Director of the Mint's Manufacturing Division ("A/D Manufacturing") in 2008.  *See* Dep. Tr. B.B. Craig ("Craig Dep.") at 24:25–26:1, 27:4–30:1, 128:1–4, ECF No. 51-3; Summ. J. Opp'n Ex. 4, ECF No. 41-6.  As A/D SAM, Mr. Craig had authority to speak and act on behalf of the Mint, and he had significant supervisory authority over approximately ninety-four full-time-equivalent employees allotted to the SAM Division.  *See* Decl. of B.B. Craig ("Craig Decl.") ¶¶ 3–4, ECF No. 40-2.

In 2012, Mr. Craig failed to meet the Mint's expectations on two critical SAM projects. Summ. J. Opp'n Ex. 11 at 4, ECF No. 41-11; Summ. J. Opp'n Ex. 24 at 5, ECF No. 41-19 (noting Mr. Crag's "lack of constructive resolution of and leadership on the Order Management System project, and the failure to produce an effective comprehensive marketing plan).  These performance issues prompted the Mint's Chief Administrative Officer, Beverly Babers, to begin

---

[2] This Court's most recent opinion in this matter, *Craig v. Mnuchin (Craig II)*, 278 F. Supp. 3d 42 (D.D.C. 2017), provides additional background detail.

[3] The SES is the federal government's executive management core.  Office of Personnel Management, About the SES, available at http://www.opm.gov/ses/about_ses/index.asp.  SES members manage key government programs, divisions, offices, and functions within federal agencies such as the Mint.  *See generally* Mint Organizational Charts, Def.'s Mot. Summ. J. ("Summ. J. Mot.") Ex. 2 (designating SES positions as "ES" positions), ECF No. 34-2; U.S. Office of Personnel Management, Guide to the SES, Summ. J. Mot. Ex. 3, ECF No. 34-3.  SES members are governed differently than other federal employees and can, at the government's discretion, be reassigned to an SES position within an agency for which they are qualified or "detailed" to a position with unclassified duties within the agency or to another agency for up to 240 days.  Pl.'s Opp'n Def.'s Mot. Summ. J. ("Summ. J. Opp'n"), Ex. 16 at 9, 11–12, ECF No 41-14.

seeking a position in the Mint that would be a "better fit" for Mr. Craig.  *Id.*; Craig Decl. ¶ 9.

Around this time, Mr. Craig filed an informal complaint with the Equal Employment

Opportunity Commission (an "EEO complaint"), alleging that certain individuals at the Mint

discriminated against him based on his race and gender.  *Id.* ¶ 10; Pls. Petition Award

Reasonable Attorneys' Fees & Costs ("Fee Mot.") Att. D, ECF No. 121-9.

Ultimately, the "better fit" that Ms. Babers identified was a detail to a position called

"Executive Lead" which, unlike Mr. Craig's previous position, had unclassified duties and no

supervisory authority.[4]  Craig Dep. at 128:1–7, 180:8–13; Craig Decl. ¶¶ 13–14; Summ. J. Opp'n

Ex. 6, ECF No. 41-7.  Mr. Craig remained in the Executive Lead position until 2014, when he

was reassigned to a permanent SES position as Associate Director of Environment, Safety, and

Health ("A/D ESH"), having again failed to receive an appointment to the A/D Manufacturing

position.  Craig Dep. at 125:15–128:6; Craig Decl. ¶ 14.  Mr. Craig has received performance

bonuses and excellent performance reviews since assuming the A/D ESH position, where he

remains to this day.  *See* Def's Opp'n Partial Equitable Relief ("Partial Inj. Opp'n") Ex. A, ECF

No. 112-1.

Mr. Craig brought this action in 2014 and filed an amended complaint in 2015, alleging

that the Mint violated Title VII by (1) failing to place Mr. Craig in the A/D Manufacturing

position in 2008; (2) moving Mr. Craig out of the A/D SAM position in 2012; (3) giving Mr.

Craig a sub-par performance review in 2012; (4) assigning Mr. Craig to the Executive Lead

position for approximately 18 months, from 2012 to 2014; (5) declining to reassign Mr. Craig to

the acting or permanent A/D Manufacturing or A/D SAM positions in 2014; and (6) reassigning

---

[4] Ms. Babers reported to the Mint's Deputy Director, Richard Peterson, who allegedly had a hand in Mr. Craig's reassignment to the Executive Lead position.  *See* Am. Compl. ¶ 40; Craig Decl. ¶¶ 13–14; Dep. Richard Peterson at 149:16–150:13, ECF No. 50-2.

Mr. Craig to his current position, the A/D ESH. *See generally* Am. Compl. These claims were narrowed over several rounds of briefing. First, the Court granted the government's pre-discovery motion for summary judgment on Mr. Craig's claim that his non-selection to the A/D Manufacturing position in 2008 was discriminatory. *Craig v. Lew (Craig I)*, 109 F. Supp. 3d 268, 284 (D.D.C. 2015). Next, the Court granted the government's post-discovery motion for summary judgment on Mr. Craig's claims that his sub-par performance review in 2012, his removal from the A/D SAM position in 2012, and the Mint's refusal to reassign him to the A/D SAM position in 2014 were discriminatory or retaliatory; and Mr. Craig's claims that his placement in the Executive Lead position from 2012 to 2014, his assignment to the A/D ESH position in 2014, and his non-selection to the A/D Manufacturing position in 2014 were discriminatory. *Craig II*, 278 F. Supp. 3d at 59, 65, 69, 72, 76.

Finally, the case went to trial on Mr. Craig's claims that (1) his placement in the Executive Lead position from 2012 to 2014; (2) his assignment to the A/D ESH position in 2014; and (3) his non-selection to the A/D Manufacturing position in 2014 were retaliatory, in violation of Title VII. Of these three claims that went to the jury, the jury found for Mr. Craig only on his claim that the Mint retaliated against him by detailing him to the role of Executive Lead, and it awarded Mr. Craig $5,485 in compensatory damages. Jury Verdict, ECF No. 99. In 2018 the Mint received a new permanent Director, a position that had been unfilled since 2011. Pls. Mot. Award Partial Equitable Relief ("Partial Inj. Mot.") at 4–5, ECF No. 110.

Shortly after the trial, Mr. Craig filed a motion for partial injunctive relief. *See generally* Partial Inj. Mot. After the parties were unable to settle during mediation on injunctive relief and attorneys' fees, the Court ordered Mr. Craig to file motions for complete injunctive relief and complete attorneys' fees and costs. *See* Minute Order (Aug. 1, 2018). Mr. Craig dutifully filed

those motions, which are now, along with his earlier motion for partial injunctive relief and his later motion for interim attorneys' fees, ripe for the Court's consideration. *See* Partial Inj. Mot.; Pls. Mot. Complete Award Equitable Relief ("Inj. Mot."), ECF No. 120; Fee Mot., ECF No. 121; Pls. Mot. Interim Award Reasonable Attorneys' Fees ("Fee Mot. II"), ECF No. 129. [5]

## III. LEGAL STANDARDS

### A. Equitable Relief

"[O]ne of the central purposes of Title VII is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'" *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 763 (1976) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418 (1975)). Accordingly, Title VII expressly provides for a wide range of remedies:

> If the court finds that the [defendant] has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).

In considering what remedy is appropriate, the Court "must strive to grant 'the most complete relief possible.'" *Lander v. Lujan,* 888 F.2d 153, 156 (D.C. Cir. 1989) (quoting *Franks,* 424 U.S. at 764). In other words, the Court's goal is to restore the plaintiffs, as nearly as possible, to the circumstances they "would have occupied if the wrong had not been committed." *Id.* (internal quotation marks omitted) (quoting *Albemarle Paper,* 422 U.S. at 418–19). In

---

[5] When referencing these motions, their accompanying memoranda of points and authorities, and their related opposition and reply briefs, the Court cites to the page numbers automatically generated by ECF.

fashioning a remedy which satisfies the objectives of Title VII, the district court is vested with "considerable discretion." *Id.*; *see also Hayes v. Shalala,* 933 F. Supp. 21, 25 (D.D.C. 1996).

### B. Attorneys' Fees

Under Title VII, the Court is authorized, in its discretion, to award "the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). Generally, "[a] reasonable fee is one that is 'adequate to attract competent counsel, but that does not produce windfalls to attorneys.'" *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). In awarding reasonable attorneys' fees, a court must conduct a two-step inquiry. *Craig v. District of Columbia*, 197 F. Supp. 3d 268, 274–75 (D.D.C. 2016) (citing *Does I, II, III v. District of Columbia.*, 448 F. Supp. 2d 137, 140 (D.D.C. 2006)).

First, the court must determine whether the plaintiff is the prevailing party. *Id.* at 275. A plaintiff is considered a prevailing party, entitled to attorneys' fees, "if [he] succeed[s] on any significant issue in litigation which achieves some of the benefit the [plaintiff] sought in bringing suit." *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 53 (D.D.C. 2013) (internal quotation marks and alterations omitted) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). A litigant need not succeed at every step of the litigation in order to be a prevailing party under Title VII; "a litigant who is unsuccessful at a stage of litigation that was a necessary step to [his] ultimate victory is entitled to attorney's fees even for the unsuccessful stage." *Craig*, 197 F. Supp. 3d at 275 (quoting *Ashraf-Hassan v. Embassy of Fr. in the U.S.*, 189 F. Supp. 3d 48, 54–55 (D.D.C. 2016)).

Second, the court must determine whether the plaintiff's fee request is reasonable. *Does I, II, III*, 448 F. Supp. 2d at 140. In analyzing the plaintiff's fee request, "[a] court must: (1)

determine the 'number of hours reasonably expended in litigation'; (2) set the 'reasonable hourly rate'; and (3) use multipliers as 'warranted.'" *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 61 (D.C. Cir. 2015) (quoting *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015)). In determining whether the hours expended on the successful litigation are reasonable, the court must exclude hours that are "excessive, redundant, or otherwise unnecessary." *Craig*, 197 F. Supp. 3d at 275 (quoting *Does I, II, III*, 448 F. Supp. 2d at 140). And in determining whether the proposed hourly rate is reasonable, the court must consider three sub-elements: "(1) 'the attorneys' billing practices,' (2) 'the attorneys' skills, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Salazar*, 809 F.3d at 62 (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995)). Generally, "there is a 'strong presumption that the fee yielded by the now-ubiquitous lodestar method, which bases fees on the prevailing market rates in the relevant community, is reasonable.'" *Makray v. Perez*, 159 F. Supp. 3d 25, 30 (D.D.C. 2016) (quoting *West*, 717 F.3d at 1034). However, if a plaintiff "achieved only partial or limited success," the court may conclude that "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount," and it may accordingly reduce the award. *Hensley*, 461 U.S. at 436.

Ultimately, the plaintiff bears the burden of establishing both his entitlement to attorneys' fees and the reasonableness of the fees he seeks. *See Eley*, 793 F.3d at 100; *Turner v. D.C. Bd. of Elections & Ethics*, 354 F.3d 890, 895 (D.C. Cir. 2004); *Covington*, 57 F.3d at 1107. Once the plaintiff meets this initial burden, a presumption arises that the number of hours billed and the rates at which they are billed are reasonable. *See Covington*, 57 F.3d at 1110–11; *Makray*, 159 F. Supp. 3d at 30; *Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 101 (D.D.C. 2010). At

that point, the burden shifts to the opposing party to "provide specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1109–10 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982)).

## IV.  ANALYSIS

As described above, the jury concluded that the Mint retaliated against Mr. Craig when it assigned him to the Executive Lead position.  Mr. Craig's rights having been vindicated at trial, he is a prevailing party seeking injunctive relief and attorneys' fees.  The Court will address each form of relief in turn, concluding that Mr. Craig is entitled to a portion of the injunctive relief sought and a portion of the attorneys' fees sought.  Accordingly, it grants each of Mr. Craig's motions in part.

### A.  Injunctive Relief

The Court first addresses Mr. Craig's motions for injunctive relief.  Again, under 42 U.S.C. § 2000e-5(g)(1), the Court may grant "equitable relief" that "the court deems appropriate" to restore Mr. Craig, as nearly as possible, to the circumstances he would have occupied but for the Mint's retaliation.  *Lander*, 888 F.2d at 156; *see also Berger v. Iron Workers Reinforced Rodmen,* 170 F.3d 1111, 1119 (D.C. Cir. 1999) ("[A] court must, as nearly as possible, recreate the conditions and relationships that would have been, had there been no unlawful discrimination." (citation and internal quotation marks omitted)).  In furtherance of this objective, "[d]uring the remedial stage of the proceedings, the district court may make factual findings to determine appropriate 'make whole' relief under § 2000e-5(g)(1), as long as the findings are consistent with the jury verdict."  *Porter v. Natsios,* 414 F.3d 13, 21 (D.C. Cir. 2005) (internal citation omitted).

Mr. Craig seeks wide ranging injunctive relief designed to replicate the career path that he believes he would have followed, had he not been placed in the Executive Lead position.  He asks the Court to (1) require the government to install Mr. Craig in a "dual hat" role; (2) enjoin the government from detailing Mr. Craig to a position with unclassified duties for more than 240 days; (3) declare that Mr. Craig's civil rights were violated by his placement in the Executive Lead position; and (4) require the government take certain actions with respect to Mr. Craig's personnel file and future employment inquiries.  Inj. Mot. at 1–2.  As explained below, the Court concludes that Mr. Craig is not entitled to a dual hat role or declaratory relief, but that he is entitled to certain personnel file-related relief.  Accordingly, the Court grants Mr. Craig's motion in part.

### 1. Assignment to a Dual Hat Role

Mr. Craig argues that to restore him to the position he would have occupied but for the Mint's retaliation, this Court must require the Mint to install Mr. Craig in a dual hat role in which he encumbers his current Associate Director position *and another* SES-level position simultaneously.  As noted, "Title VII envisioned that making a victim whole would include his reinstatement to the position he would have held but for the discrimination."  *Jean-Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 42 (D.D.C. 2013) (quoting *Lander*, 888 F.2d at 156).  However, while a court must strive to "recreate the conditions and relationships that would have been" in the absence of the defendant's discrimination or retaliation against the plaintiff, *Berger*, 170 F.3d at 1119 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 372 (1977)), "equitable relief is not automatic and the court must assess the appropriateness of the equitable relief sought in light of the injuries found," *Hayes*, 933 F. Supp. at 27.  "Where the jury has not actually decided an issue or where the basis for the jury's decision cannot be determined, the

court is not bound." *Id.* (citing *Blake v. Hall,* 668 F.2d 52, 54 (1st Cir. 1981), *cert. denied,* 456 U.S. 983 (1982)).  Accordingly, a court need not recreate a plaintiff's hypothetical career path, if the jury's verdict does not dictate that the plaintiff be placed on that path.

Mr. Craig contends that "the path to career advancement for a member of the SES is through indefinite details in acting positions, usually while simultaneously assigned to his or her permanent position," Partial Inj. Mot. at 6, and that "other Associate Directors who did not engage in protected EEO activity" received these "career enhancing assignments." *Id.* at 14. Mr. Craig thus asks the Court to require the government to install him as acting A/D of Manufacturing, acting A/D SAM, now titled Director of Numismatics and Bullion, acting Chief Administrative Officer, or an "equivalent acting position" for eighteen months, in addition to his current position as A/D ESH.  Inj. Mot. at 1.  The government counters that such relief is inappropriate because (1) the jury's verdict does not dictate that Mr. Craig be detailed—in addition to his current A/D ESH position—to another Associate Director position; and (2) Mr. Craig "has presented no evidence that would support a claim that he would have been 'dual-hatted' in any other role, were it not for the Mint detailing him to the Executive Lead role." Partial Inj. Opp'n at 8, ECF No. 112.  The government's argument is well-taken.

Courts in this District occasionally grant retroactive promotions grounded in plaintiffs' "career path" theories, applying the principle that a "remedial decree which considers career progress improperly denied is well within this Court's discretion under Title VII." *Brown v. Marsh*, 713 F. Supp. 20, 22 (D.D.C. 1989) (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 399 (1982); *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 762 (1976)).  In determining whether this type of relief is appropriate, a court must consider whether the jury's verdict is based on the plaintiff's failure to obtain a specific position or promotion to which he or

she was entitled in the absence of discrimination or retaliation. *See Porter*, 414 F.3d at 22–23 (affirming the district court's decision to deny the plaintiff retroactive placement when the jury's verdict did not establish that the plaintiff would have received that placement in the absence of discrimination). The court must also look to "the career path of the man [or woman] promoted in [the plaintiff's] stead" and any record evidence suggesting that the plaintiff was likely to progress at a similar or faster rate. *Brown*, 713 F. Supp. at 22.

For instance, in *Brown*, another court in this District determined that a plaintiff who had been refused a GS-9 position in the United States Army for discriminatory reasons was entitled to equitable relief mirroring the career path of the individual chosen for that position, who had subsequently advanced to a GS-13 position. *Id*. a 21–22. The record indicated that the plaintiff was a qualified, "perhaps . . . exceptional employee" with ambitious goals—as indicated by his personnel reviews, application history, and his superiors' statements—such that merely placing the plaintiff in the position he was initially refused "seem[ed] clearly inequitable." *Id*. at 22–23. The court accordingly concluded that the plaintiff was entitled to back pay and retroactive promotions corresponding to the career path of the individual promoted in the plaintiff's stead. *Id*. at 24.

Similarly, in *Allen v. Barram*, another court in this District held that the plaintiffs—who had been discriminatorily denied GS-7 jobs—were entitled to retroactive promotions and trainings to mirror the career paths of the individuals selected in their stead. 215 F. Supp. 2d 184, 189–91 (D.D.C. 2002). The court concluded that because "the incumbents [could not] claim some expertise that [the] plaintiffs lack[ed]", because the plaintiffs had "excellent records" and their "supervisors thought highly" of them, and because nine of the eleven incumbents

achieved substantial career advancement from the positions that the plaintiffs were improperly denied, retroactive promotion was appropriate. *Id.* at 191–92.

On the other hand, courts have been reluctant to grant retroactive promotions where a plaintiff is unable to sufficiently demonstrate that he would have achieved the promotions sought, but for the discrimination or retaliation. In *Lloyd v. Holder*, for instance, another court in this District refused to grant a retroactive promotion where the record indicated only that "if [the plaintiff] had had the opportunities which were denied him, [he] *might* have been a more attractive candidate for promotion." No. 97-1287, 2010 WL 1999657at *3 (D.D.C. May 18, 2010). The court found it significant that the plaintiff provided no evidence that he was a competitive candidate for the promotion sought—he "was an average employee"—and the career path of the individual that the plaintiff sought to imitate "was not comparable" to the plaintiff's. *Id.* at *3–4; *see also Jean-Baptiste*, 958 F. Supp. 2d at 42–43 (denying the plaintiff's request for a retroactive promotion where the plaintiff relied on "vague," "unduly speculative" assertions in support of that request); *Fogg v. Gonzales*, 407 F. Supp. 2d 79, 91 n.6 (D.D.C. 2005) (holding that the plaintiff was not entitled to a retroactive promotion where such a promotion was "overly speculative" and the court was "not persuaded that [the plaintiff] would have been among the relatively few [individuals] selected to advance to the . . . level" sought) *aff'd in part and rev'd on other grounds,* 492 F.3d 447 (D.C. Cir. 2007).

Here, Mr. Craig has not sufficiently demonstrated that the jury's verdict requires that he be placed in a dual hat role. The jury determined that Mr. Craig's "placement and treatment . . . in the role of Executive Lead was retaliatory." Jury Verdict at 1. In making this determination, as Mr. Craig notes, Reply Mem. Supp. Partial Inj. Mot. ("Partial Inj. Reply") at 2, ECF No. 114, the jury was instructed to determine whether Mr. Craig's placement "significantly affect[ed] [Mr.

Craig's] supervisory authority, programmatic responsibilities, *or* future employment opportunities *or* career prospects." Jury Preamble at 18 (emphasis added), ECF No. 98. Put another way, the jury determined that Mr. Craig's retaliatory detail from an Associate Director position to the Executive Lead position harmed him by depriving him of certain authority and responsibilities that he enjoyed as an Associate Director, *or* by depriving him of career opportunities that he would have otherwise received as an Associate Director. The jury did not determine, as Mr. Craig would have this Court conclude, that Mr. Craig was retaliated against because he was deprived of "career-enhancing" dual hat details or assignments, but rather because he was deprived of an Associate Director role overseeing a single Mint unit.[6] *See* Partial Inj. Mot. at 14; Partial Inj. Reply at 4. Mr. Craig points to no evidence, and the record does not indicate, that the jury's verdict depended on Mr. Craig's entitlement to a dual hat assignment.[7]

However, just because the jury did not consider whether Mr. Craig would have received a dual hat role but for the Mint's retaliation does not mean that the Court cannot grant such relief. As Mr. Craig notes, Partial Inj. Reply at 8–9, "a district court which endeavors to fashion a remedy for discrimination cannot confine itself to narrow or technical measures which, while perhaps bearing a logical connection to the plaintiff's complaint, fail to reflect the whole of the

---

[6] The government concedes that Mr. Craig is at least entitled to retroactive assignment to an Associate Director role. Partial Inj. Opp'n at 10. It proposes to alter Mr. Craig's personnel file to reflect that he was the A/D SAM until his 2014 reassignment to the role of A/D ESH. *Id*. That proposal is discussed in greater detail below.

[7] Even if the jury determined that Mr. Craig's career prospects were harmed by his Executive Lead detail, the jury could have reached this conclusion merely because it determined that Mr. Craig was assigned to a position with inferior responsibilities to an Associate Director position, and therefore that Mr. Craig would be considered an inferior candidate for future Mint promotion. Such a conclusion would not require the jury to determine that Mr. Craig would have received *additional* career enhancing assignments during the retaliation period.

plaintiff's injury." *Brown*, 713 F. Supp. at 22. In attempting to "recreate the conditions and relationships that would have been" in the absence of the Mint's retaliation against Mr. Craig, *Berger*, 170 F.3d at 1119 (quoting *Teamsters*, 431 U.S. at 372), the Court may look beyond the jury's verdict to place Mr. Craig on the career path he would have followed had he remained in an Associate Director role. That said, while the Court may "engage in some speculation" in granting equitable relief, Mr. Craig's assertion that he would have received a dual hat assignment but for the Mint's retaliation is overly speculative. *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995).

Mr. Craig argues that because certain SES members—specifically David Croft, Marc Landry, and Jon Cameron—received dual hat Mint assignments while Mr. Craig was assigned to the Executive Lead position, Mr. Craig would have received a dual hat assignment if he remained in an Associate Director position. Partial Inj. Mot. at 10–13. However, Mr. Craig fails to provide evidence that those individuals were similarly situated to him, other than through their common SES membership.[8] The record indicates that those individuals occupied different Mint roles than Mr. Craig, had different levels of experience, and had different skill sets. For instance, both Mr. Croft and Mr. Landry spent several years managing the Mint's Denver and Philadelphia manufacturing facilities, respectively, before their stints as A/D Manufacturing; experience that Mr. Craig lacked. *See* Organizational Announcement at 1, ECF No. 110-16; 2012–2016 Mint Organizational Charts at 1, ECF No. 110-22. Similarly, Mr. Cameron had decades of managerial

---

[8] Mr. Craig devotes a portion of the briefing on this issue to the assertion that, like Mr. Craig's rocky tenure as A/D SAM, these individuals did not perfectly execute their assignments, and therefore were not distinguishable on performance grounds from Mr. Craig. *See* Partial Inj. Mot. at 7, 11–12 (discussing Mr. Landry's alleged "monumental performance failure" as the Mint's Philadelphia Plant Manager and Mr. Cameron's alleged performance issues at the Bureau of Engraving and Printing). This evidence, however, does not show that Mr. Craig's career path would have mirrored Mr. Landry's path and Mr. Cameron's path but for the Mint's retaliation.

and financial experience in the United States Federal Reserve before moving to the Bureau of Engraving and Printing, and then the Mint, where he occupied different roles than Mr. Craig.[9] *See* Dep. of Jon Cameron at 22:20–33:12, ECF No. 112-5. These individuals' paths are therefore "not helpful in projecting what [Mr. Craig's] career path would have been absent unlawful retaliation." *Lloyd*, 2010 WL 1999657, at *3; *see also Barbour*, 48 F.3d at 1278 (declining to award a Title VII plaintiff back pay based on the salary of the individual hired in the plaintiff's stead, because that individual's background justified a higher salary than the plaintiff's).

Mr. Craig also more generally asserts that dual hat assignments were "afforded to other Associate Directors who did not engage in protected EEO activity," and he suggests that these assignments were given as a matter of course because the Mint had more SES positions to fill than SES members to fill them. Partial Inj. Mot. at 14–15. However, while the record shows that certain SES members received dual hat assignments, *see* Organizational Announcement at 1 (announcing dual hat roles for Mr. Landry and Mr. Croft), and while dual hat assignments may improve an SES member's career prospects, Mr. Craig has not provided evidence indicating that such assignments were issued as a matter of course within the Mint. The record suggests that some SES members received dual hat assignments, and some did not. *See* 2012–2016 Mint Organizational Charts (listing Associate Directors, including Goutam Kundu, Marty Greiner, and Annie Brown, who do not appear to have occupied dual hat assignments). Therefore, at most, Mr. Craig has demonstrated that "if he had had the opportunities which were denied him, [he] *might* have" received a dual hat assignment. *Lloyd*, 2010 WL 1999657, at *3. But Mr.

---

[9] The record indicates that Mr. Cameron temporarily held the acting A/D SAM position after it was vacated by Mr. Craig, but Mr. Cameron's roles at the Mint otherwise did not overlap with Mr. Craig's. *See* Dep. of Jon Cameron at 43:14–22, ECF No. 51-2; 2012–2016 Mint Organizational Charts.

Craig might instead have followed the same path as the SES members who did not receive dual hat assignments.

The Court finds the latter scenario more likely because, as Mr. Craig concedes, the only open Associate Director Mint position in 2012, when Mr. Craig was detailed from A/D SAM to the Executive Lead, was the A/D Manufacturing position. *See* Partial Inj. Reply Att. N at 2 n.1, ECF No. 114-2. Mr. Craig was denied assignment to that position in 2008 and denied reassignment to that position in 2014; denials that were found to be non-discriminatory and non-retaliatory. *See Craig I*, 109 F. Supp. 3d at 284; *Craig II*, 278 F. Supp. 3d at 76; Jury Verdict. Mr. Craig provides no evidence to suggest that the Mint would have detailed him into the A/D Manufacturing role in 2012 in a dual hat capacity, given that the Mint denied his application for assignment to that role four years earlier and would deny his application for reassignment to the role two years later.[10] Accordingly, the Court concludes that Mr. Craig's assertion that he would have received a dual hat assignment but for the Mint's retaliation is unduly speculative.[11] While

---

[10] This Court similarly concluded that the Mint's decision to remove Mr. Craig from the A/D SAM position in 2012 was not retaliatory or discriminatory. *Craig II*, 278 F. Supp. 3d at 64–65. Mr. Craig fails to show why the Mint would detail him back into that position, now titled A/D Numismatics and Bullion, in a dual hat capacity after previously removing him.

[11] Mr. Craig appears to be primarily angling for a permanent reassignment or a temporary detail to the A/D Manufacturing position. As noted, a key qualification that made Mr. Croft and Mr. Landry suitable for that position was their work managing the Mint's Denver and Philadelphia manufacturing facilities, respectively. Partial Inj. Opp'n at 13–15; Dep. Richard Peterson at 189:9–15. And they continued to manage those facilities while dual hatted into other Mint positions. *Id.* Their dual hat roles thus required them to travel between cities. *See* Organizational Announcement at 1 (stating that Mr. Croft would remain the Denver Plant Manager while assuming the Washington, D.C.-based A/D Manufacturing position, and that Mr. Landry would "continue to split his time between Philadelphia and Washington" while detailed to the A/D SAM position).

Mr. Craig concedes that he was considered for the Superintendent position at the Mint's Denver facility, an SES-level position, but appears to have declined that consideration because he did not want to relocate from Washington, D.C. Partial Inj. Mot. at 13; EEO Investigative Affidavit of Lisa Nicholson ("Nicholson Aff.") at 6, ECF No. 110-18. His apparent refusal to accept a career enhancing opportunity because he did not want to relocate in some ways makes

Mr. Craig may well have received such an assignment had he remained an Associate Director, and while he may well receive one in the future on his own merit, the Court declines to "interfere with the policymaking and personnel decisions that rightly belong to public servants" without stronger record support.[12] *Caudle v. District of Columbia*, 825 F. Supp. 2d 73, 80 (D.D.C. 2011) (quoting *Jones v. Rivers,* 732 F. Supp. 176, 178 (D.D.C. 1990)).

## 2. Anti-Retaliation Injunction

Mr. Craig also requests that the Mint be enjoined from detailing him to a position with unclassified duties for more than 240 days. Inj. Mot. at 1. Mr. Craig contends that this anti-retaliation injunction is necessary to ensure "that he will not be placed at a competitive disadvantage because of the Mint's illegal actions." *Id*. at 9. The government, on the other hand, argues that "[n]o basis in fact exists to suggest that such relief is necessary where [the government] has demonstrated a commitment to a fair assessment of Plaintiff's contributions and has awarded Plaintiff for his performance." Def.'s Opp'n Inj. Mot. ("Inj. Opp'n") at 8, ECF No. 125. The government again has the better of this argument.

---

him even more dissimilar from Mr. Croft and Mr. Landry. Mr. Craig does not simply want any dual hat role, he wants a dual hat role that keeps him in the same city; a role that Mr. Croft and Mr. Landry do not appear to have been offered, at least during the retaliation period at issue here.

[12] The parties allude in their briefing to Mr. Craig's separate, pending EEO complaint regarding the Mint's alleged retaliatory or discriminatory behavior in recently denying Mr. Craig certain "career enhancing" assignments, including assignments to the Mint's Chief Financial Officer and A/D Manufacturing positions. *See* Oct. 6, 2017 EEO Complaint, ECF No. 112-2; Inj. Reply at 6. To the extent Mr. Craig is attempting to litigate that complaint before this Court through his post-trial motions, Partial Inj. Mot. at 7–8; Inj. Reply at 6–7, the Court declines to address it. Mr. Craig's complaint in this action did not raise Frank Goulart's appointment to the A/D Manufacturing position, nor did it directly raise Mr. Craig's inability to secure assignment to the Chief Financial Officer position, and the Court will not consider now whether Mr. Craig is entitled to those positions outside of the relief necessary to address the jury's verdict here. Moreover, Mr. Craig has failed to indicate that he has the type of qualifications necessary for placement in either the Chief Financial Officer position or the Chief Administrative Officer position.

Absent more specific evidence that Mr. Craig is likely to again face retaliation, restricting the Mint's employment decisions going forward is not necessary to address Mr. Craig's harm. The Mint officials primarily responsible for the retaliatory decision to detail Mr. Craig to the Executive Lead position—Ms. Babers and Mr. Peterson—are no longer employed by the Mint. *See* 2018 Mint Organizational Charts, Inj. Mot. Att. A, ECF No. 110-2; 2012–2016 Mint Organizational Charts.[13] The Mint has a new permanent Director, who Mr. Craig acknowledges is likely to institute more transparent, competitive procedures for filling open SES positions. Inj. Mot. at 9. And Mr. Craig has received sterling performance reviews and SES performance bonuses since being reassigned to the A/D ESH position, a reassignment that occurred before Mr. Craig filed his lawsuit in this Court. *See* Inj. Opp'n at 8; Partial Inj. Opp'n Ex. A; Summ. J. Mot. Ex. 41, ECF No. 34-35 (announcing Mr. Craig's reassignment to the A/D ESH position on July 31, 2014); Compl. (filed Aug. 6, 2014), ECF No. 1. Mr. Craig has presented no record evidence to suggest that he will be retaliated against in the future.

Rather than supplying record evidence, Mr. Craig relies extensively on the D.C. Circuit's opinion in *Bundy v. Jackson* and the District Court's opinion in *Jean-Baptiste*, but those cases are factually inapposite. The female plaintiff in *Bundy* was subjected to a pattern of sexual harassment by her supervisors as part of a "discriminatory environment"; a pattern of which the agency's director was aware. *Bundy v. Jackson*, 641 F.2d 934, 943–46 (D.C. Cir. 1981). In remanding the case for the District Court to impose injunctive relief, the Circuit noted that despite the fact that the plaintiff had not complained of harassment in six years, there was little certainty that the harassment would not resume "because [the plaintiff's] agency ha[d] taken no

---

[13] Moreover, Mr. Craig states that the Mint's acting Deputy Director, Mr. Croft, has been "supportive and an honest broker for Mr. Craig's continued advancement in the organization." Reply Mem. Supp. Inj. Mot. ("Inj. Reply") at 7, ECF No. 128; *see also* Nicholson Aff. at 4.

affirmative steps to prevent recurrence of the harassment, and because all the harassing employees still work[ed] for the agency." *Id*. at 946 n.13. Similarly, the plaintiff in *Jean-Baptiste* was subjected to a pattern of harassment, and the District of Columbia took no proactive steps to address the plaintiff's injury until *after* the jury rendered a verdict, giving the court "significant concerns" that the plaintiff could face retaliation after being reinstated to her previous position. *Jean-Baptiste*, 958 F. Supp. 2d at 51.

Here, on the other hand, Mr. Craig did not demonstrate that he was subjected to a systemic discriminatory or retaliatory environment, and he was assigned to a more favorable position before he filed the action in this Court.[14] As another court in this District stated while denying a similar request for an anti-retaliation injunction, "[t]he Court will not presume that the [Mint] will not follow the law and plaintiff has not demonstrated that future violations are likely." *Hayes*, 933 F. Supp. at 27 (citing *E.E.O.C. v. General Lines, Inc.,* 865 F.2d 1555, 1565 (10th Cir. 1989)). Because the Court cannot conclude that there is a "reasonable expectation" that retaliation will reoccur, the Court declines to enjoin the Mint from detailing Mr. Craig to a position with unclassified duties for more than 240 days. *Bundy*, 641 F.2d at 946 n.13; *see also Spencer v. General Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990) (declining to award injunctive relief to Title VII plaintiff where the action involved "an isolated incident of one supervisor run

---

[14] This conclusion should in no way be read to mean that the Court condones the extraordinary action taken by the Mint in retaliation for Mr. Craig's EEO activity. The Mint has been rightly held to account for that action. However, the extreme nature of the Mint's action—creating an Executive Lead role with little to no responsibility and banishing Mr. Craig to that role—makes that action less likely to occur again, absent record evidence to the contrary. This is particularly true here, because the individuals responsible for that action are no longer employed by the Mint. And Mr. Craig's suggestion that Ms. Babers will have significant influence over Mint personnel decisions from a Treasury position finds no support in the record. Inj. Reply at 10.

amok," and the supervisor was no longer employed by the defendant) *abrogated on other grounds by Farrar v. Hobby*, 506 U.S. 13 (1992).[15]

### 3. Declaratory Relief

Mr. Craig also requests a declaration that the Mint retaliated against him, in violation of Title VII, by placing him in the Executive Lead position. Inj. Mot. at 1–2, 10. He claims that such relief is necessary to "ensure that defendant and its officials, management, and agents are given specific notice of the Mint's violation of Title VII." Inj. Reply at 11. However, the jury's publicly available verdict already gives clear, specific notice of the Mint's violation. Jury Verdict ("[T]he Plaintiff has proved by a preponderance of the evidence that the Defendant's placement and treatment of Mr. Craig in the role of Executive Lead was retaliatory.").[16] "The jury verdict is sufficient in and of itself to protect plaintiff against future acts of discrimination and retaliation," particularly where Mr. Craig has provided no evidence to suggest that declaratory relief is necessary to clarify the Court's ruling. *Hayes*, 933 F. Supp. at 27; *see also Pitrolo v. Cty. of Buncombe*, 589 F. App'x 619, 629–30 (4th Cir. 2014) (per curiam) (unreported) (holding that declaratory relief was inappropriate for a successful Title VII plaintiff where the declaration would not clarify an issue of law raised by the decision, would not clarify the parties' post-trial rights, and "would simply reiterate the jury's verdict"). Accordingly, the Court denies Mr. Craig's motion for declaratory relief.

---

[15] This relief is particularly unnecessary where the government's own pre-existing policies prevent such a detail. *See* U.S. Office of Personnel Management, Guide to the SES at 11, Summ. J. Mot. Ex. 3.

[16] Mr. Craig's requested declaration—"that defendant retaliated against plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3, by virtue of its placement and treatment of plaintiff in the position of Executive Lead starting on December 11, 2012, and continuing through his reassignment to the position of Associate Director of Environment Safety & Health on August 1, 2014"—does not meaningfully differ from the jury's verdict form. Inj. Mot. Proposed Order at 1, ECF No. 120-1.

### 4. Record-Related Injunctive Relief

Finally, Mr. Craig argues for personnel record-related relief. "The federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute." *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975). Such "[e]xpungement of personnel records constitutes equitable relief under Title VII." *Fogg*, 407 F. Supp. 2d at 87 (citing *Smith v. Sec'y of the Navy,* 659 F.2d 1113, 1114 (D.C. Cir. 1981)). Mr. Craig requests that (1) the Mint be required to expunge any reference to Mr. Craig's Executive Lead tenure from its official agency records, such that the records indicate that Mr. Craig was an Associate Director throughout the retaliation period; (2) for purposes of Mint personnel decisions, including future reassignments, training, and promotions, the Mint be required to treat Mr. Craig's Executive Lead position as an Associate Director-level position with Associate Director-level responsibilities and authority; and (3) for purposes of external, employment-related inquiries, the Mint be required to characterize Mr. Craig's Executive Lead position as an Associate Director-level position with Associate Director-level responsibilities and authority. Inj. Mot. at 1–2, 10.

The government asserts that much of Mr. Craig's requested relief has already been implemented, but the government's assertions do not fully address Mr. Craig's harm and the government fails to provide record support for those assertions. For instance, the government claims that it "has never considered [Mr. Craig] as having left the SES, or as having performed non-SES duties at all relevant times; nor has [it] ever suggested that the Executive Lead role was not at the SES level." Inj. Opp'n at 10. However, while the government may not consider the Executive Lead role to have been a non-SES role, when contemplating future personnel decisions the government could still consider the Executive Lead role to have been inferior to an

Associate Director role, such as A/D SAM.[17]  Similarly, while under Treasury policy Mr. Craig

may have been "considered for pay and strength count purposes to [have been] permanently

occupying" the A/D SAM position while detailed to the Executive Lead position, Inj. Opp'n Ex.

E at 4, ECF No. 125-5, the government does not identify a policy requiring the Mint to consider

Mr. Craig to have been the A/D SAM when contemplating future personnel decisions.[18]

Furthermore, despite the government's characterization of Mr. Craig's request as

"overbroad" and "unduly burdensome," the parties seem to agree that Mr. Craig's official

personnel file should be altered to reflect that he occupied an Associate Director-level role

during the retaliation period.  *See* Inj. Mot. at 11; Inj. Opp'n at 11.  The government proposes to

expunge the document in Mr. Craig's electronic Official Personnel File that memorializes Mr.

Craig's detail to the Executive Lead position—the "Standard Form 52 Initiation of / Request for

Personnel Actions" ("SF-52")—leaving only documentation suggesting that Mr. Craig occupied

the A/D SAM position through 2014, when he was reassigned to the A/D ESH position.  *Id*.  Mr.

Craig argues that his SF-52's, performance appraisals, and Performance Review Board materials

in his Official Personnel File identifying him as Executive Lead should be expunged and

replaced with documents identifying him as an Associate Director.  Inj. Reply at 13.  Mr. Craig's

proposal is better crafted to address his harm because it includes the documents that Mint

officials may consider when making promotion decisions in the future.

---

[17] It is clear from the record and the jury's verdict that Mr. Craig's Executive Lead role
was in fact inferior to an Associate Director role in terms of responsibility and authority, despite
both roles' technical designations as SES-level roles.

[18] Moreover, the government's records from the retaliation period designate Mr. Craig as
the Executive Lead rather than the A/D SAM.  *See* 2013 Mint Ratings, Bonuses and Pay
Adjustments, ECF No. 110-14 at 4 (listing Mr. Craig as "Executive Lead, Long Term
Planning").

Therefore, to "recreate the conditions and relationships that would have been" in the absence of the Mint's retaliation against Mr. Craig, *Berger*, 170 F.3d at 1119 (quoting *Teamsters*, 431 U.S. at 372), the Court exercises its equitable powers under Title VII to order the following personnel record-related relief. First, the Mint must treat Mr. Craig's Executive Lead position as an Associate Director-level position, with Associate Director-level responsibilities and authority, for purposes of both internal personnel decisions and external, employment-related inquiries.[19] Second, the Mint must alter the SF-52's, performance appraisals, and Performance Review Board materials in Mr. Craig's Official Personnel File so that they identify Mr. Craig as an Associate Director rather than as an Executive Lead.[20] Such relief is necessary, because allowing Mr. Craig's retaliatory detail to influence his future employment prospects "would be to diverge from the aim of Title VII equitable relief." *Fogg*, 407 F. Supp. 2d at 88 (ordering the Title VII defendant to expunge the plaintiff's discriminatory dismissal from its employment records); *see also Hayes*, 933 F. Supp. at 27 (ordering "that [the plaintiff's] personnel folder and other relevant Department records be corrected to reflect the jury's verdict and the equitable relief provided by the Court"). To ensure that the relief has been properly

---

[19] The government argues that such relief dictates that the Court must "inject itself into the scripting of employment references." Inj. Opp'n at 10. Not so. The Court's decision merely precludes the Mint from considering Mr. Craig to have occupied the inferior Executive Lead position, both in its internal deliberations and in its discussions with outside employers. The Mint has full creative liberty in crafting those discussions in good faith.

[20] The parties disagree on whether the records should be altered to state that Mr. Craig was A/D SAM through 2014, when he was reassigned to the A/D ESH position, *see* Inj. Opp'n at 11, or whether the records should be backdated to state that Mr. Craig has occupied the A/D ESH position since 2012, when he was reassigned from the A/D SAM position, *see* Inj. Reply at 13. Having considered this disagreement, the Court concludes that Mr. Craig's records should reflect that he was the A/D SAM until his reassignment to the A/D ESH position in 2014. This relief is most logical because A/D SAM was the position from which Mr. Craig was detailed to the Executive Lead position, and because the A/D ESH position did not exist during Mr. Craig's Executive Lead detail.

implemented, the Mint shall submit to Mr. Craig an updated version of Mr. Craig's Official

Personnel File within thirty days from this Memorandum Opinion's issuance.

## B. Attorneys' Fees

The Court next addresses Mr. Craig's motion for attorneys' fees and costs under 42

U.S.C. § 2000e-5(k).  As noted, to receive attorneys' fees, Mr. Craig must establish that he is the

prevailing party, and if he succeeds in establishing this element he must further establish (1) a

reasonable hourly rate for his attorneys' services; (2) the number of hours reasonably expended

by those attorneys on the litigation; and (3) whether a fee adjustment is warranted.[21] *Salazar*,

809 F.3d at 61.  The parties agree that Mr. Craig is a prevailing party.  *See* Fee Mot. at 39; Def.'s

Opp'n Fee Mot. ("Fee Opp'n") at 21, ECF No. 130.  The parties do not agree, however, on the

hourly rates that should govern the Court's fee determination or the overall reasonableness of the

fees that Mr. Craig seeks.

Mr. Craig has divided his attorneys' work into multiple stages, and he has applied

different methodologies to those stages to reach the attorneys' fees he claims.  First, for the

litigation's administrative stage (the "EEO complaint stage")—before the complaint was filed in

this Court—Mr. Craig seeks fees for approximately 100 hours of work by his current counsel,

Fee Mot. at 24, billed at the rates dictated by the fee matrix maintained and updated by the

United States Attorney's Office ("USAO") for the District of Columbia (the "USAO Matrix"),

Fee Mot. at 1 n.2, reduced by 26.25 percent to account for Mr. Craig's lack of success, Fee Mot.

at 27.

---

[21] Mr. Craig is represented by the law firm of Seldon Bofinger & Associates, P.C.
("Seldon Bofinger").  Fee Mot. at 2.  The individuals from that firm who have contributed to Mr.
Craig's action are lead counsel Robert C. Seldon, partner Charlene Bofinger, of counsel Molly
Buie, former associate Lauren Marsh Drabic, and paralegal Kirby York.  Fee Mot. at 11–17.

Second, for the litigation's stage covering the filing of Mr. Craig's complaint in this Court through trial, Mr. Craig seeks fees for approximately 1,607 hours of attorney work, Fee Mot. at 8, billed at the rates dictated by the Legal Services Index ("LSI") Fee Matrix (the "*Salazar*/LSI Matrix"),[22] Fee Mot. at 1, then (1) reduced by fifteen percent to account for the difference between the billing rates reported by law firms and those firms' actual billing realization, Fee Mot. at 38 (citing *Citizens for Responsibility & Ethics in Wash. ("CREW") v. DOJ*, 80 F. Supp. 3d 1, 5 (D.D.C. 2015)); (2) reduced to $750,000 to bring the award in line with other awards recently received by Mr. Craig's counsel in successful Title VII actions, Fee Mot. at 9; and (3) reduced by 26.25 percent to account for Mr. Craig's lack of success, Fee Mot. at 10.

Third, for the litigation's post-trial stage, Mr. Craig seeks fees as follows. Mr. Craig first seeks fees for approximately 130 hours spent on equitable relief briefing, Fee Mot. at 24; *See* Second Decl. of Robert C. Seldon ("Seldon Decl. II") ¶ 57, ECF No. 134-1, billed at the USAO Matrix's rates, Fee Mot. at 1 n.2, with no additional reduction, Fee Mot. at 2. Mr. Craig next seeks fees for approximately 150 hours spent on attorneys' fees briefing, Fee Mot. at 24; Seldon Decl. II ¶ 57, billed at the USAO Matrix's rates, Fee Mot. at 1 n.2, with no additional reduction, Fee Mot. at 2.[23]

---

[22] The differences between these two fee matrices will be discussed in detail below.

[23] In a Minute Order issued on August 27, 2018, the Court stated that it was "amenable to granting an interim award of *undisputed* attorney's fees." Minute Order (Aug. 27, 2018) (emphasis added). In response, the government offered Mr. Craig up to $15,000 as an undisputed interim fee award. *See* Fee Reply Att. F, ECF No. 134-3; Fee Reply Att. G, ECF No. 134-4. Mr. Craig's counsel, apparently unsatisfied with this offer, proceeded to file a *disputed* motion for interim attorneys' fees re-asserting the merits arguments asserted in Mr. Craig's motion for attorneys' fees. *See generally* Fee Mot.; Fee Mot. II. And Mr. Craig now seeks fees for time expended by his counsel on this motion. *See* Fee Reply at 27 (seeking $5,620 for "the opening portion of the interim fee award litigation"). In light of the Court's Minute Order and the government's lack of stipulation to a specific amount of undisputed fees, the Court holds that the hours expended on this disputed motion for interim fees were "excessive, redundant, or otherwise unnecessary," and it therefore declines to award Mr. Craig fees for those hours.

Applying these methodologies, Mr. Craig seeks $43,871.74 in attorneys' fees for work done at the EEO complaint stage by his current counsel, $13,141.39 in fees for work done at the EEO complaint stage by his former counsel, $553,125.00 in fees for work done from the filing of Mr. Craig's complaint through trial, $74,660.30 in fees for work done at the equitable relief stage, and $87,393.30 in fees for work done at the attorneys' fees stage.  Fee Mot. at 2; Reply Mem. Supp. Fee Mot. ("Fee Reply") at 27, ECF No. 134; Seldon Decl. II ¶ 57; Proposed Order, ECF No. 134-5.  In total, Mr. Craig seeks $759,050.34 in attorneys' fees for his current counsel,[24] $13,141.39 in attorneys' fees for his former counsel, $11,660.04 in costs, and $8,853.20 for expert services.  Fee Mot. at 2; Fee Reply at 27.  The government contends that the fee award sought by Mr. Craig "is manifestly unreasonable" because (1) the award is based on "enhanced hourly rates not recognized by this Court as being superior to the [USAO] Matrix rates currently in effect"; (2) the award incorporates "an excessive number of hours billed"; and (3) the award does not account for Mr. Craig's "limited success and the minimal damages award obtained."  Fee Opp'n at 1.  Applying the analytical framework laid out above, the Court agrees that Mr. Craig's proposed fees are unreasonably high, and it reduces those fees accordingly.

### 1. Reasonable Hourly Rate

First, the Court must determine the "reasonable hourly rate" applicable to Mr. Craig's attorneys' services.  As noted, in determining whether Mr. Craig's proposed hourly rate is reasonable, the Court must consider: (1) his attorneys' billing practices; (2) his attorneys' skills,

---

*Hensley*, 461 U.S. at 434.  Moreover, because the Court is rendering a decision on Mr. Craig's motion for complete attorneys' fees and costs, it will deny Mr. Craig's motion for interim fees as moot.  However, should the government file post-judgment motions and/or notice an appeal, the Court will reconsider the appropriateness of awarding interim fees.

[24] As noted above, this total does not include Mr. Craig's fee request for the preparation of his interim fee motion.

experience, and reputation; and (3) the prevailing market rate in Washington, D.C. *See Salazar*, 809 F.3d at 62. Mr. Craig has submitted a declaration from Mr. Seldon describing in great detail (1) Mr. Seldon's extensive experience litigating complex federal cases at his current firm, at the United States Attorney's Office, and at other organizations; (2) the skills and experience of the other Seldon Bofinger attorneys who participated in this action; and (3) Mr. Seldon's billing practices. *See generally* Decl. of Robert C. Seldon ("Seldon Decl. I"), ECF No. 121-2. Based on these representations, which the government does not dispute, *see generally* Fee Opp'n, the Court concludes that Mr. Craig has satisfied his burden of demonstrating his attorneys' skills, experience, reputation, and billing practices. *See Salazar*, 809 F.3d at 62. The Court will therefore focus on the parties' evidence regarding the applicable prevailing market rate.

While "[a]scertaining the prevailing market rate is inherently difficult[,]" the "court must determine the hourly rate in each particular case with a fair degree of accuracy." *Taylor v. District of Columbia*, 205 F. Supp. 3d 75, 83–84 (D.D.C. 2016) (citations and internal quotation marks omitted). To demonstrate prevailing market rates, "a fee applicant must produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Gatore v. DHS*, 286 F. Supp. 3d 25, 33 (D.D.C. 2017) (internal quotation marks omitted) (quoting *Eley*, 793 F.3d at 100). Parties and courts generally use a fee matrix—which lists Washington, D.C.-based billing rates, categorized by attorney experience—to simplify the prevailing rate analysis because, as the D.C. Circuit has noted, "the matrices . . . provide a useful starting point."[25] *Covington*, 57 F.3d at 1109.

---

[25] The hourly rates in these matrices are presumptively reasonable only for "complex federal litigation." *See, e.g., Salazar*, 809 F.3d at 64; *Flood v. District of Columbia*, 172 F. Supp. 3d 197, 210 (D.D.C. 2016). Here, as noted below, the government "acquiesc[es] in the notion

Decades of fee litigation in this Circuit have produced competing fee matrices based on slightly different underlying data and approaches to inflation. Two of these matrices are relevant here: (1) the USAO Matrix; and (2) the *Salazar*/LSI Matrix.[26] The USAO Matrix

> begins with 2011 average hourly attorney rates derived from ALM Legal Intelligence's 2011 Survey of Law Firm Economics. The data provided by this survey represents *actual* average billing rates of attorneys from all size firms in the Washington, DC metropolitan area. . . . [T]he matrix [is] adjusted for inflation using a Producer Price Index ("PPI") published by the Bureau of Labor Statistics ("BLS"). A PPI measures the average change over time in the selling price received by producers for their products or services. The specific PPI that will be used to update the USAO Matrix is one that tracks pricing changes in the output of Offices of Lawyers[.]

Declaration of Dr. Laura A. Malowane ("Malowane Decl.") ¶¶ 6–7, Fee Opp'n Ex. 7, ECF No. 130-7;[27] *see also* USAO Attorney's Fees Matrix: 2015–2019.[28] The *Salazar*/LSI Matrix

---

that the litigation at issue qualifies as complex federal litigation (as to which the . . . [m]atrices apply) . . . [because it] argues that one . . . [m]atrix should apply instead of the other." *Salazar*, 809 F.3d at 64.

[26] The matrices are sometimes referred to as "*Laffey* matrices." This title derives from the first fee matrix to gain widespread use in this Circuit, which was set out in *Laffey v. Northwest Airlines, Inc.*, a Title VII class action brought by a class of female flight attendants. 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. ("SOCM") v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc).

[27] This declaration was also submitted on behalf of the defendants in opposition to the plaintiff's fee request in *DL v. District of Columbia*, 267 F. Supp. 3d 55, 70 (D.D.C. 2017). In that case, another court in this District considered whether the *Salazar*/LSI Matrix or the USAO Matrix should govern attorney's fees in a successful IDEA action. *Id.* at 69. The court held that IDEA litigation is complex federal litigation to which one of the fee matrices presumptively applies, and that "the USAO Matrix is more reliable and unbiased." *Id.* Because Dr. Malowane's *DL* declaration addressed the same dispute raised by the parties here, the Court will consider it a piece of the government's evidence rebutting Mr. Craig's evidence in support of the *Salazar*/LSI Matrix. *See Gatore*, 286 F. Supp. 3d at 37–38 (considering evidence submitted on behalf of the *DL* plaintiffs in support of the *Salazar*/LSI Matrix).

[28] Available at https://www.justice.gov/usao-dc/file/796471/download. The Court may take judicial notice of the hourly rates provided in the USAO Matrix because the rates "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Bricklayers & Trowel Trades Int'l Pension Fund*

begins with rates provided in an attorney's 1989 declaration in [*SOCM*, 857 F.2d at 1516] and then proposes to use a national consumer index, the U.S. City Average of the Consumer Price Index for Legal Services ("CPI-LS"), to update these hourly billing rates . . . The CPI-LS averages out pricing changes for personal legal services in several urban centers in the United States. The specific services tracked by the CPI-LS are noncommercial legal services provided to individual household consumers: such as wills, uncontested divorces, powers of attorney, and traffic violations. For each of these pre-defined services, the BLS seeks to measure changes in the price for the entire procedure (otherwise known as a "flat-fee").

Malowane Decl. ¶¶ 8–9; *see also Salazar*/LSI Matrix.[29] In other words, the USAO Matrix is based on 2011 data adjusted for inflation based on a national index of law office pricing, while the *Salazar*/LSI Matrix is based on 1989 data adjusted for inflation based on a national index of noncommercial legal services pricing.

The parties agree that the Court should utilize a fee matrix when determining the appropriate hourly rate for Mr. Craig's attorneys. *See* Fee Mot. at 19–20; Fee Opp'n at 11–12. They also agree that the Court should apply the USAO Matrix to work done at the litigation's administrative and post-trial stages. *See* Fee Mot. at 21; Fee Opp'n at 11–12. However, they do not agree on the matrix that should apply to work done from "the inception of the case," the complaint, "through trial." Fee Mot. at 20. Mr. Craig argues that the Court should apply the

---

*v. Conn. Stone Indus., LLC*, 318 F. Supp. 3d 328, 335 n.4 (D.D.C. 2018) (taking judicial notice of the USAO Matrix).

[29] Available at http://www.laffeymatrix.com/see.html. Mr. Craig has not supplied a current version of the *Salazar*/LSI Matrix as an attachment to any of his briefs or declarations, nor does he cite to the online version of that matrix. However, as discussed further below, Mr. Craig has submitted a declaration from a fee expert, Steven Davidson, which includes a table of the *Salazar*/LSI Matrix rates that Mr. Craig claims for his counsel. Declaration of Steven K. Davidson ("Davidson Decl.") ¶16, ECF No. 121-10. Those rates mirror the rates listed in the *Salazar*/LSI Matrix available online, cited above, except that the rates listed for Mr. Seldon, Ms. Bofinger, and Ms. Buie are one dollar higher in Mr. Davidson's declaration than in the matrix available online. The Court will assume that Mr. Davidson intended to list the exact *Salazar*/LSI Matrix rates.

*Salazar*/LSI Matrix rates. *Id.*[30] The government argues that the USAO Matrix is superior to the *Salazar*/LSI Matrix, and that it should therefore govern the rates for all work done by Mr. Craig's attorneys. Fee Opp'n at 12–13.[31]

Recent D.C. Circuit decisions make clear that a plaintiff cannot demonstrate a prevailing market rate simply by submitting a declaration from the plaintiff's attorney and referencing a fee matrix. *See Eley*, 793 F.3d at 100. Rather, the plaintiff must present *additional* evidence, such as "surveys to update [the applicable fee matrix]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by courts or through settlement to attorneys with comparable qualifications handling similar cases." *Makray*, 159 F. Supp. 3d at 33 (internal quotation marks omitted) (quoting *Eley*, 793 F.3d at 101); *see also Salazar*, 809 F.3d at 64–65 (holding that the plaintiffs sufficiently justified application of the *Salazar*/LSI Matrix where they presented 1) an economist's affidavit explaining the advantages of the *Salazar*/LSI Matrix; (2) tables comparing national law firm rates, which demonstrated that the rates provided by the *Salazar*/LSI Matrix more closely mirrored national averages; and (3) recent National Law Journal ("NLJ") rate surveys showing that, in one of the years for which fees were requested, high-end rates for law firm partners in Washington, D.C. "far exceeded" the *Salazar*/LSI Matrix rates). Should the plaintiff meet his burden, "a defendant may rebut [the] plaintiff's showing with specific countervailing evidence." *Gatore*, 286 F. Supp. 3d at 36 (citing *Covington*, 57 F.3d

---

[30] Mr. Craig claims the following hourly rates for his counsel under this matrix: Robert Seldon, $895; Charlene Bofinger, $743; Molly Buie, $743; Lauren Marsh Drabic, $455; and Kirby York, $202. Davidson Decl. ¶ 16; *see also Salazar*/LSI Matrix.

[31] Under this matrix, Mr. Craig's counsel would be entitled to the following hourly rates: Robert Seldon, $602; Charlene Bofinger, $602; Molly Buie, $483; Lauren Marsh Drabic, $352; and Kirby York, $164. USAO Attorney's Fees Matrix: 2015–2019.

at 1110). Thus, the "issue is whether [Mr. Craig has] submitted sufficient evidence for the . . . [C]ourt to conclude that the [*Salazar*/LSI] Matrix applies," and if so, whether the government has rebutted that evidence. *Salazar*, 809 F.3d at 64; *see also Gatore*, 286 F. Supp. 3d at 36; *Makray*, 159 F. Supp. 3d at 39.

In support of Mr. Craig's position that the *Salazar*/LSI Matrix best captures the prevailing rate for Title VII litigation, Mr. Craig presents several pieces of evidence. First, Mr. Craig submits a declaration from his lead counsel, Mr. Seldon, describing Mr. Seldon's extensive complex federal litigation experience, his previous successful Title VII actions, and his billing practices; comparing his hourly rates to those charged by other private firms engaged in complex federal litigation; and advocating for the rates dictated by the *Salazar*/LSI Matrix. *See generally* Seldon Decl. I. Second, Mr. Craig submits the declaration of Mr. Davidson, a partner in the law firm of Steptoe & Johnson LLP, who "is eminently qualified to speak to the reasonable hourly rates charged in the fully for-profit legal market in Washington, D.C." Fee Mot. at 20; *see generally* Davidson Decl. Third, Mr. Craig references market data, specifically the NLJ's 2016 and 2017 annual surveys of law firm billing rates, which Mr. Davidson contends "indicates the reasonableness" of the fees sought. Davidson Decl. ¶¶ 20–21; *see also* Davidson Decl. Ex. B, ECF No. 121-10. Fourth, and finally, Mr. Craig directs this Court to the fee awards in Mr. Seldon's most recent successful Title VII actions, in which Mr. Seldon was awarded fees or settled a fee petition based on the *Salazar*/LSI Matrix. *See Makray*, 159 F. Supp. 3d at 56; *Roman v. Castro*, No. 12-1321 (D.D.C.).[32]

---

[32] In *Roman*, the parties reached an attorneys' fees settlement after trial. *See* Order Granting Motion for Entry of Final Judgment, *Roman*, ECF No. 109 (Jan. 6, 2017). That Order does not make clear that the parties agreed to apply the *Salazar*/LSI Matrix to calculate Mr. Seldon's fees, nor does it indicate whether the applicable matrix was a point of contention. That said, Mr. Seldon asserts that the *Roman* settlement was based on *Salazar*/LSI Matrix rates and,

To rebut Mr. Craig's evidence, the government presents its own declarations and data. First, the government submits Dr. Malowane's declaration asserting the USAO Matrix's superiority. *See generally* Malowane Decl. Second, the government directs this Court to the government's amicus brief recently submitted to the D.C. Circuit regarding the advantages of the USAO Matrix over the *Salazar*/LSI Matrix. *See generally* Br. for the United States as Amicus Curiae Supporting Appellees, *DL v. District of Columbia*, No. 18-7004 (D.C. Cir. July 20, 2018). Third, and finally, the government directs this Court to recent decisions in this District holding that the USAO Matrix, rather than the *Salazar*/LSI Matrix, most accurately captures the prevailing market rates for complex federal litigation. Fee Opp'n at 6 n.3.

While Mr. Craig has submitted a "great deal of evidence regarding [the] prevailing market rates for complex federal litigation" to demonstrate that his requested rates are entitled to a presumption of reasonableness, *Salazar*, 809 F.3d at 64 (quoting *Covington*, 57 F.3d at 1110), the Court concludes that the government has "rebutted that presumption and shown that the current USAO Matrix is the more accurate matrix for estimating the prevailing rates for complex federal litigation in this District." *Gatore*, 286 F. Supp. 3d at 37. First, the Court will address the fundamental differences between the two relevant matrices; second, it will address Mr. Craig's showings regarding Mr. Seldon's entitlement to the *Salazar*/LSI Matrix rates; and third, it will address the relevant case law cited by the parties.

### a. The USAO Matrix is Superior to the Salazar/LSI Matrix

Both parties submit declarations asserting the superiority of their preferred matrices. However, Mr. Craig's declarations—from Mr. Seldon and Mr. Davidson—fail to address *why*

---

given that the government has not provided any contrary information, the Court has no reason to doubt Mr. Seldon's truthfulness on this point. Seldon Decl. I ¶ 59.

the *Salazar*/LSI Matrix is a more accurate measure of the prevailing market rate than the USAO Matrix—what Mr. Seldon refers to as the USAO "*Laffey* Matrix." Instead, Mr. Seldon references his previous *Salazar*/LSI fee awards, Seldon Decl. I ¶ 58–59, he expounds upon the sophistication required to successfully litigate federal employment cases, *id*. ¶ 60–61, and he makes the conclusory assertion that the USAO Matrix "does not account for the expertise, experience, success of [his] firm, and credibility in federal courts." *Id*. ¶ 57. Mr. Seldon fails to show how the *Salazar*/LSI Matrix's methodology better accounts for those factors, aside from simply listing higher billing rates. Mr. Seldon also criticizes the USAO Matrix for "lumping all attorneys into categories that are based exclusively on years of practice," *id*. ¶ 65, but he fails to explain why the *Salazar*/LSI Matrix does not suffer from the same shortcoming.

Mr. Davidson takes a stab at distinguishing the *Salazar*/LSI Matrix from the USAO Matrix based on their methodologies, but he focuses on a previous version of the USAO Matrix rather than the version implemented in 2015. [33] For instance, Mr. Davidson states that the *Salazar*/LSI Matrix is "more accurate" than the USAO *Laffey* Matrix "established in 1982," Davidson Decl. ¶ 17, but the USAO Matrix at issue here uses base rates from 2011 and was established in 2015. When Mr. Davidson does address the USAO Matrix at issue here, he states only that it "has never been reviewed or accepted by the D.C. Circuit." *Id*. ¶ 17 n.2. Like Mr. Seldon, Mr. Davidson does not attempt to explain why the *Salazar*/LSI Matrix is a more accurate measure of the prevailing market rate.

---

[33] The previous USAO *Laffey* Matrix was based on fees from legal "work done principally in 1981–82," and was "adjusted for inflation using the Consumer Price Index for All Urban Consumers for all items in the Washington, D.C. area." *Nat. Sec. Counselors v. CIA*, No. 11-0445, 2017 WL 5633091, at *5 (D.D.C. Nov. 21, 2017) (citation and internal quotation marks omitted).

On the other hand, the government's declarant—Dr. Malowane—largely echoed by the government's *DL* amicus brief, makes nuanced arguments for why the USAO Matrix is superior to the *Salazar*/LSI Matrix. First, the USAO Matrix rates are calculated based on 2011 survey data, while the *Salazar*/LSI rates are calculated based on 1989 data. Malowane Decl. ¶ 12. As Dr. Malowane notes, "[t]he more years [a] matrix continues without updating its original data source, the more previous years' forecasting errors may be compounded." *Id*. ¶ 12; *see also Gatore*, 286 F. Supp. 3d at 38–39 (applying the USAO Matrix because it is based "on far more current rate data"); *DL*, 267 F. Supp. 3d at 69 (concluding that the USAO Matrix is "more reliable and unbiased" than the *Salazar*/LSI Matrix in part because it is based on more recent data); *Clemente v. FBI*, No. 08-1252, 2017 WL 3669617, at *5 (D.D.C. Mar. 24, 2017) (applying the USAO Matrix rates because that matrix "specifically measures rates in the legal services industry, and is based on much more current data than the [*Salazar*/LSI Matrix]").

Second, the USAO Matrix's underlying survey data is more reliable because it was "based on a statistical survey of hundreds of attorneys in the Washington, DC area," while the *Salazar*/LSI Matrix's data was derived from a single attorney's informal survey of fee awards, law firm rates, and NLJ surveys. Malowane Decl. ¶¶ 14–15. Without more information about how the data underlying the *Salazar*/LSI Matrix was collected, "there is no way to determine the reliability of" this data. *Id*. ¶15.[34] While "the rate survey underlying the USAO Matrix is not

---

[34] That said, the government has not provided the USAO Matrix's underlying ALM survey data for the Court to evaluate its reliability. *See* Malowane Decl. ¶ 6 n.1 (stating that the "survey is under copyright and available for purchase through the firm ALM Legal Intelligence"). However. Dr. Malowane asserts that the data used by the USAO Matrix is "based on a statistical survey of hundreds of attorneys in the Washington, DC area," and that "for each billing rate of each experience level there must be a sufficient number of firms and individual attorneys providing data to determine that rate." *Id*. ¶ 14; *see also id*. ¶ 14 n.7 (further explaining the ALM's survey methodology). Mr. Craig provides no such declaration asserting the statistical rigor underlying the *Salazar*/LSI Matrix.

perfect," *Gatore*, 286 F. Supp. 3d at 39, Mr. Craig fails to put forth an argument for why the *Salazar*/LSI Matrix is more accurate, given the limitations of its underlying data. *See id.* at 38 (holding that "the methodology of the 2011 ALM survey underlying the USAO Matrix is more reliable than the methodology of the rates survey underlying the [*Salazar*/Laffey Matrix]"); *see also Nat. Sec. Counselors*, 2017 WL 5633091, at *18 n.14 (applying the USAO Matrix, but noting that "the 2011 ALM Survey data includes rates charged by attorneys across all practice areas, which undermines the degree to which the data fairly reflects rates charged by attorneys engaged principally in complex federal litigation" (citation and internal quotation marks omitted)).

Third, the USAO Matrix is more precise because it lists rates for nine categories of attorney experience, while the *Salazar*/LSI Matrix lists rates for only five categories. Malowane Decl. ¶¶ 21–22. Having "more narrowly defined categories of years of experience enables the USAO Matrix to more accurately capture an individual attorney's fees." *Id.* ¶ 22. Again, Mr. Craig fails to address this difference between the matrices. The Court thus concludes that the government has shown that, in the abstract, the USAO Matrix is likely to be a more accurate indicator of prevailing market rates than the *Salazar*/LSI Matrix.

### b. *Mr. Craig's Additional Evidence is Insufficient to Justify Application of the Salazar/LSI Matrix*

Mr. Craig attempts to bolster his reliance on the *Salazar*/LSI Matrix by supplying additional evidence of the current market rates for complex federal litigation, but he fails to show that "attorneys with similar qualifications have received [*Salazar*/LSI Matrix rates] from fee-paying clients in comparable cases." *Makray*, 159 F. Supp. 3d at 33. Mr. Seldon asserts that he has "kept abreast of hourly rates and staffing practices by other firms engaged in complex litigation," that he is intimately aware of the billing rates of local large firms because of his

previous experience as a partner in one of these firms, and that his billing rates are "far less than the rates charged by private firms in other fields of private litigation that are no more or less complex." Seldon Decl. I ¶¶ 56–68. Similarly, Mr. Davidson states that the rates sought by Mr. Craig are "well within the reasonable range of rates for a firm undertaking matters of the complexity of those involved here." Davidson Decl. ¶ 12.

These declarations lay the foundation for Mr. Craig's submission of the NLJ's 2016 and 2017 annual surveys of law firm billing rates, which capture the billing rates of large, national, corporate law firms in Washington, D.C. *See* Davidson Decl. Ex. B. As Mr. Davidson notes, Mr. Seldon's *Salazar*/LSI Matrix rate of $895 is within $100 of the average partner rates in the NLJ's surveys—$794 in 2016 and $892 in 2017—and it is lower than the high-end partner rates in those surveys—$945 in 2016 and $1160 in 2017. Davidson Decl. Ex. B. However, the court is not persuaded that these surveys reflect the prevailing market rate in Washington, D.C. for the type of complex federal litigation undertaken in this case.

The Court's skepticism arises primarily from the fact that the data in the NLJ's surveys is drawn only from the nation's largest commercial law firms.[35] *See* Davidson Decl. Ex. B (listing rates charged by attorneys at "big law" firms such as Hogan Lovells, Jones Day, and Wilmer Cutler Pickering Hale & Dorr). First, large commercial firms charge high fees in part because they have significant overhead, staffing, and rent expenses; the types of costs not faced to the

---

[35] The Court is also skeptical that the rates listed in the surveys reflect the rates actually collected by the surveyed firms. *See CREW*, 80 F. Supp. 3d at 5 (noting that "[s]urveys of 'standard' billing rates also overlook the fact that clients rarely pay those rates" because "[f]irms frequently discount their standard rates and, even after discounting, lower the effective rate further by writing off a portion of their billed hours to reflect attorney inefficiency and other considerations," not to mention that "firms do not always collect 100 percent of the fees they ultimately bill"). The Court has no confidence that the surveyed firms have any incentive to provide accurate information to be publicized by the NLJ.

same extent by smaller for-profit firms in the region. *See Gatore*, 286 F. Supp. 3d at 41–42 (crediting Dr. Malowane's assertion that rates are likely to be higher at large law firms because "small firms generally are able to offer services at lower fees due to lower overhead, and larger multinational firms may be able to command higher fees due to, among other reasons, an offering of more services, having a better national or international reputation, having the capacity to take on bigger or more complicated matters, or being located in a higher rent and higher profile area of the region" (internal quotation marks omitted)).

Second, despite Mr. Davidson's assertion that that large corporate firms, such as his firm, represent defendants in employment cases, and that the hourly rates charged for this work "are similar to those rates charged by comparably experienced attorneys in other types" of federal litigation, Davidson Decl. ¶ 14, Mr. Craig has not demonstrated that the large firms included in the NLJ's surveys charge their rates in "comparable cases" to Mr. Craig's action here. *Makray*, 159 F. Supp. 3d at 33. Other than on a pro bono basis, a firm like Jones Day or Hogan Lovells has never represented either a plaintiff or an employer in a single-plaintiff employment case before the undersigned, and Mr. Craig has presented no evidence contradicting this experience. Those firms' rate structures do not appear to make sense in most single-plaintiff cases. In assessing market rates and awarding a fee that is "adequate to attract competent counsel, but that does not produce windfalls to attorneys," the Court cannot ignore what the market seems to reveal in the real world. *Makray*, 159 F. Supp. 3d at 30 (internal quotation marks omitted) (quoting *West*, 717 F.3d at 1033). For this reason, courts in this District have been reluctant to grant *Salazar*/LSI rates based solely on data pulled from large commercial firms. *See Gatore*, 286 F. Supp. 3d at 41–42 (stating that NLJ survey data is "unreliable because [it] heavily rel[ies] on rates from attorneys at some of the nation's largest law firms," and listing cases exhibiting

similar skepticism); *DL*, 267 F. Supp. 3d at 70 (stating that "reliance on [NLJ] surveys has been

called into question by other courts," and listing additional decisions from within this District).[36]

Moreover, Dr. Malowane's declaration includes law firm data that seems to suggest that

the *Salazar*/LSI Matrix rates are higher than the prevailing market rates in this region.  For

instance, Table 2 of Dr. Malowane's declaration compares the USAO Matrix rates and

*Salazar*/LSI Matrix rates to the rates compiled by ALM's 2014 Survey of Law Firm Economics,

and it indicates that the *Salazar*/LSI Matrix rates are far above the highest ten percent of billing

rates in the ALM survey.  *See* Malowane Decl. ¶ 17 (indicating that in 2014, the average hourly

rate for the highest-billing ten percent of attorneys across the nation with at least thirty-one years

of experience was $570, while the *Salazar*/LSI Matrix rate for that category was $796 and the

USAO Matrix rate was $568).  While it may be true that the data compiled by the ALM surveys,

including the data underlying the USAO Matrix, "includ[es] . . . rates charged by attorneys

across all practice areas," which "significantly undermines the degree to which [they] fairly

reflect[] rates charged by attorneys engaged principally in complex federal litigation[,]" *Makray*,

159 F. Supp. 3d at 51; *see also EPIC v. DHS*, 218 F. Supp. 3d 27, 49 (D.D.C. 2016); *Malowane*

Decl. ¶ 17 n.11 (noting that the ALM survey includes rates for litigation specialties including

---

[36] While another court in this District stated in *Makray* that "differentiation [between the prevailing rates for larger and smaller firms] has been explicitly rejected by the Supreme Court and the D.C. Circuit," *Makray*, 159 F. Supp. 3d at 52 (alteration in original) (citation omitted), this Court follows *Gatore* in concluding that the relevant Supreme Court and D.C. Circuit decisions merely stand for the principle that a Title VII plaintiff's counsel should be compensated at the "prevailing market rate" charged by private for-profit firms, regardless of whether that counsel is a nonprofit counsel who does not typically bill clients, or a private counsel who typically charges "reduced rates reflecting non-economic goals."  *SOCM*, 857 F.2d at 1524; *see also Gatore*, 286 F. Supp 3d at 42 n.14.  While this Court does not believe that public interest attorneys should be penalized for their lack of a profit motive, it also does not believe that they should receive the windfall of the rates charged only by the nation's largest, full-service commercial law firms, rather than rates more in line with those typically charged by both large and small private, for-profit firms for complex federal litigation in this market.

family law, insured defense, and employee benefits), those surveys at least include a mix of large and small law firms, and thus are more likely to capture the overall mix of rates in this region. The Court concludes that the government's filings have sufficiently rebutted Mr. Craig's additional evidence in support of the *Salazar*/LSI Matrix rates.

### c. *Recent Case Law Supports Application of the USAO Matrix*

Finally, Mr. Craig attempts to provide "evidence of recent fees awarded by courts or through settlement to attorneys with comparable qualifications handling similar cases." *Makray*, 159 F. Supp. 3d at 33 (quoting *Eley*, 793 F.3d at 101). Mr. Craig ascribes considerable weight to the fact that Mr. Seldon himself has received *Salazar*/LSI Matrix rates for successful Title VII verdicts. *See* Fee Mot. at 22, 38 (referencing *Makray* and *Roman*). While these previous fee awards certainly indicate that the *Salazar*/LSI Matrix rates may be reasonable, they do not represent the slam dunk argument that Mr. Craig apparently believes them to be. *See* Fee Mot. at 44 (stating that it "would be an impossible task" for the government to rebut Mr. Craig's evidence in support of the *Salazar*/LSI Matrix, in light of *Makray* and *Roman*). In the *Roman* filings, there is no indication that the government put forth the more recent USAO Matrix as an alternative to the *Salazar*/LSI Matrix, and the *Makray* court did not consider the USAO Matrix. *See Makray*, 159 F. Supp. 3d at 49–50 (distinguishing the *Salazar*/LSI Matrix from the previous USAO *Laffey* Matrix). These prior awards thus do not reflect a judgment that the *Salazar*/LSI Matrix more accurately reflects the prevailing market rate for Mr. Seldon's services. Similarly, while the D.C. Circuit recently observed that the *Salazar*/LSI Matrix provides a "conservative" estimate of the prevailing market rate for Title VII litigation, *Salazar*, 809 F.3d at 65, it too has

not yet considered whether the USAO Matrix provides a more accurate estimate of the prevailing market rate, considering that Matrix's advantages laid out above.[37]

Furthermore, courts in this District that have considered the two matrices at issue here have determined that the USAO Matrix is a more appropriate measure of the prevailing market rate. *See Wadelton v. U.S. Dept of State*, No. 13-0412, 2018 WL 4705793, at *12 (D.D.C. Sept. 30, 2018) (applying the USAO Matrix where "[t]he changes to the matrix, as well as the more recent survey data used to develop its rates, indicate that the 2015 version provides a more a useful starting point" compared to the *Salazar*/LSI Matrix (citation and internal quotation marks omitted)); *Gatore*, 286 F. Supp. 3d at 37 (holding that the defendant in a FOIA action showed "that the current USAO Matrix is the more accurate matrix for estimating the prevailing rates for complex federal litigation in this District"); *DL*, 267 F. Supp. 3d at 70 (holding that the defendant "submitted evidence showing that the USAO Matrix had more indicia of reliability and more accurately represents prevailing market rates" than the *Salazar*/LSI Matrix); *Clemente*, 2017 WL 3669617, at *5 (applying the USAO Matrix because it "specifically measures rates in the legal services industry, and is based on much more current data than the *Salazar* Matrix"); *Nat. Sec. Counselors*, 2017 WL 5633091, at *18 (applying the USAO Matrix where the plaintiff primarily addressed only the previous USAO *Laffey* Matrix, and therefore "did not meet his burden for demonstrating that the [*Salazar*/LSI Matrix] is superior" to the USAO Matrix); *but see Hernandez v. Chipotle Mexican Grill, Inc.*, 257 F. Supp. 3d 100, 115 (D.D.C. 2017) (applying the *Salazar*/LSI Matrix where the defendant failed "to provide any actual evidence that the [*Salazar*/LSI Matrix] rate is unreasonable in the context of any complex federal litigation . . .

---

[37] This issue is currently pending before the Circuit. *See* Notice of Appeal, *DL*, No. 18-7004 (D.C. Cir. Jan. 10, 2018).

providing no affidavits or declarations of its own, no surveys of any rates charged in the Washington, D.C. legal market, no economic analyses of the prevailing market rate, or even examples of the rates charged by its own counsel for similar cases").  Mr. Craig has cited to no case in which a court in this District considered the evidence for and against the *Salazar*/LSI Matrix and the USAO Matrix and concluded that the *Salazar*/LSI Matrix more accurately captures the prevailing market rate.

*       *       *

For the reasons stated above, the Court concludes that while Mr. Craig has submitted evidence to support his argument that the *Salazar*/LSI Matrix should dictate a portion of his attorneys' fees, the government has rebutted that evidence with its own evidence that the USAO Matrix more accurately reflects the prevailing market rate for complex federal litigation of the type undertaken in this action.  *See Salazar*, 809 F.3d at 64.  Accordingly, the Court holds that the USAO Matrix dictates the reasonable hourly rates for work done by Seldon Bofinger's attorneys.

Typically, courts award fees at hourly rates based on the year in which the work was completed; historical rates rather than current rates.  *See, e.g.*, *Reed v. District of Columbia*, 134 F. Supp. 3d 122, 136–37 (D.D.C. 2015), *rev'd in part on other grounds*, 843 F.3d 517 (D.C. Cir. 2016).  However, to account for delays in payment of attorneys' fees, courts occasionally award (1) pre-judgment interest on fee awards, or (2) fees from past years at current hourly rates.  *See, e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989) ("An adjustment for delay in payment [i.e. applying current rates] is . . . an appropriate factor in the determination of what constitutes a reasonable attorney's fee"); *West*, 717 F.3d at 1034 ("If compensation for delay is necessary to provide a reasonable fee, it may be made 'either by basing the award on current rates or by

adjusting the fee based on historical rates to reflect its present value.'" (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 556 (2010)); *Craig*, 197 F. Supp. 3d at 277 n.6 (applying the current hourly rate to past attorney work to compensate for a delay in payment in a Title VII case).

Here, Mr. Craig appears to request fees at current billing rates, even for past work, Fee Mot. at 23, a request the government seems to believe is unreasonable, Fee Opp'n at 10–11. While Mr. Craig does not support his request with any case law or explanation, this Court concludes that Mr. Craig's counsel is entitled to "some compensation for delay" in the resolution of this action. Fee Opp'n at 7. Mr. Craig initiated this lawsuit on August 6, 2014, and the matter did not go to trial until April 9, 2018, nearly 44 months later. *See Tridico v. District of Columbia*, 235 F. Supp. 3d 100, 107 n.7 (D.D.C. 2017) (declining to apply current billing rates to the plaintiffs' counsel's past legal work where "[a]t approximately 19 months, the resolution of [the plaintiffs'] lawsuit was expeditious, as compared to other civil lawsuits that were resolved at trial in this district"). The Court accordingly concludes that "compensation for delay is necessary to provide a reasonable fee," and the Court will award fees at the 2017–2018 USAO Matrix rates for all past work undertaken by Seldon Bofinger's attorneys, based on those attorneys' years of experience during the trial, subject to additional reductions imposed below. *West*, 717 F.3d at 1034.

### 2. Hours Reasonably Expended

Having determined that the USAO Matrix should govern the hourly rates for Mr. Craig's current counsel, Seldon Bofinger, the Court turns to the reasonableness of the hours expended by that counsel. As noted, Mr. Craig asserts that Seldon Bofinger billed 100 hours on the EEO complaint stage ($43,871.74 in fees); 1,607 hours from the complaint through trial ($553,125.00

in fees);[38] 130 hours on equitable relief briefing ($74,660.30 in fees); and 150 hours on

attorneys' fees briefing ($87,393.30 in fees); and that his former counsel billed 80 hours on the

EEO complaint stage ($13,141.39 in fees).  The government argues that the Court should reduce

Mr. Craig's requested fees because (1) the number of hours billed is excessive for the work done,

Fee Opp'n at 13–18; and (2) the fees requested are unreasonable considering Mr. Craig's limited

success, *id*. at 18.  Addressing each argument in turn, the Court concludes that certain downward

adjustments are warranted.

### a. Reduction in Fees for Excessive Billing

First, the Court addresses the government's argument that Mr. Craig's fee award should

be reduced because Seldon Bofinger worked an unreasonable number of hours on his case.[39]  In

making fee determinations, "courts should exclude 'hours that were not reasonably expended,'

*i.e.*, 'excessive, redundant, or otherwise unnecessary' hours."  *DL*, 267 F. Supp. 3d at 74

(quoting *Hensley*, 461 U.S. at 434).  Fee reductions may be appropriate to compensate "for

inadequate billing judgment, for hours billed unrelated or unnecessary to the litigation, for

statutorily non-reimbursable time, or for double-billing."  *Shaw v. District of Columbia*, 210 F.

Supp. 3d 46, 51 (D.D.C. 2016) (internal citations omitted).  "In addition, tasks that are clerical in

nature, such as filing documents, setting up meetings, and faxing documents, are non-

compensable."  *DL*, 267 F. Supp. 3d at 74 (citing *Beckwith v. District of Columbia*, 254 F. Supp.

3d 1, 4–6 (D.D.C. 2017)).  Moreover, where "[a] pleading-by-pleading examination of the

copious files in [a] case would be unnecessarily burdensome[,]" the Court has discretion to

---

[38] As noted, the Court is applying lower hourly rates to these hours than the rates sought in Mr. Craig's fee motion.

[39] Although, as noted, multiple attorneys from Mr. Seldon's firm billed time to this action, for simplicity's sake in this section the Court will consider all hours to have been billed by Mr. Seldon.

"simply reduc[e] the proposed lodestar fee by a reasonable amount without performing an item-by-item accounting." *Copeland v. Marshall*, 641 F.2d 880, 903 (D.C. Cir. 1980) (en banc) (internal quotation marks omitted).

The government challenges Mr. Seldon's recorded hours for several stages of the action. *See* Fee Opp'n at 15–18. It argues that the hours expended by Mr. Seldon on the EEO complaint stage, the complaint, certain pretrial briefs, the motions for partial and full equitable relief, and the fee petition are excessive and unreasonable. *Id.* The Court has reviewed Mr. Seldon's time entries with "special caution," given "'the incentive' that a government's 'deep pocket offers to attorneys to inflate their billing charges and to claim far more as reimbursement then would be sought or could reasonably be recovered from private parties.'" *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 47 n.13 (D.D.C. 2011) (quoting *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 941–42 (D.C. Cir. 1984)). Although the Court will not dissect each entry here, it "will discuss the [government's] challenges to the entries for" Mr. Craig's motions *in limine*, his motions for equitable relief, and his motion for fees "as illustrative of [the government's] concerns." *Craig*, 197 F. Supp. 3d at 281 (citing *Copeland*, 641 F.2d at 903 (noting that a court may avoid "[a] pleading-by-pleading examination")). It agrees that Mr. Seldon billed an excessive number of hours.

Mr. Craig requests fees for nearly 150 hours spent drafting and responding to motions *in limine*. *See* Fee Mot. Att. A-2, ECF No. 121-4 at 23–34. This time includes four hours spent drafting a memo listing anticipated motions *in limine*, *id.* at 23, and six hours assembling and reviewing prior motions *in limine*, *id.* at 24. As these entries suggest, Mr. Seldon has previously filed similar motions *in limine* in similar Title VII actions. For instance, in this action, Mr. Craig filed a motion *in limine* to exclude "the protected EEO activity of Mr. Craig," to prevent the

government from improperly "paint[ing] Mr. Craig as a 'claims minded' plaintiff."  Pl.'s First

Mot. Limine at 4–5, ECF No. 66.[40]  In *Makray*, Mr. Seldon also filed a motion *in limine* to

exclude the plaintiff's EEO complaint and other administrative activity, to similarly prevent "the

prejudicial effect of painting [the] plaintiff as litigious or 'claims-minded.'"  Pl.'s Mot. In Limine

at 4, *Makray*, No. 12-0520, ECF No. 38.[41]  The motion in this action raised substantially similar

arguments, and cited the same case law, as the motion filed in *Makray*, yet Mr. Seldon spent

approximately twenty hours drafting the motion in this action.  *See* Fee Mot. Att. A-2 at 24–25.

Considering Mr. Seldon's extensive experience with pretrial practice in Title VII cases, the Court

concludes that Mr. Seldon's time spent drafting Mr. Craig's motions *in limine* and opposing the

government's motions *in limine* was excessive.

      Mr. Craig also requests fees for over sixty hours drafting his equitable relief briefing.  *See*

*generally* Fee Mot. Att. A-3, ECF No. 121-5; Fee Reply Att. A-5, ECF No. 134-1.  Much of this

briefing consists of stating the court's standards for awarding equitable relief, summarizing the

relevant facts developed during the litigation, and requesting relief based on those facts.  *See*

Partial Inj. Mot. at 1–5 (identifying the "long-standing principles that guide a court in making an

award of equitable relief"); Inj. Mot. at 1–5 (same).  The briefs include little legal analysis that

would require extensive research and drafting.  Moreover, two pages of Mr. Craig's eleven-page

motion for full equitable relief were devoted to the same relief requested in Mr. Craig's motion

for partial equitable relief.  *See* Inj. Mot. at 6–8 (requesting that Mr. Craig be assigned a dual-hat

---

[40] As noted, when referencing Mr. Craig's briefs the Court cites to the page numbers automatically generated by ECF.

[41] This Court may take judicial notice of public filings in other cases in this District.  *Al–Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("A court may take judicial notice of facts contained in public records of other proceedings[.]" (citing *Covad Comms. Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

role).  Again, considering the relief sought here and Mr. Seldon's extensive experience with Title VII cases, Mr. Seldon's time spent on the equitable relief stage was excessive.

Finally, Mr. Craig requests fees for nearly 150 hours spent during the fee motion stage. *See generally* Fee Mot. Att. A-4, ECF No. 121-6; Fee Reply Att. A-6, ECF No. 134-1.  This time includes over fifty hours spent preparing Mr. Seldon's declaration.  *See* Fee Mot. Att. A-4. However, Mr. Seldon's declaration in this case is similar in many ways to his declaration submitted in *Makray*.  *See generally* Decl. of Robert C. Seldon, *Makray*, ECF No. 85-1.  And Mr. Craig's fee motion is similar in many ways to the fee motion filed in *Makray*.  *See generally* Fee Mot.; Pl.'s Petition Partial Award *Salazar*/LSI Rate, *Makray*, ECF No. 85.  While the "time reasonably devoted to obtaining attorneys' fees in the context of litigation where the court must be petitioned for such an award is itself subject to an award of fees," *Cobell v. Norton*, 231 F. Supp. 2d 295, 306–07 (D.D.C. 2002) (quoting *Envtl. Def. Fund v. EPA*, 672 F.2d 42, 62 (D.C. Cir. 1982)), one hundred hours' worth of fees for the preparation of Mr. Craig's fee motion would again be excessive, considering Mr. Seldon's experience in this area.  *See Robinson v. District of Columbia*, No. 15-444, 2018 WL 5266879, at *17 (D.D.C. Oct. 23, 2018) (granting the plaintiff's fees on fees request for forty hours); *McNeil v. District of Columbia*, 233 F. Supp. 3d 150, 162–63 (D.D.C. 2017) (granting the plaintiffs' fees on fees request for fifty hours).

In addition to debating the reasonableness of specific time expenditures by Mr. Seldon, both parties spend significant briefing space comparing the time spent in this action to the time spent by prevailing plaintiffs' attorneys in other Title VII actions.  For instance, to rebut the government's challenge to the reasonableness of the hours expended, Mr. Craig argues that because the number of hours expended during this litigation were approximately the same as the number of hours expended during *Makray* and *Roman*, the number of hours is "inherently

reasonable." Fee Mot. at 9. However, in both *Makray* and *Roman*, the plaintiff and the government agreed on the number of hours reasonably expended, and the courts in those cases did not evaluate the hours' reasonableness. *See Makray*, 159 F. Supp. 3d at 31 ("[T]he parties have stipulated to the total number of hours reasonably billed by the plaintiff's attorneys[.]"); Order Granting Motion for Entry of Final Judgment, *Roman*.[42] Similarly, the government argues that the "hours billed in this matter" are "excessive in comparison to some of the very cases that Plaintiff's counsel cites to in his fee request." Fee Opp'n at 14–15 (listing the number of hours expended by plaintiffs in various successful Title VII actions). While a comparison of hours expended across successful Title VII cases may provide some rough measure of reasonableness, as Mr. Craig's counsel acknowledges, "the amount of billable time needed in litigation to litigate varies from case to case." Seldon Decl. I ¶69 n.16. The Court declines to evaluate the reasonableness of the hours spent here based on hours spent in unrelated Title VII actions with their own idiosyncrasies.

To rebut the government's challenge to the reasonableness of the hours expended, Mr. Craig submitted a supplemental declaration by Mr. Seldon. *See* Seldon Decl. II. In addition to distinguishing the cases relied upon by the government discussed in the previous paragraph, this declaration primarily asserts that the hours expended in this action were reasonable in light of the government's vigorous litigation tactics and refusal to negotiate. *See id.* ¶¶ 24, 28–30. This

---

[42] The fact that the government previously stipulated to the number of hours reasonably expended, to avoid further litigation, does not preclude the government from challenging the hours expended in a later, unrelated case. *See, e.g., Makray*, 159 F. Supp. 3d at 43 ("[S]imply because the plaintiff's counsel in the past agreed to less generous compensation to avoid further litigation (and the accrual of additional attorneys' fees), does not preclude that counsel from seeking reimbursement for the actual value of his services."). The Court will not penalize the government for its previous settlement efforts; as noted below, such efforts would have been welcomed here.

argument is well taken; as Mr. Craig notes, "[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." Fee Reply at 25 (citing *Copeland*, 641 F.2d at 904).[43] That said, as discussed above, the Court finds that Mr. Seldon did spend an unreasonable amount of time on certain phases of this action. Because a "pleading-by-pleading examination of the copious files in this case would be unnecessarily burdensome[,]" the Court will reduce the overall "lodestar" fee by fifteen percent. *Id.* at 903.[44]

### b. Reduction in Fees for Lack of Success

Second, the Court must determine the degree to which Mr. Craig's attorneys' fee award should be reduced to account for Mr. Craig's limited success. The Court may make such a reduction, if warranted. *See Hensley*, 461 U.S. at 434–36 (explaining that when plaintiffs prevail on only some of their claims, "a fee award based on the [total] claimed hours" would be

---

[43] The Court is particularly vexed by the government's litigating position with respect to Mr. Craig's attorneys' fees. The government's refusal to stipulate to any aspect of the fee award, and its assertion that Mr. Craig is entitled to no more than $15,000 in fees, are patently unreasonable considering the vigor with which the government has litigated this case since its inception. *See* Fee Opp'n at 2; Def.'s Opp'n Pl.'s Mot. Award of Interim Att'y's Fees & Costs at 1–2, ECF No. 133. Had the government demonstrated a shade more rationality, the parties and this Court may have saved a significant amount of time and resources. Moreover, given that the government offered to stipulate to $15,000 in fees, its assertion that this Court should award that amount appears to be a negotiating position, rather than a proposed reasonable fee award. Fee Reply Att. G. "When a party submits a fee petition, it is not the 'opening bid in the quest for an award[,]'" *Clemens v. N.Y. Central Mutual Fire Ins. Co.*, 903 F.3d 396, 403 (3d Cir. 2018) (quoting *Fair Hous. Council of Greater Wash. v. Landow*, 999 F.2d 92, 97 (4th Cir. 1993)), and the same principle applies to a defendant responding to a fee petition. Just as this Court "may deny in its entirety a request for an 'outrageously unreasonable' amount [of attorneys' fees], lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place[,]'" *Environ. Def. Fund v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993) (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)), in the future this Court may be less inclined to reduce a fee award, should the government fail to suggest reasonable reductions.

[44] This reduction does not apply to time billed by Mr. Craig's former counsel on Mr. Craig's EEO complaints. That counsel's fee award is discussed below.

"excessive"); *Merrick v. Dist. of Columbia*, 316 F. Supp. 3d 498, 506 (D.D.C. 2018) ("Courts . . . have the discretion to reduce attorneys' fees awards to account for partial or limited success on the merits by either eliminating specific hours or reducing the award as a whole." (citing *Hensley*, 461 U.S. at 436–37)); *Craig*, 197 F. Supp. 3d at 283 (same). And both parties agree that a reduction is appropriate here. *See* Fee Mot. at 26 (stating that the final step in Mr. Craig's "calculation of a lodestar award was to take account of plaintiff's success in this case and make an overall reduction"); Fee Opp'n at 1. The parties do not agree, however, on the appropriate degree of reduction.

When determining how to reduce a fee award for a partially successful plaintiff, a court must analyze the relationships between the successful and unsuccessful claims. *See Hensley*, 461 U.S. at 434–35. If the plaintiff presented "distinctly different claims for relief that are based on different facts and legal theories," then "counsel's work on one claim will be unrelated to his work on another claim." *Id.* In cases with such "distinctly different claims," "no fee may be awarded for services on [any] unsuccessful claim[s]." *Id.* But if the plaintiff's claims "involve a common core of facts[,]" or are based on "related legal theories[,]" "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435. In cases with interrelated claims, the court should "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

The government makes two arguments for why Mr. Craig's fee award should be significantly reduced for lack of success. First, the government argues that Mr. Craig was unsuccessful on several claims unrelated to his successful claim, and therefore that Mr. Craig should not be awarded fees for work on those unsuccessful claims. Fee Opp'n at 18–19.

Second, the government argues that the overall relief obtained by Mr. Craig—$5,485 and minimal equitable relief—does not justify a fee award of approximately $700,000. *Id.* at 3–4. By contrast, Mr. Craig contends that all of his claims arose from the same core set of facts and his degree of success cannot be measured only by his relief at trial, considering the core equitable relief he seeks. *See* Fee Reply at 7, 12. The Court concludes that Mr. Craig's claims were sufficiently interrelated that a claim-by-claim reduction is only feasible for the EEO complaint stage. However, the Court also concludes that a downward fee adjustment is appropriate considering Mr. Craig's limited overall success.

### i. Claim-by-Claim Reduction

The government claims that Mr. Craig's fee award should be reduced on a claim-by-claim basis because Mr. Craig was only successful on one of his original claims, and while Mr. Craig "argues that virtually all of his claims were interrelated, this is not the case." Fee Opp'n at 18–19. As noted, fees may be reduced for time spent on ultimately unsuccessful claims, but those claims generally must be both unsuccessful and unrelated to the successful claims. *See Hensley,* 461 U.S. at 434-35. Claims are completely unrelated when they are "distinctly different in all respects, both legal and factual, from [the] plaintiff's successful claims." *Radtke v. Caschetta*, 254 F. Supp. 3d 163, 175 (D.D.C. 2017) (internal quotation marks omitted) (quoting *Morgan v. D.C.,* 824 F.2d 1049, 1066 (D.C. Cir. 1987)). In such circumstances, a court should not award fees for the time spent on the unsuccessful claims. *Craig*, 197 F. Supp. 3d at 283. However, when claims "involve a common core of facts" or are "based on related legal theories," "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* (quoting *Hensley*, 461 U.S. at 435). Under those circumstances, "the district court should focus on the

significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435.

Having reviewed the record and overseen this case from its inception through trial and beyond, the Court concludes that only Mr. Craig's EEO complaints may be addressed on a claim-by-claim basis. Mr. Craig filed at least four administrative EEO complaints before bringing this action. *See* Fee Opp'n Ex. E, ECF No. 130-5 (collecting Mr. Craig's EEO complaint declarations). Of these complaints, only one of them, 13-0024, focused on Mr. Craig's placement and treatment in the Executive Lead position; the claim for which Mr. Craig was ultimately successful at trial. *See id*. at 1. The other EEO complaints asserted claims that were ultimately unsuccessful, arising from Mr. Craig's non-selection to the A/D Manufacturing position in 2008 and 2014, *see id*. at 20, 53 (13-0661 & 14-0762), Mr. Craig's year-end reviews and bonus awards, *see id*. at 35, 76 (14-0311 & 15-1466), and other position changes not directly related to his assignment to the Executive Lead, *see id*. at 72 (claiming that the Mint's decision to alter Mr. Craig's reporting structure was discriminatory and retaliatory).

Mr. Craig argues that the EEO complaints arose from a common core of facts, all of which were necessary to his trial victory, and therefore that the Court cannot analyze them on a claim-by-claim basis. Fee Mot. at 28. For instance, Mr. Craig argues that the EEO complaints related to his non-selection to the A/D Manufacturing position involved facts that "would have been offered at trial" in pursuing his successful claim because they showed that the Executive Lead position harmed Mr. Craig's career prospects. *Id*. Similarly, Mr. Craig argues that the facts underlying his unsuccessful EEO complaint challenging his 2014 year-end performance bonus were "essential" because they showed that Mr. Craig did not have classified duties as the

Executive Lead. *Id*. at 29. Mr. Craig also notes that he pursued very little discovery with respect to his claims arising from unsuccessful EEO complaints. *Id*. at 28–29.

However, even if Mr. Craig's unsuccessful EEO complaints arose from facts that were ultimately used to support his successful claim before this Court, Mr. Craig has not demonstrated why time spent on those EEO complaints at the administrative stage should not be discounted. Presumably, had Mr. Craig only pursued his Executive Lead-related claim, the facts necessary for him to succeed on that claim would have emerged through discovery, regardless of whether Mr. Craig filed other EEO complaints related to those facts. In other words, Mr. Craig would be allowed discovery on those issues if relevant to his successful claim without the need to have independently administratively exhausted specific EEO complaints based on those issues.

Accordingly, because only one of Mr. Craig's administrative EEO complaints was successful, the Court concludes that Mr. Craig is only entitled to attorneys' fees for that complaint. It appears that Mr. Craig's prior counsel primarily worked on Mr. Craig's successful EEO complaint, so the Court will not reduce that counsel's fees on a claim-by-claim basis. *See* Fee Mot. Att. C, ECF No. 121-8; Seldon Decl. ¶ 75 n.18. On the other hand, Mr. Craig's current counsel worked on each of Mr. Craig's EEO complaints, and Mr. Craig has helpfully categorized his time entries for this stage of the litigation by EEO complaint. *See* Fee Mot. Att. A-1, ECF No. 121-3. The Court holds that Mr. Craig is only entitled to attorneys' fees for time spent on the successful EEO complaint, which Mr. Seldon contends was 31.5 hours. Seldon Decl. ¶ 76.

While Mr. Craig's EEO complaints may be addressed on a claim-by-claim basis, Mr. Craig's claims litigated before this Court arose from a "common core of facts," and thus were too closely intertwined for the Court to reduce Mr. Craig's fee award on a claim-by-claim basis. *Hensley*, 461 U.S. at 435. The claims dismissed at the motion to dismiss and motion for

summary judgment stages involved the same core set of facts underlying the claims that reached the trial stage; facts related to the timing of Mr. Craig's EEO complaints compared to the timing of certain personnel decisions, and the Mint's proffered reasons for those personnel decisions (whether allegedly based on race or retaliation). For instance, the government successfully moved for summary judgment on Mr. Craig's discrimination claims arising from his assignment to the Executive Lead position, his non-selection for the A/D Manufacturing position in 2014, and his assignment to the A/D ESH position, but his retaliation claims arising from those actions, which turned on the same set of facts and whether the Mint's stated reasons for its actions were pretextual, survived to trial. *Craig II*, 278 F. Supp. 3d at 66–68, 75. Similarly, while Mr. Craig's claims arising from his non-selection to the A/D Manufacturing position in 2008 and 2014 and his reassignment out of the A/D SAM position in 2012 were ultimately unsuccessful, the facts underlying those claims were necessary to show that Mr. Craig's assignment to the Executive Lead position was harmful to his career prospects because it resulted in a significant reduction in his responsibilities and authority. *See* Fee Mot. at 35–36; Fee Reply at 7–9.

Considering the "overlapping factual issues and related legal theories" that form the foundation of Mr. Craig's action, the time that Mr. Craig's counsel spent on the unsuccessful claims "undoubtedly contributed to the litigation of [his]" successful retaliation claim. *Craig*, 197 F. Supp. 3d at 197 (citing *Hensley*, 461 U.S. at 435 n.11 (disapproving of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon" (internal quotation marks omitted))). Because much of Mr. Craig's counsels' time was devoted to litigating the case as a whole, the Court will not attempt to parse Mr. Craig's time records to reduce the fee award based on time spent on unsuccessful claims. Rather, it will evaluate Mr. Craig's overall degree of success.

### ii. Overall Reduction

Having determined that a claim-by-claim reduction is mostly impractical, the Court must determine the extent to which Mr. Craig's fee award should be reduced for his overall lack of success. As noted, "[t]here is no precise rule or formula for making [fee] determinations . . . . The court necessarily has discretion in making this equitable judgment." *Hensley*, 461 U.S. at 436–37. Accordingly, the Court will consider the relief obtained by Mr. Craig in comparison to the relief sought—both monetary and equitable—without applying a rigid mathematical approach. *See Radtke*, 254 F. Supp. 3d at 171 ("[F]ees awarded need not necessarily be proportionate to the amount recovered by the prevailing party, and should not be reduced solely to achieve proportionality." (citations omitted)).

The government ascribes significant weight to the fact that the attorneys' fee award sought by Mr. Craig is 143 times larger than Mr. Craig's damages award. Fee Opp'n at 20. However, as even the government admits, Fee Opp'n at 22, simply because an attorneys' fee award is greater than the damages and injunctive relief awarded does not automatically make that fee award excessive. *See Thomas v. Nat'l Football League Players Ass'n,* 273 F.3d 1124, 1129 (D.C. Cir. 2001) ("That the fees awarded are . . . nearly five times the amount of plaintiff's recovery does not make them excessive." (internal quotation marks omitted)). "There is, of course, no mathematical rule requiring proportionality between compensatory damages and attorneys' fees awards, and courts have awarded attorneys' fees where plaintiffs recovered only nominal or minimal damages." *Thompson v. Int'l Ass'n of Machinists & Aerospace Workers,* 664 F. Supp. 578, 581 (D.D.C. 1987) (citation omitted). As acknowledged by another court in this District, "the use of the lodestar approach will, at times, necessitate fee awards that exceed the aggregate recovery to their clients." *Driscoll v. George Washington Univ.*, 55 F.

Supp. 3d 106, 113–14 (D.D.C. 2014). But "[t]his is no reason to reduce fee awards given the policy objectives of fee-shifting statutes." *Radtke*, 254 F. Supp. 3d at 172.

On the other hand, the difference between the relief obtained by a plaintiff and the relief sought by that plaintiff is a key factor in determining the proper success-based fee reduction. *See Radtke*, 254 F. Supp. 3d at 173 ("District courts should consider the disparity between the amount of damages sought versus the amount of damages ultimately awarded." (citing *Combs v. City of Huntington, Texas,* 829 F.3d 388, 395–96 (5th Cir. 2016)). This evaluation should account for both monetary and equitable relief sought and obtained. *See Hensley,* 461 U.S. at 455 n.11 ("[A] plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time."). "Thus, '[a]lthough a substantial disproportionality between a fee award and a verdict, standing alone, may not justify a reduction in attorney's fees, a lack of litigation success will.'" *Radtke*, 254 F. Supp. 3d at 173 (quoting *McAfee v. Boczar,* 738 F.3d 81, 94 (4th Cir. 2013)).

And Mr. Craig's counsel ultimately secured a very limited portion of the monetary and equitable relief sought. First, as the government notes, Fee Opp'n at 22, Mr. Craig's complaint sought compensatory damages, which are statutorily capped at $300,000, 42 U.S.C. § 1981a(b)(3), yet Mr. Craig only obtained $5,485 in compensatory damages at trial, Fee Opp'n at 3; *see also* Am. Compl. at 29; Fee Opp'n Ex. F, ECF No. 130-6 (collecting Mr. Craig's requests for relief attached to his EEO complaints). Second, Mr. Craig's complaint sought backpay "in the amount of the difference of a performance based bonus . . . for [fiscal year] 2012 and a Fully Successful bonus," Am. Compl. at 29, and the Court's summary judgment decision in favor of the government prevented Mr. Craig from receiving that relief, *Craig II*, 278 F. Supp. 3d at 57–

59. Third, and perhaps most importantly, while the Court does not believe that the core relief sought by Mr. Craig was, as the government asserts, a promotion to the A/D Manufacturing position, Fee Opp'n at 21, Mr. Craig himself states that the core relief sought was "equitable relief to protect his career and allow him to move forward without the anchor of having been sidelined in a meaningless position for a year and a half around his neck." Fee Reply at 14. The Court is sympathetic to Mr. Craig's harm but, as discussed above, it is not granting the key equitable relief sought in multiple motions; installation in a dual hat, "career enhancing" role. *See generally* Partial Inj. Mot.; Inj. Mot; *see also Mazloum v. District of Columbia*, 654 F. Supp. 2d 1, 4 (D.D.C. 2009) (reducing the plaintiff's requested fees because the plaintiff "was wholly unsuccessful on his primary discrimination claim"). And while holding the Mint accountable for conduct that a jury found illegal is an important contribution to the public interest, Fee Reply at 14–15, that contribution does not outweigh the fact that Mr. Craig's counsel was unable to obtain for him a large portion of the relief sought.[45]

In urging the Court to reduce the fee award by only approximately 26 percent, Mr. Craig relies heavily on this Court's prior holding in *Craig*. While that case illustrates the analytical

---

[45] The government cites several cases in which a court in this District reduced a plaintiff's fee award because (1) the plaintiff prevailed on only a small fraction of the claims brought, or (2) the relief obtained was significantly less than the relief sought. Fee Opp'n at 14–15, 22–26 (citing *Thomas,* 273 F.3d at 1129; *Tridico*, 235 F. Supp. 3d at 108–11; *Medina v. District of Columbia*, 864 F. Supp. 2d 13, 22 (D.D.C. 2012); *Mazloum*, 654 F. Supp. 2d at 2–5; *David v. District of Columbia*, 489 F. Supp. 2d 45, 49–52 (D.D.C. 2007); *Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156–61 (D.D.C. 2006); *Mintzmyer v. Babbitt*, No. 93-773, 1996 WL 294252, at *4 (D.D.C. May 29, 1996)). While these cases may be factually distinguishable in certain respects from Mr. Craig's action, *see* Fee Reply at 17–22, they stand for the basic proposition that a court may reduce a fee award to account for time spent on unsuccessful claims unrelated to the successful claims, or to account for the plaintiff's overall lack of success. *See Hensley*, 461 U.S. at 434–36. They also show that courts have broad discretion to impose reductions on a case-by-case basis depending on the posture, facts, and procedural history of a given case.

framework governing a success-based fee reduction, it is factually inapposite here. In *Craig*, this Court recognized that while the plaintiff only succeeded on "one claim of the numerous claims initially pressed," she prevailed on her "central claim," and the dismissal of other claims and defendants "did not materially reduce the damages or remedies that [she] was able to seek, and that she ultimately obtained, at trial." *Craig*, 197 F. Supp. 3d at 283–84. Moreover, the plaintiff obtained a successful verdict on every claim that reached trial. *Id*. at 284. Here, on the other hand, Mr. Craig did not obtain the core relief sought—a retroactive promotion to a "career enhancing" position—and Mr. Craig's failure to obtain successful verdicts related to his non-selection to the A/D Manufacturing position and his reassignment from the A/D SAM position reduced his ability to receive a "promotion" to one of those positions as part of his equitable relief. Additionally, Mr. Craig was successful on only one of three claims at trial. *See* Jury Verdict.

Mr. Craig also argues that the Court should not reduce his counsels' fees incurred during the equitable relief and attorneys' fees stages because the "equitable relief Mr. Craig is seeking is tailored to his success at trial." Fee Mot. at 37. However, Mr. Craig cites no case law in support of this argument. And it is well established that attorneys' fee awards for both fee motions, *see Gatore*, 286 F. Supp. 3d at 50; *EPIC v. DHS*, 982 F. Supp. 2d 56, 64 (D.D.C. 2013), and equitable relief motions, *see Robinson*, 2018 WL 5266879, at *15, may also be reduced for lack of success. Such reductions are appropriate here, where Mr. Craig's counsel failed to obtain the primary equitable relief sought and failed to obtain the full measure of attorneys' fees sought.

In summary, Mr. Craig obtained less than ten percent of the compensatory damages the jury could have awarded, and he obtained roughly half of the equitable relief sought, albeit not the core relief of a "career enhancing" dual hat role. However, the jury's verdict did vindicate

Mr. Craig's rights, and that verdict may deter the agency from similarly retaliating against other Mint employees.  Accordingly, because Mr. Craig obtained less than half of the total relief sought, the Court concludes that a sixty-five percent reduction of Mr. Craig's fee award is necessary to reflect "the significance of the overall relief obtained by [Mr. Craig] in relation to the hours reasonably expended on the litigation."  *Hensley*, 461 U.S. at 435; *see also Radtke*, 254 F. Supp. 3d at 175 ("Given plaintiffs lack of success on two major issues that would otherwise have greatly increased their damages, the Court finds that a downward departure is warranted.").[46]

### 3.  Costs

Mr. Craig also requests reimbursement for $11,660.04 in costs, to which the government does not object, and $8,853.20 in expert fees for Mr. Davidson's services.  *See* Fee Mot. at 10; Fee Reply at 27; Fee Mot. Att. B; Seldon Decl. II ¶ 59.  "An award of costs for copying, faxing and postage . . . [is] customarily included in fees awards." *Kaseman v. District of Columbia*, 329 F. Supp. 2d 20, 28 n.7 (D.D.C. 2004); *see also Sexcius v. District of Columbia*, 839 F. Supp. 919, 927 (D.D.C. 1993) (noting that "[r]easonable photocopying, postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable 'attorney's fee'").  Such costs are only shifted to the defendant if they are reasonable, *see Bailey v. District of Columbia*, 839 F. Supp. 888, 892 (D.D.C. 1993), and if they are "related *nontaxable* expenses."  Fed. R. Civ. P. 54(d)(2)(A) (emphasis added).  Moreover, Title VII explicitly allows for an award of "reasonable . . . expert fees."  42 U.S.C. § 2000e-5(k).

---

[46] This reduction applies to work done by Mr. Craig's current and former counsel on the successful EEO complaint, in addition to work done during the litigation and post-trial stages.

While Mr. Craig requests reimbursements for nontaxable expenses—such as transportation costs, meals, and printing—he also appears to request reimbursement for taxable expenses. Fee Mot. at 49–50 ("Several [costs] may be taxable and therefore need not be part of a fee petition"); Fee Mot. Att. B. Under 28 U.S.C, § 1920 and Local Rule 54.1(d), "Clerk's fees," deposition transcripts, witness fees, costs of subpoena service, and certain other reimbursable items are taxable by the Clerk upon receipt of a bill of costs submitted on a court-approved form. LCvR 54.1(a) & 54.1(d). Mr. Craig seeks reimbursement for, among other taxable expenses, a filing fee, a deposition transcript, and witness fees. Fee Mot. Att. B. Although these line items appear to be taxable expenses that must normally be submitted through a bill of costs, because the government does not contest Mr. Craig's costs the Court will award them without requiring this extra step. *See* Fee Opp'n at 2 n.1 (stating that the government "does not seek a reduction" of Mr. Craig's request for costs).

While the government concedes Mr. Craig's request for costs, it has not had the opportunity to challenge Mr. Craig's request for Mr. Davidson's expert fees. Mr. Davidson was retained to support Mr. Craig's argument for the application of *Salazar*/LSI billing rates, an argument that was ultimately unsuccessful. Fee Mot. at 23. Accordingly, the Court will exercise its discretion to consider Mr. Craig's success when awarding attorneys' fees and costs, and it will deny Mr. Craig's request for expert fees associated with his unsuccessful argument regarding the prevailing market rate for Mr. Seldon's services. *See Hensley*, 461 U.S. at 436–37; *see also Westfahl v. District of Columbia*, 183 F. Supp. 3d 91, 102 (D.D.C. 2016) (denying the prevailing plaintiff's request for costs associated with the plaintiff's unsuccessful claims, and reducing the total cost award to reflect the plaintiff's overall success).

\*     \*     \*

For the reasons stated above, the Court holds that Mr. Craig is entitled to $307,000.28 in attorneys' fees for Seldon Bofinger's work, $4,599.49 in attorneys' fees for Mr. Craig's former counsel's work, and $11,660.04 in costs. This award is calculated as follows.

The Court applied the 2017-2018 USAO Matrix rates to Seldon Bofinger's billable hours from the action's inception through trial. The Court applied the rates corresponding to the relevant attorneys' years of experience as of the April 2018 trial. The following chart summarizes the Court's calculation.[47]

| Attorney | Years of Experience (April 2018) | USAO Matrix Rate | Hours | Fee |
|---|---|---|---|---|
| Robert Seldon | 31+ | $602.00 | 753.5 | $453,607.00 |
| Charlene Bofinger | 31+ | $602.00 | 129.3 | $77,838.60 |
| Molly Buie | 15 | $483.00 | 617.7 | $298,349.10 |
| Lauren Drabic | 6 | $352.00 | 19.1 | $6,723.20 |
| Kirby York | Paralegal | $164.00 | 87.8 | $14,399.20 |
| **Totals** | | | **1607.40** | **$850,917.10** |

---

[47] Mr. Craig helpfully summed the hours expended by each Seldon Bofinger attorney on this stage of the litigation. Fee Mot. at 24 n.15. In lieu of conducting a line-by-line analysis of Mr. Craig's time entries, the Court assumes the accuracy of this information, which the government has not contested. Mr. Craig's motion, however, does not list the hours expended by Kirby York on this stage. The Court calculated Ms. York's hours by subtracting the hours listed in Mr. Craig's motion for the other Seldon Bofinger attorneys from Mr. Craig's asserted total of 1,607.4 hours. *See id.* at 24.

The Court also applied the 2017-2018 USAO Matrix rates to Seldon Bofinger's billable hours expended on the ultimately successful EEO complaint, Mint No. 13-0024. *See* Seldon Decl. ¶ 76; Fee Mot. Att. A-1. The following chart summarizes the Court's calculation.

| Attorney | Years of Experience (April 2018) | USAO Matrix Rate | Hours | Fee |
|---|---|---|---|---|
| Robert Seldon | 31+ | $602.00 | 4.7 | $2,829.40 |
| Charlene Bofinger | 31+ | $602.00 | 26.8 | $16,133.60 |
| **Totals** | | | **31.50** | **$18,963.00** |

With these adjustments, Mr. Craig's fee award for Seldon Bofinger's work, without additional reductions, would have been $1,031,933.70. This award incorporates the following fees:

- Administrative stage: $18,963.00

- Litigation stage: $850,917.10

- Equitable relief stage: $74,660.30

- Attorneys' fees stage: $87,393.30

Finally, the Court reduced Mr. Craig's award by fifteen percent to account for excessive billing, and then reduced the award by another sixty-five percent to account for Mr. Craig's lack of success. Thus, the total award for Seldon Bofinger's work is **$307,000.28**. The Court also applied the sixty-five percent success reduction to work done by Mr. Craig's former counsel at the administrative stage, generating fees for that counsel of **$4,599.49**. Finally, as noted, the Court is granting Mr. Craig's unopposed request for **$11,660.04** in costs, but not his request for expert fees associated with his unsuccessful argument in favor of *Salazar*/LSI billing rates. The government shall promptly pay these awards.

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

1. Mr. Craig's Motion for Partial Equitable Relief (ECF No. 110) is **DENIED**.

2. Mr. Craig's Motion for Complete Equitable Relief (ECF No. 120) is **GRANTED IN PART** as follows:

   a. The Mint shall treat Mr. Craig's Executive Lead position as an Associate Director-level position, with Associate Director-level responsibilities and authority, for purposes of both internal personnel decisions and external, employment-related inquiries.

   b. The Mint shall alter the SF-52's, performance appraisals, and Performance Review Board materials in Mr. Craig's Official Personnel File so that they identify Mr. Craig as the A/D SAM, rather than as an Executive Lead, until Mr. Craig became the A/D ESH in 2014.

   c. The Mint shall submit to Mr. Craig an updated version of Mr. Craig's Official Personnel File within thirty days from this Memorandum Opinion's issuance.

3. Mr. Craig's Motion for an Award of Attorneys' Fees and Costs (ECF No. 121) is **GRANTED IN PART** as follows:

   a. Mr. Craig is awarded fees for his current counsel totaling **$307,000.28**.

   b. Mr. Craig is awarded fees for his former counsel totaling **$4,599.49**.

   c. Mr. Craig is awarded costs totaling **$11,660.04**.

4. Mr. Craig's Motion for an Interim Award of Attorneys' Fees (ECF No. 129) is **DENIED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 21, 2018                                    RUDOLPH CONTRERAS
                                                            United States District Judge